

**CV 12 – 3626**

RECEIVED
JUL 2 0 2012
PRO SE OFFICE

ORIGINAL

BRODIE, J.
BLOOM

SUMMONS ISSUED

2012 JUL 20 PM 2: 35
U.S. DISTRICT COURT
EASTERN DISTRICT
NEW YORK
FILED
CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X

KIM DE PRIMA,
       PLAINTIFF

vs.

CITY OF NEW YORK DEPARTMENT OF
EDUCATION,
       DEFENDANT.
-------------------------------------------------X

COMPLAINT
("JURY TRIAL DEMANDED")

COMES NOW THE PLAINTIFF, KIM DE PRIMA, and files this federal complaint against the DEFENDANTS, CITY OF NEW YORK DEPARTMENT OF EDUCATION and moves this honorable court in the United States District Court for the Eastern District of New York for a trial by jury at a time and place appointed by this honorable court.

JURISDICTIONAL STATEMENT

This action is brought pursuant to the 14th Amendment of the United States Constitution and the Equal Protection Clause of that Amendment. The action is brought pursuant to New York State Executive Law Section 296 (16) and New York Criminal Procedure Law Section 160.60. This action also arises under Title 28 U.S.C. Section 1331 and 1343.

PARTY ADDRESSES AND ACTION DATE

1. Plaintiff resides at 158 Willowbrook Road, Staten Island, New York 10302.

2. The Defendants have its place of business at 52 Chambers Street, Room 308 New York, New York 10007 and is represented in this action by Carlyne B. Tuner-Beverly who is an Agency Attorney for the New York City Department of Education. The phone number is 212-374-6044.

3. Plaintiff was terminated from her employment at P.S. 26 located in Staten Island within District 31 also known as the Carteret School.

4. Plaintiff asserts that the action complained of took place on November 11, 2011.

FIRST CAUSE OF ACTION:

Defendants have wrongfully and unlawfully terminated Plaintiff's employment in violation of federal law under the 14th Amendment, specifically her right to equal protection of the laws.

SECOND CAUSE OF ACTION:

Defendants have wrongfully and unlawfully terminated Plaintiff's employment under New York State Law which protected her from being discriminated against based on criminal charges which were never filed against her and which were required to be sealed, specifically New York Executive Law 296 (16) and New York Criminal Procedure Law 160.60.

THIRD CAUSE OF ACTION:

Defendants discriminated against Plaintiff because it sought her termination in two separate 3020(a) hearings and its attempts to terminate her were denied. On the third attempt, the Defendants unlawfully and wrongfully obtained Plaintiff's termination.

-------------------------------------------------------------------------------

**...URTH CAUSE OF ACTION:**

Defendants discriminated against Plaintiff based on the prior two 3020(a) hearings which demonstrate that none carried the penalty of termination.

**FIFTH CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff because the history of the prior 3020(a) hearings demonstrate that the instant 3020(a) hearing cited conduct of Plaintiff as questionable but in all other respects found her to be competent to continue teaching in her classroom.

**SIXTH CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff because the prior 3020(a) hearings demonstrate that Defendants deliberately, intentionally and with reckless disregard for the truth leveled arbitrary and capricious charges against the Plaintiff continuously in order to achieve her termination.

**SEVENTH CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff because after its prior attempts to terminate her were rebuffed by independent arbitrators, Defendants continued to file arbitrary and capricious charges against Plaintiff until it achieved her termination.

**EIGHTH CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff because it violated New York State Law by using information that it knew or should have known was barred from being used at the instant 3020(a) hearing.

**NINTH CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff because it commenced the instant 3020(a) hearing prior to resolution of the criminal allegations in order to specifically gain a tactical advantage over Plaintiff to achieve her termination.

**TENTH CAUSE OF ACTION:**

Defendants knew that if it commenced the 3020(a) hearing prior to the resolution of the criminal allegations, it could rely on the acts alleged to terminate Plaintiff, this violated the Plaintiff's rights to be treated equally and fairly under the law.

**ELEVENTH CAUSE OF ACTION:**

Defendants discriminated against Plaintiff and knew that it was discriminating against her when it sought and obtained Plaintiff's termination because it had sought her termination for conduct in a previous 3020(a) hearing that it felt she should be terminated for; but which an arbitrator found that she should not be terminated for.

**TWELFTH CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff because the Constitution requires under the 14 Amendment that the Defendants await the resolution of the criminal allegations before relying upon such allegations which comprised the conduct that were the subject of Plaintiff's termination.

**THIRTEENTH CAUSE OF ACTION:**

Defendants have not treated the Plaintiff equally and fairly under the law as is required by 14th Amendment standards in order to achieve her termination within the confines of the law.

**FOURTEENTH CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff because it terminated her employment for criminal allegations for which she was never convicted in violation of New York State Law which specifically prevents the use of the criminal allegations to terminate her when those allegations were resolved in her favor.

--------------------------------------------------------------------------------

**FIFTEENTH CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff because they have deprived her of a property right in which she had an interest and such right was protected under the 14th Amendment to the Constitution and under New York State Law.

**SIXTEENTH CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff because its findings to justify her termination was an illegally concerted effort on the part of the Defendants to achieve her termination even though it knew that it was barred from using the allegations against her.

**SEVENTEENTH  CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff because of its own admission that Plaintiff was not convicted of the criminal allegation that were used in the instant 3020(a) hearing to achieve her termination and such a finding demonstrates that Defendants were only interested in termination.

**EIGHTEENTH CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff because had Plaintiff not been the subject of a prior 3020(a) hearing that involved manslaughter, Defendants would not have consistently sought her termination.

**NINETEENTH CAUSE OF ACTION:**

Defendants have discriminated against the Plaintiff because the alleged conduct that was never charged against the Plaintiff later denied by the alleged participants in the alleged conduct and such a denial implicates the 14 Amendment's equal protection clause and New York State Law, both of which protects Plaintiff's property right and interest in her employment.

**TWENTIETH CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff in finding that the alleged conduct constituted grounds for termination when a court of competent jurisdiction dismissed the allegations and key participants in the alleged conduct deny that the conduct took place as originally reported.

**TWENTY FIRST CAUSE OF ACTION:**

Defendants discriminated against Plaintiff when it deprived Plaintiff of the right to a fair hearing that excludes information and alleged conduct that is barred by law when it circumvented the legal process and preempted the court's findings and order that the criminal allegations be dismissed for the sole and only purpose of terminating Plaintiff's employment.

**TWENTY SECOND CAUSE OF ACTION:**

Defendants discriminated against Plaintiff when it took hearing action and refused to separate professional standards in the work place from that of the private personal decisions of the Plaintiff in order to achieve her termination.

**TWENTY THIRD CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff when two prior hearing officers in 3020(a) hearings found that the Defendant's were wrong to seek the termination of Plaintiff when her work history and performance as a teacher demonstrated that her private choices did not affect her ability to effectively teach her students.

**TWENTY FOURTH CAUSE OF ACTION:**

Defendants have discriminated against Plaintiff when the hearing officer in the instant 3020(a) hearing like the previous two hearing officers found that Plaintiff's work history was satisfactory and she was not terminated in either of those proceedings.

**TWENTY FIFTH CAUSE OF ACTION:**

---

...ntiff was a tenured teacher and was entitled to have a fair hearing free from bias and discrimination because of past acts and Defendants deprived Plaintiff of this right solely because of the manslaughter conviction.

TWENTY SIXTH CAUSE OF ACTION:

Defendants had the goal of terminating the Plaintiff since the November 7, 2009 3020(a) hearing in which the manslaughter conviction was the main issue and when the Defendants were denied their request for termination, they continued to level arbitrary and capricious charges against the Plaintiff to achieve her termination.

TWENTY SEVENTH CAUSE OF ACTION:

Defendants discriminated against the Plaintiff because it used charges that contained filing falsified instruments and a massive number of procedural violations that included tardiness and absences in the aftermath of the 3020(a) manslaughter hearing to try and achieve the termination of the Plaintiff.

TWENTY EIGHTH CAUSE OF ACTION:

Defendants showed a pattern of discrimination against Plaintiff by seeking to terminate Plaintiff specifically for conduct that would not have been pursued toward a vast majority of other tenured teachers, for example multiple tardy and absence violations.

TWENTY NINTH CAUSE OF ACTION:

Defendants showed a pattern of discrimination by achieving the termination of Plaintiff using actions that were later found to be without merit and untrue, specifically, the Arbitrator found that the Plaintiff had not submitted any false documents at all.

'RTIETH CAUSE OF ACTION:

Defendants showed a pattern of discrimination by achieving the termination of Plaintiff using an unfair reassignment that was not reflected in her performance evaluations, specifically Plaintiff never received an unsatisfactory report by superiors prior to her termination.

THIRTY FIRST CAUSE OF ACTION:

Defendants showed a pattern of discrimination because it in fact discriminated against Plaintiff, specifically noting that her termination was based on "conduct" that affected the Defendant, but the conduct was never charged to Plaintiff, was denied by key participants and it was used against her only to achieve her unlawful termination.

THIRTY SECOND CAUSE OF ACTION:

Defendants showed a pattern of discrimination against Plaintiff because Defendants do not have a history of terminating tenured teachers because of conduct that did not directly impact upon the tenured teacher's ability to perform her duties. Specifically tenured teachers who have had relationships with their students are normally terminated, physical abuse of students are also grounds for termination, and no such history is present with the Plaintiff.

THIRTY THIRD CAUSE OF ACTION:

Defendants have in fact discriminated against Plaintiff because no such charges have been leveled against Plaintiff and Plaintiff has received several years of satisfactory evaluation reports; even in the instant 3020(a) hearing, there were no unsatisfactory reports, thus making unreasonable any finding by the Defendants that Plaintiff could no longer perform her duties.

THIRTY FOURTH CAUSE OF ACTION:

...endants have shown a pattern of discrimination and a concerted, deliberate and planned effort to terminate Plaintiff's employment in violation of the law, for specificity, two independent arbitrators found that Defendant's request for termination in two separate 3020(a) hearings were not warranted.

THIRTY FIFTH CAUSE OF ACTION:

endants have discriminated against Plaintiff in terminating her employment on the grounds that she was not able to perform her duties in the classroom and to be impressionable upon her students, because prior attempts for those reasons were rejected.

THIRTY SIXTH CAUSE OF ACTION:

Specifically on November 7, 2009, the independent Arbitrator found that there was "no evidence in the record whatsoever to suggest Respondent has ever failed to properly supervise the children in her class, nor any indication that Respondent has exercised poor judgment in the performance of her duties." Thus the Defendant discriminated against Plaintiff in using this hearing as justification for termination in the instant 3020(a) hearing.

THIRTY SEVENTH CAUSE OF ACTION:

On November 7, 2009 the independent Arbitrator found specifically that "the Arbitrator is not persuaded that the unfortunate circumstances of the dogs getting loose on the property would translate into the Respondent being negligent in the care of her students." Thus the Defendant discriminated against Plaintiff in using this hearing as justification for termination in the instant 3020(a) hearing.

THIRTY EIGHT CAUSE OF ACTION:

The independent Arbitrator found, " Similarly, the alleged generalized comments by the faculty and administration regarding Respondents choice of boyfriend is little more than idle gossip, absent any proof of demonstrated poor judgment in the classroom." Thus the Defendants discriminated against Plaintiff in using such information in the instant 3020(a) hearing to achieve her termination.

RTY NINTH CAUSE OF ACTION:

Finally, the arbitrator found in rejecting  Defendants request for termination, "the arbitrator also considered that Principal Barnes expressed to Respondent in April 2009 that she hope the Respondent could return to the school and participate in the Reading Recovery Program. Further, there is no evidence in the record critical of the Respondents performance when she was in school." Defendants discriminated against Plaintiff in terminating her employment based on this reasoning in the instant 3020(a) hearing.

FORTIETH CAUSE OF ACTION

On December 1, 2010 Defendants yet again sought the termination of the Plaintiff, less than one year after being rejected in a further pattern of discrimination against Plaintiff.

FORTY FIRST CAUSE OF ACTION:

The Defendants sought termination under the "progressive discipline" theory relying upon the November 7, 2009 3020(a) hearing, but the Defendant's request was again denied and rejected as "unsubstantiated." Defendants continued a pattern of discrimination as a result.

FORTY SECOND CAUSE OF ACTION:

The Arbitrator of December 1, 2010 held, "Generally the important timing question for purposes of progressive discipline is whether the supposedly prior discipline occurred before the acts for which current discipline is being considered." Defendants discriminated against Plaintiff in the instant hearing because it sought to use the "manslaughter hearing" as justification for terminating the Plaintiff which had been rejected.

FORTY THIRD CAUSE OF ACTION:

The Arbitrator found, "That is not the case here, and it would not be consistent with progressive discipline for me to consider Respondent's prior 3020(a) hearing penalty in this case." Defendant discriminated against Plaintiff because it had been on notice that using prior acts from prior hearings had already been rejected, thus use of the information again to obtain termination shows a pattern of discrimination.

RTY FOURTH CAUSE OF ACTION:

The Arbitrator found that the Defendants charges against Plaintiff in the December 1st hearing were not "substantiated." Finding, "I have found that the Department has not proved that this Respondent submitted any false documents, so the cases the Department cites are not instructive to me on the propriety of termination in this case." Defendants discrimination against Plaintiff is plain in the continuous nature that it sought Plaintiff's termination for acts that she has never committed.

FORTY FIFTH CAUSE OF ACTION:

Finally the Arbitrator found, "Submitting false documents is, all else equal a far more serious offense than the single non-falsification act I have found Respondent committed." Defendants had continued to seek the termination of Plaintiff through frivolous accusations and were rebuffed by two independent arbitrators, thus the discriminatory practice against the Plaintiff is plain.

FORTY SIXTH CAUSE OF ACTION:

The two Opinion and Awards on November 7, 2009 and December 1, 2010 more than demonstrate that the Defendant's used discriminatory practices against the Plaintiff and establishes a discriminatory pattern designed only to achieve her termination.

FORTY SEVENTH CAUSE OF ACTION:

Defendants yet again filed charges against Plaintiff less than a year after the second attempt to achieve termination had failed, and after these failed attempts, Defendants finally achieved what they had sought two years before, on November 11, 2011, Defendants finally unlawfully obtained the termination of Plaintiff.

FORTY EIGHTH CAUSE OF ACTION:

Defendants used a domestic dispute in which the Plaintiff was found by the Arbitrator to have been involved; even after a court of competent jurisdiction has dismissed the allegations, to achieve her termination in violation of the law and through deliberate discrimination.

FORTY NINTH CAUSE OF ACTION:

Defendants commenced a third 3020(a) hearing against the Plaintiff based on the alleged conduct prior to the allegations being adjudicated in court, thus violating the equal protection of the Plaintiff's right to a fair and equal hearing without the use of barred information.

FIFTIETH CAUSE OF ACTION:

Allegations against the Plaintiff were dismissed with prejudice for lack of evidence by the court, yet Defendants still used the information against Plaintiff in violation of New York State Law for the specific purpose of obtaining the Plaintiff's termination after it had failed to do so on two separate occasions.

FIFTY FIRST CAUSE OF ACTION:

In an Opinion and Award on November 11, 2011, the arbitrator finally terminated the Plaintiff's employment, unlawfully granting the Defendants what it had been strategically seeking since 2009.

FIFTY SECOND CAUSE OF ACTION:

The Arbitrator found "the fact that the charges against Respondent where dismissed does not mean that the conduct did not occur." But under the law, the fact that Plaintiff was not charged with the conduct is the precise reason that New York State prevented its use in a subsequent hearing, so that Plaintiff would not be negatively affected by a favorable ruling. Since the Defendants were seeking Plaintiff's termination, it ignored the rights that she was entitled to.

FIFTY THIRD CAUSE OF ACTION:

The arbitrator found that the change in testimony of the key participants in the hearing was contradictory to the initial reports, but that it was incredible and a shock. The Arbitrator's decision to terminate supported the discrimination that Defendants have

---

n practicing against Plaintiff because the testimony from the key participants in the alleged conduct is what prompted the New York State Attorney's Office to recommend dismissing the case which the court ultimately did. Thus, the findings of the arbitrator supports the discrimination complained of by Plaintiff.

FIFTY FOURTH CAUSE OF ACTION:

The arbitrator found, "I cannot require the Department of Education to assume the risk that in the future, Respondent could engage in conduct which would jeopardize the well being of students entrusted to her care." But, this finding supports the discrimination against the Plaintiff in that the Defendants never presented and the arbitrator never found that Plaintiff had placed the well being of students in danger at any time. Indeed she had been found to be a satisfactory teacher her entire career.

FIFTY FIFTH CAUSE OF ACTION:

The historical findings that Plaintiff had been a satisfactory teacher and the fact that two prior hearing officers held that the Defendants were not justified in the action that it sought further supports the fact that Defendant had a concerted effort to terminate Plaintiff's employment.

FIFTY SIXTH CAUSE OF ACTION:

The Arbitrator of November 11, 2011 found, "While certain aspects of Respondent's private life may be of no legitimate concern to the Department, in this case the fact that Respondent engaged in the type of behavior at issue is a matter of legitimate concern to the Department." The Court did not hear any facts that would make Plaintiff responsible for the alleged acts that the arbitrator found, those facts were denied by the key participants and the court dismissed the case, thus the only conclusion from this finding is that the Defendants used the alleged acts unlawfully to justify the termination of Plaintiff.

TY SEVENTH CAUSE OF ACTION:

Discrimination is evident in this case because the information used against the Plaintiff in the 3020(a) hearing was prohibited from being adversely used against her, Defendants permitted its use and terminated Plaintiff.

FIFTY EIGHTH CAUSE OF ACTION:

Defendants discriminated against Plaintiff because the Arbitrator found that the conduct "impacted her fitness to teach" based on conduct dismissed by a court of competent jurisdiction; it was prevented from being used by the Defendants against the Plaintiff; and there was no finding independently that Plaintiff could not perform her duties. The Defendants offered no evidence that termination was required because Plaintiff was unfit to teach.

FIFTY NINTH CAUSE OF ACTION:

The Arbitrator acknowledged, "While I agree there is no evidence in this record that Respondent was not a satisfactory teacher as of January 7, 2011 that does not conclude the inquiry whether she continues to be fit to teach." But the inquiry was never about whether she was fit to teach because no evidence of charges where presented for such an inquiry. The inquiry was held on conduct that was never to be before the Arbitrator because of New York Law and had the inquiry been about Plaintiff's ability to be fit to teach, the 14 Amendment required that she be given an opportunity to address that issue. Plaintiff was discriminated against.

SIXTIETH CAUSE OF ACTION:

Neither the Arbitrator nor the Defendants presented any incident which happened over the course of Plaintiff's career that demonstrated that she was unable or unfit to be an effective teacher, thus the Defendants continued their pattern of discrimination.

TY FIRST CAUSE OF ACTION:

Defendants did not cite any student who had made a complaint against the Plaintiff, and it did not cite any complaints from student's parents about the Plaintiff's inability to teach her students even after the incident was referenced in local news papers. The alleged acts were dismissed and Plaintiff was not charged with the conduct upon which her termination was based, thus this reveals the discriminatory nature of the Defendants against Plaintiff.

SIXTY SECOND CAUSE OF ACTION:

The Arbitrator found on behalf of Defendants that Plaintiff " cannot be a role model for impressionable students" and that she showed "an astounding lack of judgment" and that "she can no longer be trusted to exercise the type of judgment required of teachers working with students in New York City Schools. But the finding is clearly at odds with the history of Plaintiff's performance and shows the discriminatory lengths at which the Defendants went to achieve her termination.

SIXTY THIRD CAUSE OF ACTION:

Defendants did not produce any evidence that Plaintiff lacked good judgment when it came to teaching her students in the classroom. And Plaintiff consistently received satisfactory evaluations that do not support the discriminative position of the Defendants.

SIXTY FOURTH CAUSE OF ACTION:

The Defendants created a risk for the Plaintiff that did not exist, was not present to support her termination and there was no support or evidence in the record that Plaintiff was a future risk to students in the classroom. Thus risk was created  for the sole purpose discriminating against the Plaintiff to terminate her employment.

SIXTY FIFTH CAUSE OF ACTION:

The Arbitrator on behalf of the Defendants cited both the November 7, 2009 and December 1, 2010 3020(a) hearings to support its conclusion. But the findings in both these proceedings were more favorable to the Plaintiff than Defendants had sought, they did not achieve her termination and they brought additional charges in an effort to terminate her yet again, it is discrimination.

TY SIXTH CAUSE OF ACTION:

Defendants have used a deliberate, planned and concerted effort to terminate the Plaintiff. It has sought her termination since November of 2009 and tried each subsequent year thereafter to terminate her until those efforts succeeded in 2011.

SIXTY SEVENTH CAUSE OF ACTION:

Defendants violated Plaintiff rights under New York State Law. It violated her rights under the Constitution.

Defendants have distorted and misrepresented Plaintiff's teaching record in order to achieve her unlawful termination.

SIXTY EIGHTH CAUSE OF ACTION:

This Complaint more than sufficiently establishes factual disputes that should proceed to the jury for trial.

SIXTY NINTH CAUSE OF ACTION:

Defendants should not be allowed to commit these obvious patterns of discrimination against Plaintiff and terminate her employment in violation of the laws of New York State and the Constitution.

SEVENTIETH CAUSE OF ACTION:

Defendants should be held accountable for the discrimination that it has committed against the Plaintiff in 2009, 2010, and 2011.

SEVENTY FIRST CAUSE OF ACTION:

Because of the discrimination of the Defendants against Plaintiff, Plaintiff is entitled to punitive damages in the amount of $3.5 million and compensatory damages of $500,000.

SEVENTY SECOND CAUSE OF ACTION:

In the alternative, Plaintiff should be immediately reinstated to her employment and compensated $250,000 for her loss of wages and income, duress, emotional distress, and mental strain.

5. Plaintiff prays for this relief and any other relief that is deemed appropriate by this court. In the event that this Court finds that the Plaintiff has not stated grounds on which relief may be granted, Plaintiff seeks the right to amend this Complaint.

6. On February 15, 2012, Plaintiff filed a verified Complaint with the New York State Division of Human Rights and on March 17, 2012 the NYSDHR dismissed Plaintiff's Complaint for no probable cause.

7. On March 21, 2012, The Supreme Court of the State of New York (Hon. Philip G. Minardo) of Richmond County entered an order dismissing the appeal of the Decision of the Arbitrator and the NYSDHR's no probable cause findings.

8. On April 25, 2012, the United States Equal Employment Opportunity Commission dismissed Plaintiffs charges finding that the charge did not state a claim enforceable under statues by the EEOC.

9. On the same date immediately above, the EEOC issued a right to sue letter.

WHEREFORE PLAINTIFF attests that the facts listed above are true and correct to the best of her knowledge and prays that the court grant the relief that is sought and grants the demand of a jury trial on the facts claimed above.

Kim De Prima
PLAINTIFF

Dated this 20 Day of July, 2012

EEOC Form 161 (3/98)    **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## DISMISSAL AND NOTICE OF RIGHTS

| To: | Kim DePrima<br>158 Willowbrook Road<br>Staten Island, NY 10302 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

| | ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR §1601.7(a)) | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2012-01296 | Jean E. Mulligan,<br>Investigator | (212) 336-3748 |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

[X] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

[ ] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_Kevin Berry_                    4-25-12

Enclosures(s)                **Kevin J. Berry,**            (Date Mailed)
                             **District Director**

cc:    **Robin Singer**
       **Associate Counsel**
       **NYC DEPARTMENT OF EDUCATION**
       **Office of Legal Services**
       **52 Chambers Street, Room 308**
       **New York, NY 10007**

# EXHIBITS TABLE OF CONTENTS

**Exhibit A** .........2009 3020a Arbitrator    Bonnie Siber Weinstock Opinion and Award

**Exhibit B** .........2010 3020a Hearing Officer Douglas S.Abel   Opinion and Award

**Exhibit C** .........2011 3020a   Hearing Officer Mary L. Crangle Opinion and Award

**Exhibit D** .........Transcript from Criminal Court Proceeding ( August 30, 2011)

**Exhibit E** .........Disposition from Criminal Charges and Probation Violation

**Exhibit F** ......... TRI STATE, INC Interview and Statements from   Jermaine Gavins, Wade Alston, and   Lakeisha Dennis

**Exhibit G** .........Transcript of Jermaine Gavins and William Foster's testimony on August 8, 2011 @ 2011 3020a Proceeding

**Exhibit H** .........Letter from PO Suavez in regards to Probation Violation

**Exhibit I** .........Letter from Criminal Attorney Mike Ryan to ADA Cilia

**Exhibit J** .........Letter from Steve Didonato (therapist) and Dr. Runaway (psychiatrist)

UNIVERSITY OF THE STATE OF NEW YORK
STATE EDUCATION DEPARTMENT
SCHOOL DISTRICT EMPLOYER-EMPLOYEE RELATIONS UNIT

Decision # 2009101N031
Atty. KJG    File #2203a740
Date Rec'd 11/10/09

---

In the Matter of the Proceeding Pursuant
to Section 3020-a of the Education
Law

    between

THE DEPARTMENT OF EDUCATION OF THE CITY
SCHOOL DISTRICT OF THE CITY OF NEW YORK

    and

KIM DEPRIMA

---

OPINION and AWARD
File #13,330

NOV 10 2009

OSPRA

BEFORE:  Bonnie Siber Weinstock, Arbitrator

APPEARANCES:
    For the Complainant:    Michael Best, Esq. - General
                            Counsel, by Crystal Barrow, Esq.


    For the Respondent:    James Sandner, Esq., by Keith J.
                           Gross, Esq. - Associate Counsel
                           Richard A. Shane, Esq. - Associate
                           General Counsel
                           Kim DePrima - Respondent


        Pursuant to Section 3020-a of the New York State

Education Law, Charges were preferred by The Department of

Education of the City School District of The City of New York

("Department") against tenured teacher Kim DePrima ("Respondent")

which alleged that the Respondent engaged in criminal conduct,

conduct unbecoming her profession and that she was excessively

absent. (D-1)[1]  Those Charges sought as a penalty the

Respondent's dismissal from service.  Each of the Specifications

contained in the Charges is discussed below.   A prehearing

---

[1]  The Department's exhibits are referred to herein as "D-"
and the Respondent's exhibits" are marked "R-."

2

conference was held on September 22, 2009. Thereafter, hearings
on the Charges were conducted before the undersigned Arbitrator
on October 2 and 5, 2009. The hearings were transcribed.[2] The
parties had full and fair opportunity to present evidence and
argument, to engage in the examination and cross-examination of
sworn (or affirmed) witnesses, and otherwise to support their
respective positions. The record was declared closed after oral
summations.

### BACKGROUND

The Respondent has been employed by the Department as a
teacher for more than twelve years. The last position she held
before her removal from service was as a Reading Recovery
Teacher. At all times relevant to these Charges, the Respondent
was assigned to P.S. 57, the Hubert H. Humphrey School in
District 31 in Staten Island.

The instant Charges and Specifications can be grouped
into two categories. The first concerns an incident in the
summer of 2008 which ultimately resulted in the death of an
elderly neighbor of the Respondent, and the second group involves
alleged time and attendance violations during the academic years
2006-2007, 2007-2008, and 2008-2009.

The Department urges that the criminal conduct for
which the Respondent pled guilty demonstrates her unfitness for

---

[2]  References to the transcribed record of hearing appear
herein as "T: --."

3

duty, as she exercised extremely poor judgment in getting
involved with a man ten years her junior who had been
incarcerated for a serious crime, and in allowing pit bulls to be
in a home with young children. The Department also expressed
that the Respondent's criminal activity brought negative
publicity and embarrassment to the Department. Finally, the
Department urges that the Respondent's excessive absence and
lateness record indicates that the Respondent neglected her
duties. The Department urges that termination is the appropriate
penalty in this matter.

The Respondent, on the other hand, maintains that the
Department has failed to prove that she is unfit to be a teacher.
With respect to the time and attendance Specifications, the
Respondent urges that she received a "satisfactory" rating, even
with respect to attendance, for the 2006-2007 and 2007-2008
school years. The Respondent argues that the Department has
failed to produce any policy regarding excessive lateness, and as
to the policy on excessive absences, the Respondent did not
exceed the ten absences that would produce a "U" rating for the
2006 through 2008 school years. As to the 2008-2009 school year,
the Respondent urges that there are mitigating factors that
should be considered.

With respect to the criminal activity to which she pled
guilty, the Respondent argues that she expressed remorse and that
she is still capable of being an effective teacher. The
Respondent urges that any publicity attached to the unfortunate

4

incident in July 2008 did not rise to the level of "notoriety,"
as the only media entity showing any interest in the matter was a
local newspaper.  The Respondent urges that she be restored to
the payroll and returned to full duty.

## DISCUSSION

### A.  CRIMINAL ACTIVITY

The first group of Specifications concerns an incident
in July 2008.  Specifications 1 through 9 state:

> **SPECIFICATION 1:**  On or about the months of May through
> June, 2008, Respondent, along with another, failed to
> ensure dogs under their care and control did not escape
> the confines of 59A Newkirk Avenue, Staten Island, NY,
> where Respondent resided.

> **SPECIFICATION 2:**  On or about July 1, 2008, Respondent,
> along with another, failed to restrain dogs under their
> care and control.

> **SPECIFICATION 3:**  As a result of the conduct in
> Specification 2, above, Respondent, along with another,
> recklessly caused serious physical injury to Henry
> Piotrowski, her 90 year old neighbor.

> **SPECIFICATION 4:**  As a result of the conduct in
> Specification 2 and 3 above, Respondent was arrested
> and indicted and charged with: Assault in the Second
> Degree, New York State Penal Law, (hereinafter P.L.)
> §120.05(4); Assault in the Third Degree, P.L.
> §120.00(2); Unlawfully Dealing with Fireworks, P.L.
> §270.00(2)(a)(i), and two counts of Dogs to be
> Restrained, New York City Health Code §161.05.

> **SPECIFICATION 5:**  As a result of the conduct in
> Specifications 2 and 3 above, on or about August 17,
> 2008, Respondent, along with another, recklessly caused
> the death of Henry Piotrowski.

> **SPECIFICATION 6:**  On or about October 1, 2008, as a
> result of the conduct in Specifications 2, 3 and 4
> above, Respondent, along with another, was arraigned on
> superseding indictment charging her with Manslaughter
> in the Second Degree, P.L. §125.15(1) for recklessly

5

causing the death of Henry Piotrowski and the charges
listed in specification 3, above.

**SPECIFICATION 7:** On or about February 25, 2009, as a
result of the conduct listed in specifications 2, 3, 4
and 5 above, Respondent plead (sic) guilty to
Manslaughter in the Second Degree, P.L. §25.15(1), a
Class C Felony for recklessly causing the death of
Henry Piotrowski.

**SPECIFICATION 8:** On or about April 16, 2009, as a
result of the conduct listed in specifications 2, 3, 4,
5 and 6 above, Respondent was sentenced for the crime
of Manslaughter in the Second Degree, P.L. §25.15(1), a
Class C Felony, to five years probation, for recklessly
causing the death of Henry Piotrowski.

**SPECIFICATION 9:** Respondent's conduct as detailed in
specifications 2, 3, 4, 5 and 6 above, caused
widespread negative publicity, ridicule and notoriety
to the NYC Department of Education as said misconduct
was reported in the news reports and newspapers in the
New York area, during on or about the months of July,
August, September, October 2008 and February and April
2009.

The Respondent did not testify in this proceeding, as
is her right. The record reveals that the Respondent pled guilty
to the Class C Felony, Manslaughter in the Second Degree, for
recklessly causing the death of Henry Piotrowski, and was
sentenced by the court to five years probation. The information
regarding the plea and sentencing is contained in documentary
evidence, including the transcript from the February 25, 2009
court proceeding which contains her allocution (R-21), and the
transcript from the sentencing (R-22).

The Arbitrator notes certain facts from the court
transcript (R-22). First, the Judge described this as a plea to
a "class C nonviolent felony." (R-22, page 12). The Respondent
allocuted to the following essential facts: That on or about

6

July 1, 2008, she and her codefendant, James McNair, raised two
pit bull dogs and recklessly failed to properly restrain the
dogs. Ms. DePrima told the court that she was not aware that the
dogs had violent tendencies or that they had harmed anyone in the
past, though she was told by a neighbor that the dogs had chased
a neighborhood cat. (R-22, pages 18-20). The newspaper articles
described that the dogs mauled a 90 year old neighbor, Henry
Piotrowski, who later died. The Respondent allocuted to, along
with James McNair, recklessly causing the death of Mr.
Piotrowski. (R-22, p. 20).

Based on the Respondent's allocution and plea, the
Arbitrator finds that the facts as stated in Specifications 1
through 9 are proven. In the pre-hearing conference (R-1), and
again at the close of the Department's case (T:389-94), the
Respondent Moved to Dismiss Specifications 1 through 9 as failing
to allege any nexus between the off-duty/off-premises acts and
the Respondent's employment. The Respondent also alleged that
Specifications 4 and 6 do not allege any offense and simply
restate that the Respondent was criminally charged and arraigned.
The Arbitrator denied the Motion to Dismiss Specifications 1
through 9 at the hearing and stated that the ruling would be
fully considered in the Opinion and Award. (T:393). I now
explain that ruling.

The Arbitrator finds that as a technical matter,
Specifications 1 and 2 do not allege any failure to perform the
duties of the Respondent's position and do not, standing alone,

render her unfit to serve a teacher. To be sure, the assertion
(in Specifications 3 and 5) that the Respondent acted recklessly
which resulted in serious physical injury and, ultimately, death
to a person does state an allegation that has potential
connection to the Respondent's ability to serve as a teacher and
be responsible for the well-being of students. Specifications 4
and 6 connect to Specification 9 insofar as the negative
publicity concerning the arrest and indictment impacted the
school. The Arbitrator therefore finds that while the facts
contained in Specifications 1 and 2 are relevant to the
Respondent's ultimate plea, they do not constitute discrete bases
for conduct unbecoming a professional nor do they render the
Respondent unfit to serve as a teacher. Accordingly,
Specifications 1 and 2 are dismissed. The Arbitrator denies the
Motion to Dismiss Specifications 3 through 9.[3]

        The Arbitrator now turns to the heart of the matter
regarding this group of Specifications. The Respondent pled
guilty to Manslaughter in the Second Degree for recklessly
causing the death of a 90 year old neighbor by failing to secure
two potentially violent dogs on her property. The Respondent's

_____

[3]    At the hearing, the Arbitrator expressed that
Specifications 4 and 6 contain facts which need to be in the record
"as factual predicates to what caused [the Respondent] to be
removed from the classroom." However, the Arbitrator agreed that
the mere statement of an indictment or arrest is not enough to
prove misconduct. (T:390-91). The indictment and arrest do become
relevant where, as here, they bring negative publicity to the
school, as charged in Specification 9. Accordingly, Specifications
4 and 6 are sustained insofar as they are incorporated in
Specification 9 regarding adverse publicity.

8

guilty plea establishes the facts contained in Specifications 3
through 8. To be sure, this is a tragedy for the decedent who
suffered a horrible death, and for his family. The Arbitrator
notes from the numerous newspaper articles and on-line news
reports about this tragedy that were offered into the record (D-
12), that this matter received substantial coverage in Staten
Island where the Respondent taught. The Arbitrator finds that
the Respondent's conduct caused negative publicity for the school
in and around the time noted in Specification 9, which I now
sustain. The Arbitrator also sustains Specifications 3, 4, 5, 6,
7 and 8. These Specifications demonstrate conduct unbecoming a
professional. The appropriate penalty is discussed below.

### B.   TIME and ATTENDANCE

The following Specifications allege excessive lateness
and absence in each of three school years. Principal Sandra
Barnes testified that the Teacher Handbook she created commencing
with the 2007-2008 school year notified teachers that ten or more
absences could result in a "U" rating. (R-2; T:315). From this,
the Respondent argues that fewer than ten absences per year must
be permissible. The Arbitrator does not agree. First, an
employee who demonstrated "patterned absences" (e.g., absences on
days surrounding weekends or holidays) could still be disciplined
for unexcused or excessive absences. Second, an employee who
called in sick and then was seen at a televised baseball game may
be guilty of sick leave abuse, even with fewer than ten absences.

9

Therefore, questions of time and attendance abuse must be
carefully evaluated to determine when discipline may be imposed
for lack of dependability. Chancellor's Regulation C-601 (D-8)
places employees on notice of such factors when it states, in
pertinent part:

> 1. **Service Required in Schools**
>    \*\*\*
>    c.  While actual absence which has been excused in
>    accordance with regulations does not, of and by
>    itself, constitute grounds for disciplinary
>    action, absences which are so numerous as to limit
>    the effectiveness of service may lead to
>    disciplinary action for incompetent service or
>    unfitness to perform obligations properly to the
>    service.  The fact that excuse or leave was
>    applied for and granted properly does not preclude
>    disciplinary action which may range from adverse
>    rating to the institution of proceedings for
>    dismissal or termination of service.  Such
>    disciplinary action shall not be precluded even
>    when the cause of absence is a medical or physical
>    condition.

Applying this standard, the Arbitrator now evaluates the record
evidence regarding Specifications 10 through 15.

Angela Ulsamer, the long-service Payroll Secretary at
the Respondent's school, testified regarding the time records for
lateness and absence.  As indicated below, the documentation
regarding certain of the dates charged is conflicting. (T:421).
The Arbitrator endeavored to resolve conflicts in favor of the
Respondent but, as noted below, that still produced a finding of
excessive lateness and absence in certain years.

> SPECIFICATION 10:  During the 2006-2007 school year
> Respondent was absent eight (8) times on the following
> dates:

10

| 1 | Friday | October 13, 2006* |
| 2 | Wednesday | November 22, 2006 |
| 3 | Tuesday | January 16, 2007* |
| 4 | Wednesday | January 17, 2007 |
| 5 | Monday | March 19, 2007* |
| 6 | Friday | April 20, 2007* |
| 7 | Friday | June 1, 2007* |
| 8 | Monday | June 18, 2007* |

*The above-mentioned absences occurred preceding or following a weekend and/or holiday.

The Cumulative Absence Reserve ("CAR") (D-2) for the Respondent demonstrated that each of the above dates was listed as an absence and the Respondent signed her name next to each entry indicating her understanding that the date was logged as absent from school. (Her signature also appears next to every entry for lateness.) The CAR reflects, and Ms. Ulsamer confirmed, that medical notes were provided for the November 22nd (R:51; R-3) and the January 16 and 17 dates (T:53-56; R-4,5), while March 19, April 20 and June 1 were coded as self-treated absences. The Arbitrator finds that none of the medical notes offered a diagnosis to explain the absence.

The record indicates that for the 2006-2007 school year, the Respondent taught second grade. Therefore, if she was absent, a substitute had to be arranged (T:22) and instruction was impacted. Likewise, her class had to be covered if she was late. The Arbitrator finds that the Respondent was absent 8 times, with 7 of the 8 absences contiguous to a weekend or holiday. While this may not meet the rule contained in the Handbook (i.e., ten absences produce a "U" rating), it nevertheless evidences an unacceptable pattern. Specification 10

11

is sustained.

**SPECIFICATION 11:** During the 2006-2007 school year
Respondent was late eight (8) times on the following
dates:

| | | | |
|---|---|---|---|
| 1 | Wednesday | October 11, 2006 | 8 minutes |
| 2 | Tuesday | October 16, 2006 | 7 minutes |
| 3 | Thursday | November 2, 2006 | 8 minutes |
| 4 | Monday | November 13, 2006 | 30 minutes |
| 5 | Friday | January 19, 2007 | 21 minutes |
| 6 | Thursday | May 10, 2007 | 5 minutes |
| 7 | Thursday | May 15, 2007 | 8 minutes |
| 8 | Monday | June 11, 2007 | 8 minutes |

Ms. Ulsamer testified that the teacher workday was 8:10
AM to 3:05 PM.  (T:24).[4]  The Respondent's CAR (D-2) indicates
that for items 2, 3, 4 and 5 above, the Respondent signed her
name indicating that she knew she was marked late on those days
and for the number of minutes listed.  The Respondent's CAR does
not list a late arrival for October 11, May 10 or June 11, though
those latenesses are listed on the computer records (D-6; T:66-
67).  The Arbitrator finds that the employee is given the
opportunity to sign the CAR, but not the computer records.
Therefore, the CAR is what places the employee on notice of the
timekeeping information the Employer has, and the CAR would
enable the employee to challenge any incorrect data.  Therefore,

---

[4]  Principal Barnes testified that for the 2006-2007 school
year, the teacher workday was 8:00 AM to 3:05 PM. (T:318).  The
Arbitrator finds it more likely that Ms.  Ulsamer is correct,
because the time cards provided for the 2007-2008 school year (D-3)
seem to be based on an 8:10 AM start, and no one has suggested that
the start time for school changed between the 2006-2007 and 2007-
2008 school years.  In any event, Ms. DePrima signed her CAR which
listed the number of minutes of lateness and she did not dispute
the amounts.

12

for the purpose of this analysis, and to give every consideration to the Respondent, the Arbitrator gives weight to the CAR over the employee information system time record (D-6).[5] The Arbitrator finds that items 1, 6 and 8 of Specification 11 are dismissed. With respect to May 15th, the CAR states that the Respondent was 14 minutes late, and the Respondent signed that entry on her CAR. However, she is only charged with an 8 minute lateness and the Arbitrator sustains that item. Thus, the Respondent was late five times in the 2006-2007 school year. Together with the pattern absences sustained in Specification 10, the Arbitrator finds that the Respondent had an unacceptable time and attendance record in the 2006-2007 school year. Specification 11, except for items 1, 6 and 8, is sustained.

SPECIFICATION 12: During the 2007-2008 school year, Respondent was absent times on the following dates (sic):

| 1 | Friday | October 12, 2007* |
| 2 | Thursday | November 8, 2007 |
| 3 | [withdrawn at hearing on October 2, 2009] |
| | (T:8) | |
| 4 | Thursday | May 1, 2008 |
| 5 | Tuesday | May 13, 2008 |
| 6 | Friday | May 23, 2008* |
| 7 | Tuesday | May 27, 2008 |
| 8 | Thursday | June 5, 2008 |
| 9 | Friday | June 20, 2008* |
| 10 | Thursday | June 26, 2008 *last day of school |

---

[5]    In so doing, the Arbitrator is not suggesting that the employee information system is anything other than an official record. The Arbitrator simply indicates that even using the time and attendance data signed by the Respondent, her record demonstrated neglect of duty.

13

*The above-mentioned absences occurred preceding or
following a weekend and/or holiday.

The Respondent signed her Cumulative Absence Reserve

(D-2) to reflect that she was absent on each of these dates.

However, these absences do not demonstrate the pattern absences

evidenced in Specification 10, nor do they rise to the level of

being excessive. Of significance, the Respondent did not have

absences in the six month period between November 8th and May

1st. Accordingly, while the Respondent was absent as charged,

she is not guilty of misconduct or neglect of duty based on these

absences alone. Specification 12 is dismissed.

> SPECIFICATION 13: During the 2007-2008 school year,
> Respondent was late thirteen (13) times on the
> following dates:

| | | | |
|---|---|---|---|
| 1 | Thursday | September 6, 2007 | 11 minutes |
| | | [amended at the October 2, 2009 hearing] | |
| | (T:9) | | |
| 2 | Monday | September 17, 2007 | 3 minutes |
| 3 | Wednesday | November 28, 2007 | 2 hours 45 min. |
| 4 | Thursday | November 29, 2007 | 4 minutes |
| 5 | Tuesday | January 29, 2008 | 3 minutes |
| 6 | Monday | February 4, 2008 | 11 minutes |
| 7 | Tuesday | February 5, 2008 | 2 minutes |
| 8 | Friday | Friday (sic) 8, 2008 | 1 minute |
| 9 | Thursday | March 4, 2008 | 2 minutes |
| 10 | Friday | March 5, 2008 | 3 minutes |
| 11 | Friday | March 7, 2008 | 11 minutes |
| 12 | Friday | April 11, 2008 | 5 minutes |
| 13 | Monday | April 14, 2008 | 2 minutes |

Ms. Ulsamer testified that for the 2007-2008 school

year, the teacher workday was 8:10 AM to 3:05 PM. (T:24. See

note 4, supra). In evaluating the documentary evidence and

whether the time cards demonstrate the lateness charged, the

Arbitrator uses 8:10 AM as the start time.

On the Respondent's Cumulative Absence Reserve Card (D-2), November 28th is not listed as a lateness, but as an absence of 2 hours and 45 minutes. On the Respondent's time card (D-3), there is a punch out time of 12:12 PM for November 28th. It thus appears that the Respondent left the building and did not return. This should not have been classified as a lateness, but as a partial absence. Ms. Ulsamer testified that it is possible the Respondent attended a conference that day. (T:78). Accordingly, item 3 of Specification 13 is dismissed.

Item 8, though listed in the Specification as "Friday" is listed on the CAR as February 8th, a one minute lateness. In all other respects, the lateness charged in Specification 13 appear on the Respondent's CAR and she has signed her name next to every entry. However, the Respondent's time card (D-3) for March 7th indicates a punch in time of 8:11. Therefore, she was one minute late and not 11 minutes as charged. Accordingly, Specification 13, item 11 is dismissed. In all other respects, the items in Specification 13 are factually accurate. The Arbitrator finds that of the 11 items remaining, 7 are latenesses of one to 3 minutes. To be sure, these short duration latenesses evidence a disregard of the obligation to be on time and must be remedied by the Respondent. However, these proven latenesses, standing alone would not support a finding of neglect of duty and would not merit the severe discipline imposed herein. For this reason, the Arbitrator dismisses Specification 13 in its

15

entirety.

**SPECIFICATION 14:** During the 2008-2009 school year the
Respondent was absent eighteen (18) times on the
following dates:

| | | |
|---|---|---|
| 1 | Friday | September 19, 2008* |
| 2 | Monday | October 20, 2008* |
| 3 | Friday | October 31, 2009* (sic) |
| 4 | Tuesday | December 9, 2008 |
| 5 | Friday | January 9, 2009 |
| 6 | Wednesday | January 14, 2009 |
| 7 | Thursday | January 29, 2009 |
| 8 | Friday | February 6, 2009* |
| 9 | Monday | February 23, 2009 |
| 10 | Tuesday | February 24, 2009 |
| 11 | Wednesday | February 25, 2009 |
| 12 | Thursday | February 26, 2009 |
| 13 | Friday | February 27, 2009* |
| 14 | Monday | March 2, 2009* |
| 15 | Tuesday | March 3, 2009 |
| 16 | Wednesday | March 4, 1009 |
| 17 | Thursday | March 5, 2009 |
| 18 | Friday | April 3, 2009* |

*The above-mentioned absences occurred preceding or
following a weekend and/or holiday.

**SPECIFICATION 15:** During the 2008-2009 school year
the Respondent was late approximately thirty-seven (37)
times on the following dates:

| | | | |
|---|---|---|---|
| 1 | Monday | October 6, 2008 | 20 minutes |
| 2 | Tuesday | October 14, 2008 | 10 minutes |
| 3 | Tuesday | October 21, 2008 | 40 minutes |
| 4 | Monday | October 27, 2008 | 30 minutes |
| 5 | Thursday | October 30, 2008 | 10 minutes |
| 6 | Friday | November 7, 2008 | 50 minutes |
| 7 | Wednesday | November 19, 2008 | 10 minutes |
| 8 | Thursday | November 20, 2008 | 1 hour 20 min. |
| 9 | Friday | November 21, 2008 | 1 hour 50 min. |
| 10 | Monday | November 24, 2008 | 10 minutes |
| 11 | Tuesday | November 25, 2008 | 25 minutes |
| 12 | Tuesday | December 2, 2008 | 35 minutes |
| 13 | Wednesday | December 3, 2008 | 10 minutes |
| 14 | Thursday | December 4, 2008 | 35 minutes |
| 15 | Monday | December 8, 2008 | 35 minutes |

| 16 | Wednesday | December 10, 2008 | 50 minutes |
| 17 | Friday | December 12, 2008 | 10 minutes |
| 18 | Tuesday | December 16, 2008 | 1 hour 10 min. |
| 19 | Thursday | December 18, 2008 | 10 minutes |
| 20 | Monday | February 2, 2009 | 10 minutes |
| 21 | Tuesday | February 3, 2009 | 10 minutes |
| 22 | Wednesday | February 4, 2009 | 20 minutes |
| 23 | Thursday | February 5, 2009 | 30 minutes |
| 24 | Wednesday | March 11, 2009 | 6 minutes |
| 25 | Friday | March 13, 2009 | 1 hour |
| 26 | Monday | March 16, 2009 | 6 minutes |
| 27 | Wednesday | March 18, 2009 | 50 minutes |
| 28 | Thursday | March 19, 2009 | 6 minutes |
| 29 | Friday | March 20, 2009 | 6 minutes |
| 30 | Tuesday | March 24, 2009 | 6 minutes |
| 31 | Thursday | March 26, 2009 | 50 minutes |
| 32 | Friday | March 27, 2009 | 20 minutes |
| 33 | Monday | March 30, 2009 | 6 minutes |
| 34 | Monday | April 6, 2009 | 1 hour 30 min. |
| 35 | Tuesday | April 7, 2009 | 15 minutes |
| 36 | Monday | April 20, 2009 | 6 minutes |
| 37 | Wednesday | April 22, 2009 | 10 minutes |

During the 2008-2009 school year, the Respondent was in the Reassignment Center. Since she was not at the school, her signature does not appear on her CAR for the 2008-2009 entries. Ms. Ulsamer testified that personnel at the Reassignment Center sent her the time record information for the Respondent at the end of each month and Ms. Ulsamer entered that data onto the Respondent's CAR (D-2) and into the employee information system. (T:40-41). The documentation received from the Reassignment Center appears in the record as Department exhibit 4.

As to the 18 absences charged in Specification 14, the record evidence reveals that March 2, 2009 was a snow day. (T:98-99, 356). Neither the Respondent nor any other faculty member was expected at work. This date should not have been

17

charged, and item 14 is dismissed.  (T:392).  The Arbitrator
finds that the 17 absences clearly are excessive in number and
Specification 14 is sustained (except as to item 14).

Specification 15 charges 37 latenesses.  Item 17 of
this Specification is December 12th.  On the CAR, the date is
listed but there is no entry to indicate whether it is an absence
or, if a lateness, the duration.  The time records from the
Reassignment Center (D-7) show that the Respondent signed in at
8:20 and left at 3:00.  Therefore, she was ten minutes late for
work; she was not absent.  The Specification regarding December
12th is sustained.

The sign-in sheet from the Reassignment Center states
that the Respondent's work schedule is 8:10 to 3.  (D-7).  Ms.
Ulsamer testified that the teacher work day at the school began
at 8:15 AM that year.  (T:106).  The Arbitrator finds that the
paperwork given to the Respondent advised her that her workday
began at 8:10 and she was Charged according to that schedule.
The Respondent presented no evidence to indicate that she thought
her workday began after 8:10.

With respect to these latenesses, which certainly are
numerous, because the Respondent was not in the school, her
lateness did not impact the instructional program.  Nevertheless,
the Arbitrator finds that the Respondent was required to be
present and on time even while in the Reassignment Center.  A
document offered into the record by the Respondent shows that her
day was 8:10 AM to 3:00 PM and it states, "Enter and initial your

18

**actual** arrival and departure times daily." (R-20). That the
Respondent failed to be present on time is an indication of a
lack of dependability. The Arbitrator finds that the Respondent
knew she was expected to keep the hours listed on the time sheet.
No evidence has been presented to indicate that she could modify
the arrival or departure times for her personal convenience.

The Arbitrator further finds that 15 of the 37
latenesses were for 30 minutes or more, with 5 of the 15 lateness
of one hour or more. The Arbitrator finds the latenesses to be
excessive and meriting discipline. In reaching this conclusion,
the Arbitrator acknowledges Principal Barnes' testimony that the
Respondent told her that she was having babysitting problems.
(T:359). Principal Barnes stated that the Respondent was
pregnant during the 2007-2008 school year and gave birth shortly
after the end of school. The Arbitrator finds that even if
babysitting problems were the cause of the Respondent's lateness,
she had an obligation to remedy that problem and to report to the
Reassignment Center on time. There is no evidence in the record
to suggest that the Respondent made any arrangements for a later
arrival time than 8:10 AM.

In weighing the appropriate penalty for the Charges
proven on this record, the Arbitrator also considers that certain
of the Respondent's defenses to the time and attendance Charges
are quite suspect. For example, the Respondent submitted a note
from the attorney representing her in the criminal matter
claiming that she was in court on eight listed dates. (R-16).

19

Included in that list were the dates February 23 and 25, 2009.
However, the Respondent submitted doctors notes to excuse those
same two dates.  (R-13).  There can be no suggestion of
confusion, as the Respondent reiterated her desire for a medical
excuse for those dates in her undated letter apparently
responding to her meeting with Principal Barnes on April 28,
2009.  (R-17).

Principal Barnes testified that on April 28, 2009, she
spoke to the Respondent about her lateness and absences.  (D-11;
T:322, 325).  The Respondent argues that she was not late on any
day in May, demonstrating that she improved her time and
attendance record once she was admonished.  The Arbitrator finds
that the Respondent knew that she had an obligation to be at work
on time, every day.  The Arbitrator expressly rejects any
suggestion by the Respondent that her failure to receive a copy
of the Teacher Handbook for 2008-2009 (since she was in the
Reassignment Center) somehow denied her notice of the expectation
to report for work on time, even though she understood that
obligation in all of her prior years of service.  In addition,
the Arbitrator credits the uncontroverted testimony of Principal
Barnes that before making the Respondent the Reading Recovery
Teacher for the 2007-2008 school year, Ms. Barnes spoke with the
Respondent about her attendance "because there were some problems
with her being at work all the time -- on time and at work."
(T:321).

The Arbitrator notes that the Department did not charge

20

the Respondent with six latenesses ranging from 20 to 50 minutes
in January 2009.  (D-4).  The Arbitrator points this out simply
to show that the record lacks evidence of animus against the
Respondent.  The Arbitrator sustains Specification 15 and finds
that the 37 instances of lateness charged were excessive and
constitute neglect of duty.

        The Arbitrator now turns to the question of the
appropriate penalty based upon the Specifications sustained in
this record.  To be sure, conduct which occurs off-duty and off-
premises can be the basis for discipline by an employer if the
off-duty/off-premises conduct has a nexus to the work of the
employee.  The Department urges that a nexus has been
demonstrated because the Respondent demonstrated very poor
judgment in getting involved with Mr. McNair who served time for
a violent crime (T:337), and for being reckless by having pit
bulls, which are known to be violent dogs, in the vicinity of her
young children.  According to the Department, all of these
factors indicate that the Respondent showed poor judgement in her
personal life and she cannot be depended upon to demonstrate good
judgment when she is in the classroom.  The Department also
argues that the Respondent's actions brought negative publicity
and ridicule to the school.

        The Arbitrator finds that there is no evidence in the
record whatsoever to suggest that the Respondent has ever failed
to properly supervise the children in her class, nor is there any

indication that the Respondent has exercised poor judgment in the
performance of her duties as Reading Recovery Teacher, the
position Principal Barnes asked the Respondent to assume for the
2007-2008 academic year. (Ms. Barnes did speak with the
Respondent about her absences and latenesses as a dependability
matter, and that is discussed below.) Thus, the record is devoid
of any evidence to indicate that the Respondent exercised poor
judgment in the classroom, or that she was at risk of failing to
supervise her students. Accordingly, the Arbitrator is not
persuaded that the unfortunate circumstances of the dogs getting
loose on her property would translate into the Respondent being
negligent in the care of her students. Similarly, the alleged
generalized comments by the faculty and administration regarding
the Respondent's choice of boyfriend is little more than idle
gossip, absent any proof of demonstrated poor judgement in the
classroom.

However, the Arbitrator is persuaded that the
Respondent's actions brought ridicule and negative publicity to
the school. Any argument that several of the articles offered
into the record (D-12) come from unknown websites and were not
likely to have been viewed by many people is not compelling. The
record indicates that numerous articles appeared in the Staten
Island Advance, which has a local readership. This case gained
notoriety because of the tragic outcome, i.e., the gruesome death
of a 90 year old man. The negative publicity does constitute a
nexus to the Respondent's employment, though the strength of this

22

connection should not be overstated.

The Department offered approximately 33 news articles or on-line news items into the record (D-12) regarding the story of Mr. Piotrowski being mauled by two pit bulls, requiring two amputations and ultimately dying. At least 9 of those 33 articles mentioned only Ms. DePrima's boyfriend (McNair) as the owner of the dogs and did not mention the Respondent at all, and several other articles named neither the Respondent nor Mr. McNair. Only one article referred to the Respondent as a New York City school teacher, and that article was written by the decedent's niece. Thus, while those who already knew Ms. DePrima -- including her students and their parents -- could read ample articles about this incident and know that it concerned a teacher, this was not a case where negative publicity completely flooded the school or the Department. Ms. Barnes testified that several teachers, administrators and a parent liaison discussed this incident and the publicity with her. The Arbitrator is persuaded that the Respondent brought negative publicity to the school and that provides a connection between the off-duty/off-premises conduct and the Respondent's employment. Thus, some discipline is appropriate.

In deciding on the appropriate penalty, the Arbitrator also considered that Principal Barnes expressed to the Respondent in April 2009 that she hoped the Respondent could return to the school and participate in the Reading Recovery Program. (T:381-82). Further, there is no evidence in the record critical of the

Respondent's performance when she was in school. (There is more than ample evidence that she had problems getting to school on time and that she took excessive days of absence.) The Arbitrator therefore finds that a substantial penalty is necessary, but termination is not the appropriate penalty for the neglect of duty and conduct unbecoming a professional that is proven on this record.

The record indicates that the Respondent has been off the payroll since June 18, 2009. (T:116). The Respondent argued that she should be returned to the payroll on October 17, 2009, the expiration of the two month period described in the collective bargaining agreement covering teachers.[6] The Department had argued that it was entitled to a thirty day extension of the time off the payroll so long as the Department was not delaying the 3020-a proceedings. The Arbitrator finds that the question whether there can be an automatic extension of the time off the payroll pending the decision in a 3020-a case is a substantial question that would need to be resolved, if at all, under the grievance arbitration procedures of the collective bargaining agreement covering teachers in which Article 21(G)(7) is contained. (For this reason, the Arbitrator responded

---

[6]     Article Twenty-One (G)(7) of the collective bargaining agreement dated October 13, 2007 states: "Tenured pedagogues who have been convicted of, or who have pled guilty to, any felony not addressed in paragraph 5, above shall be suspended without pay pending the final outcome of the Education Law §3020-a disciplinary proceeding. The §3020-a hearing should be completed within two months, but the suspension without pay shall be extended one additional month if the hearing has not been completed, unless the Board has received an adjournment or otherwise delayed the case."

prematurely during the 3020-a proceeding by stating that the
Respondent should be returned to the payroll.)

In e-mail correspondence between Counsel immediately
following the hearing, it appeared that the Department was not
returning the Respondent to the payroll. In determining the
appropriate penalty herein, the Arbitrator has taken into account
that the Respondent has been off the payroll for two months which
would have ended on October 17th. The record in this matter was
not complete until October 23, 2009, when the Arbitrator received
the transcript of hearing. The Arbitrator finds that a three
month suspension without pay is a substantial and meaningful
penalty which undoubtedly impresses upon the Respondent that her
criminal activity brought negative publicity to the school, and
that her lack of dependability was intolerable, and that neither
can recur.

### AWARD

Specifications 3, 4, 5, 6, 7, 8, 9, 10, 11(except items 1, 6 and 8), 14 (except item 14) and 15 are sustained.

Specifications 1, 2, 11(items 1, 6 and 8), 12, 13 and 14 (item 14) are dismissed. The Respondent, Kim DePrima, has engaged in both criminal conduct and conduct unbecoming a teacher with respect to Specifications 3 through 9. The Respondent also engaged in neglect of duty with respect to Specifications 10, 11, 14 and 15, the time and attendance Specifications. The appropriate penalty is for the Respondent to remain off the payroll for a total of three (3) months, i.e., through November 16, 2009. After that time has been served off the payroll, the Respondent may be returned to full duty.

November 7, 2009

Bonnie Siber Weinstock
Arbitrator

26

State of New York ) ss.:
County of Suffolk )

On this 7th day of November, 2009, before me personally
came and appeared BONNIE SIBER WEINSTOCK to me known and known to
me to be the individual described in and who executed the
foregoing instrument and she acknowledged to me that she executed
the same.

GARY ALAN WEINSTOCK
NOTARY PUBLIC, STATE OF NEW YORK
No. 01WE5098509
QUALIFIED IN SUFFOLK COUNTY
MY COMMISSION EXPIRES 9/5/11

NEW YORK STATE EDUCATION DEPARTMENT
UNIVERSITY OF THE STATE OF NEW YORK

In the Matter of the Disciplinary Proceeding Between

NEW YORK CITY DEPARTMENT OF EDUCATION,

Complainant,

and

Kim DePrima,

Respondent,

Pursuant to Education Law Section 3020-a

SED File No. 16,005

OPINION
AND
AWARD

*NYSED*
DEC 03 2010
*OSPRA*

Before **DOUGLAS S. ABEL**, Impartial Hearing Officer

**APPEARANCES:**

For the Complainant
Michael Best, Esq., General Counsel to the Chancellor
Karen Antoine, Esq., Of Counsel, Office of Legal Services

For the Respondent
James R. Sandner, General Counsel, NYSUT
Wendy Star, Esq., of Counsel

Pursuant to the provisions of New York State Education Law § 3020-a, the

undersigned was appointed to hear and decide whether there is just caused for

disciplinary action against the Respondent, Kim DePrima. A pre-hearing conference

was held in this matter on September 14, 2010. On October 18, 2010, Respondent

moved to dismiss the charges in this matter on the grounds of *res judicata* and collateral

estoppel, and the Department opposed that motion. On October 26, 2010, I granted the

Motion to Dismiss as to Specification 5, and denied it as to the remaining specifications.

Tr. 116-133. A hearing was conducted at the offices of the New York City Department of

Education at 49-51 Chambers Street in New York City on October 26, 2010, and

October 28, 2010. At the close of the Department's case that day, Respondent moved

2.    February 25, 2009

**SPECIFICATION 4:** On or about the following dates, Respondent attended court proceedings in Richmond County and accepted payment for self-treated sick leave rather than requesting unpaid leave:

1.    September 19, 2008
2.    December 9, 2008
3.    January 9, 2009
4.    January 29, 2009
5.    February 6, 2009

**SPECIFICATION 5:** On or about the following dates, Respondent failed to notify and/or inform her immediate supervisor and/or the supervisor's designee of her absences:

1.    February 23, 2009
2.    February 25, 2009
3.    September 19, 2008
4.    December 9, 2008
5.    January 9, 2009
6.    January 29, 2009
7.    February 6, 2009

### The foregoing constitutes:

- Just cause for disciplinary action under § 3020-a of the Education Law;
- Conduct unbecoming Respondent's position and or conduct prejudicial to the good order, efficiency, and/or discipline of the service;
- Substantial cause rendering Respondent unfit to perform properly her obligations properly [sic] to the service;
- Criminal conduct;
- Neglect of duty;
- A violation of Chancellor's Regulations; and
- Just cause for termination

In light of my rulings on Respondent's two Motions to Dismiss, what remains for me to decide is whether, based on the evidence as to Specifications 1, 2 and 3, and Items 2 through 5 of Specification 4, there is just cause for disciplinary action against Respondent.

the two later dates (February 23 and 25, 2009), she was paid on the basis that these absences were Medically Certified sick days.

Angela Ulsamer, the Payroll Secretary for PS 57 during the relevant period, testified that under the collective bargaining agreement, teachers could take up to ten Self Treated sick days a school year, and that they could take up to three of these ten Self Treated days for personal business. No medical certification was required for any of these ten absences, and indeed for three of these absences, there was no requirement that the teacher be sick, as they could be used for personal business. Accordingly, Ms. Ulsamer testified that for three of the days Respondent was in court she would have been paid if she had applied for them as Personal Business days (as the three Personal Business days out of her ten Self Treated sick days). Tr. 218 - 220.

Although still on PS 57's payroll during her reassignment, much of the administration of Respondent's attendance was handled by the Reassignment Center, where she was to fill out the Monthly Time Report, indicating her arrival time and her departure time each day, both of which she initialed. There was a space for Respondent's signature at the bottom of each form. Ms. Ulsamer received these completed forms from the Reassignment Center by fax at the end of each month. Monthly Time Reports for Respondent for September and December, 2008, and January and February, 2009, were introduced. Dept. Ex. 4. (The Monthly Time Reports for September, December and January all have Respondent's signature; the one for February does not, but it does have Respondent's initials next to entries for arrival and departure time. Tr. 183 - 184.) For any date for which the form did not reflect Respondent present (because there was no arrival time indicated) Ms. Ulsamer entered

At some time in the Spring of 2009, Ms. Ulsamer received information about Respondent's court attendance on various dates. Ms. Ulsamer knew she had already recorded these days as Self Treated sick days, for which Respondent was paid, and Ms. Ulsamer did not do anything with this information, or discuss it with anyone. Tr. 221 - 222.

Ms. Ulsamer testified that from her review of the Payroll Register Detail, and the Pay Detail History (Dept. Ex. 7) Respondent was paid her full regular salary for each week when she had any of the absences covered by these Specifications; no deductions were taken from Respondent's pay for any of the days she was in court. Tr. 207-208. These records do not specifically identify whether a teacher is being paid on the basis of being at work, or being in Self Treated sick status, or Medically Certified sick status. Tr. 217.

Michelle Knacht was Special Assistant to the Executive Director at the Reassignment Center. She testified that she or one of her delegates would meet with reassigned teachers to orient them to the processes and expectations at the Reassignment Center. Ms. Knacht informed reassigned teachers to call her and leave a brief message in the event of absence; she also reviewed with teachers the OP-198, which she said could be used for Medically Certified absence, with a doctor's note, or for Personal Business. Tr. 258 - 259. Ms. Knacht did not recall whether she received any calls from Respondent about any of her absences that are the subject of this hearing. Ms. Knacht testified that she kept a log of calls she received, and has been unable to locate that log. Tr. 261-264.

year, she reviews Chancellor's Regulations with the teachers; while Respondent was not at such a review meeting at the start of the 2008-2009 school year, she was present at the prior year's meeting. Tr. 171.

Ms. Barnes testified that she met with Respondent (with her union representative) on April 28, 2009 to discuss Respondent's absences and latenesses. This was the first time Ms. Barnes spoke with Respondent about her attendance in 2008 and 2009. Tr. 149-151. Respondent's absences included the six dates that are still before me in this case, as well as other dates. The day before this meeting Ms. Barnes received a fax from Respondent's criminal lawyer. That fax, Dept. Ex. 3, states in part,

> Please be advised that [Respondent] appeared in Court on the following dates:
>
> 1.   July 1, 2008 for unsealed indictment;
> 2.   October 1, 2008;
> 3.   December 9, 2008;
> 4.   January 9, 2009;
> 5.   February 6, 2009;
> 6.   February 23, 2009;
> 7.   February 25, 2009; and
> 8.   April 16, 2009 for sentencing.

Respondent followed up this meeting with an undated note "To Whom It May Concern," Dept. Ex. 2A, which Ms. Barnes received. Tr. 141-142. In that note, Respondent refers to her April 28, 2009 meeting with Ms. Barnes, and states, in part:

> During this meeting I submitted a doctors note for the following dates:
> February 23, 2009
> February 24, 2009
> February 25, 2009
> February 26, 2009
> February 27, 2009
> March 2, 2009
> March 3, 2009
> March 4, 2009

in court -- Dept. Exs. 2 and 2A) were also dates that were in the Department's system as Self Treated sick days, but that Mr. Barnes did not discuss these Self Treated sick days with Respondent, or indicate to Respondent that there was anything improper about those days.  Tr. 158-160.

Transcripts of Respondent's criminal proceeding were introduced, as Dept. Exs. 11A through 11E, as follows: Dept. Ex. 11A -- December 9, 2008; Dept. Ex. 11B -- January 9, 2009; Dept. Ex. 11C -- January 29, 2009; Dept. Ex. 11D -- February 6, 2009; and Dept. Ex. 11E -- February 25, 2009.  As noted above, Respondent's (or her lawyer's) letters (Dept. Ex. 2A and 3) already established that Respondent was in court on December 9, January 9, February 6, and February 25 (as well as February 23, for which no transcript of criminal court proceedings was offered).  These transcripts reveal that in each of the criminal court proceedings in Dept. Ex. 11, the next hearing date was discussed and agreed; in other words, these exhibits show that Respondent had ample advance notice of each date she was to be in court for her next criminal proceeding. In addition, Dept. Ex. 11E, pertaining to the February 25, 2009 hearing, has the following at page 10, lines 19 - 21:

> THE COURT: Do you feel in good physical and mental health today?
>
> DEFENDANT DE PRIMA:  Yes.

This was part of a series of questions from the judge to Respondent, preparatory to accepting her guilty plea in her criminal proceeding.

## POSITION OF THE PARTIES

On this record, The Department submits that (a) the basic concept at issue in this case is that an employee should not deceive her employer, and yet this Respondent did

(c) it is undisputed that the doctor's note Respondent submitted with her OP-198 was authentic, and indeed, it was Respondent's own voluntary submission of information to the Department that explicitly demonstrated that for the two Medically Certified sick days she was in court, so she clearly was not hiding her actions and did not intend to defraud the Department as to those days; (e) as to Specification 4, Respondent was clearly entitled to be paid as Self Treated sick days for at least three days she was in court, so the most the Department has shown is that Respondent received pay for one day she was not entitled to; and (f) Respondent's "prior" discipline in her previous 3020-a matter actually came after all of the events charged in the instant case, so this is not a case of progressive discipline.

**DISCUSSION**

On the entire record before me, including my assessment of witnesses' credibility and of the probative value of evidence, I conclude that Specifications 1, 2 and 3 must be dismissed, as must Specification 4, Items 2, 3 and 4; and that Specification 4, Item 5, is sustained. I find that the proper penalty in this matter is a fine of $500.00.

**SPECIFICATION 1:** On or about March 17, 2009, Respondent offered a false instrument for filing when Respondent submitted an OP-198 requesting medically certified sick leave for dates when Respondent in fact attended court proceedings in Richmond County on or about:

1. February 23, 2009
2. February 25, 2009

**SPECIFICATION 2:** On or about March 17, 2009, Respondent falsified a business record when with intent to defraud, Respondent submitted an OP-198 requesting medically certified sick leave for dates when Respondent in fact attended court proceedings in Richmond County that should have resulted in unpaid leave on or about:

1. February 23, 2009
2. February 25, 2009

Certified leave status, were grocery shopping and transporting children to and from school. It was clear from the testimony of the SCI Investigator that criminal court dates are not lightly to be missed by a defendant, even one who may be too sick for her regular job. I do not find that the Department has demonstrated that attending criminal court proceedings, in which one is a defendant, is inconsistent with any Department regulation regarding absences or pay for absences, or is otherwise necessarily inconsistent with being on Medically Certified sick leave from work. Accordingly, the Department has not demonstrated that a teacher could not properly both attend court and be on Medically Certified sick leave.[4]

The Department asks that I find that Respondent was in fact not too sick for work on February 23 and 25, 2009, and therefore her OP-198 was false to the extent it indicated otherwise. To the extent the Department's evidence in this regard is that Respondent was in court on those days, I have found above that such court attendance is not inconsistent with being too sick to work. Had the Department established that the nature of Respondent's medical restrictions during this period rendered her incapable of attending court, or that the nature and duration of the court activities she participated in was inconsistent with the notion of being too sick for work, then the fact that she attended court might well call into question the medical certification, but those are not our facts. Indeed I note that in his interview of the doctor, the SCI investigator did not

---

[4] The Department knew by April 28, 2009 that Respondent had been both in Medically Certified sick status, and in court, on these two dates, yet it was only much later in 2009, and indeed after an intervening set of charges was submitted to arbitration, that anyone at the Department determined to treat this as a matter suitable for charging; this extremely delayed reaction by the Department to this information is not dispositive, as there was no suggestion that the Department was beyond any limitations period for this charge, but in the circumstances here I find that it corroborates that there was no obvious inherent inconsistency between Respondent's Medically Certified status and being in court.

that Respondent knew as of February 6, 2009 that she would be in court on February 23, 2009 (Dept. Ex. 11D), yet despite having over two weeks, she provided no notice of needing to be in court on February 23.  No transcript of the proceedings of February 23, 2009 was introduced, but for purposes of this part of my opinion, I assume that on February 23 Respondent learned that she would next be in court on February 25; the Department's argument then would be that even as to February 25, Respondent had the chance to give some, albeit short, advance notice of needing to be absent.  Since Respondent did not give any such notice, and had not sought or obtained a medical excuse until after these dates, the Department asks that I infer that Respondent intended all along to be paid for these dates, and came up with the Medically Certified gambit after these absences in order to accomplish this.

There was no evidence that Respondent gave any advance notice of any of her court absences.[5]  The problem with the Department's argument that I should rely on that fact to infer fraudulent intent is that, whatever Respondent's intentions might have been on February 23 and 25 regarding her absences on those days, the relevant date for me to determine Respondent's intentions under Specifications 1, 2 and 3 is March 17, 2009, the date she submitted her OP-198. And the evidence as to her intentions that date is that she submitted an OP-198 supported by a doctor's note that is indisputably authentic.  Moreover, as I have found, there is nothing in any evidence presented, including in any rule or regulation or other instruction, or, for that matter, in common

---

[5] I dismissed the "Notice" specification, Specification 5, on October 26, 2010.  In discussing the absence of advance notice in this Opinion and Award, I discuss it only from the perspective of the Department's argument that I should infer Respondent's fraudulent intent from the lack of advance notice.

set as the next hearing date. That January 29, 2009 was a court date for Respondent is also corroborated by Resp. Ex. 2. Respondent offered no substantial basis to suggest that Dept. Ex. 11C is not what it purports to be. The discussion reflected in that transcript indicates that Respondent was present in court, and her co-defendant was not. So, I find that the Department has proved that Respondent was in court on the four dates remaining in this Specification.[8]

Specification 4 charges that Respondent should have requested unpaid leave for the dates she was in court. The evidence shows that she was entitled to take up to three of her ten Self Treated sick days for personal business, which would include going to court. While Respondent could, presumably, have opted to ask for unpaid leave for these court dates, saving her Self Treated sick days (including the three available for personal business) for other dates, the Department has not shown any reason that I could find that, as to the first three such dates, she was required to treat them as unpaid rather than as paid Self Treated days. So to the extent that Specification 4 charges that Respondent engaged in misconduct in accepting pay for Self Treated sick days rather than requesting unpaid leave for December 9, 2008, and January 9 and 29, 2009, I find that the Specification must be dismissed.

This leaves Specification 4, Item 5 -- that Respondent improperly accepted payment for a Self Treated sick day for February 6, 2009, a day that she was in court, and on which there is no evidence that she was sick. I find that this Specification 4,

---

[8] No explanation was offered for why January 29, 2009 was not on either Respondent's or her criminal lawyer's letters regarding her court appearances. From the text of Respondent's letter, it appears she was merely repeating what was in her criminal lawyer's letter. The Department has not argued that I should attach any special weight to the absence of January 29, 2009 from either of these letters. For purposes of this decision, then, I conclude that this must have been an oversight by the criminal lawyer, repeated by Respondent.

decision. I agree with Respondent. Generally the important timing question for purposes of progressive discipline is whether the supposedly prior discipline occurred before the acts for which current discipline is being considered. That is not the case here, and it would not be consistent with progressive discipline for me to consider Respondent's prior 3020-a penalty in this case.

The parties have cited cases in support of their positions on penalty, which I have carefully considered. Each of the cases cited by the Department, involving termination of teachers, had significant elements not present here. *New York City Department of Education v. M.M.*, NYSED No. 5,244 (Paul S. Zonderman, December 27, 2005) involved a teacher who repeatedly falsified doctor's notes to excuse absences. The teacher in *New York City Department of Education v. G.O.*, NYSED No. 4,725 (Eleanor E. Glanstein, October 3, 2003) intentionally falsified a court document to excuse an absence for jury service beyond the duration the teacher actually served. In *New York City Department of Education v. W.H.*, NYSED No. 3,907 (Gerard G. Restaino, August 5, 2002) a teacher submitted time sheets that misrepresented his activities as Title I, on ten successive occasions; the arbitrator in that case was impressed that the teacher was not worthy of any belief. The teacher in *New York City Department of Education v. A.W.*, NYSED No. 4642 (Eleanor E. Glanstein, April 25, 2003) filled out an hourly time report with knowingly false information and forged her principal's signature. And in *New York City Department of Education v. E.A.*, NYSED No. 7,132 (Deborah M. Gaines, August 5, 2010) the teacher submitted several fraudulent documents about an absence and, again, the arbitrator did not find the teacher to be credible. Unlike these cases, I have found that the Department has not proved that this Respondent submitted any

only charge that the Department has substantiated – that Respondent accepted Self

Treated sick pay for one day that she should have asked to have treated as unpaid

leave – is not sufficiently substantial so as to support termination of her employment.  I

find that a lesser penalty is appropriate.

Respondent received pay for February 6, 2009, a day she was not entitled to

receive pay.  At a minimum, of course, she must pay it back.  Respondent has

calculated the pay for that day as $262.95, a figure not disputed by the Department.  Tr.

377.  Just requiring Respondent to disgorge this money would not deter future such

conduct.  I find it appropriate to nearly double this amount, and order that the penalty in

this matter shall be $500.00, to be paid over two months.

## AWARD

1.        Specification 1, 2 and 3 are hereby Dismissed; and

2.        In Specification 4, Item 1 was previously Dismissed; Items 2, 3 and 4 are
          hereby Dismissed; Item 5 is Sustained, and the Department has just cause to
          discipline the Respondent, Kim DePrima; and

3.        Specification 5 was previously Dismissed; and

4.        The appropriate penalty for the violation noted in Paragraph 2 above is a
          monetary penalty of $500.00, to be deducted from Respondent Kim
          DePrima's pay in equal installments over the next two months.

Dated: December 1, 2010
Basking Ridge, NJ

_Douglas S. Abel_
Douglas S. Abel, Esq.
Hearing Officer

I, DOUGLAS S. ABEL, affirm that I am the individual described in and who executed the
foregoing instrument which is my Opinion and Award.

_Douglas S. Abel_
Douglas S. Abel

THE STATE EDUCATION DEPARTMENT
THE UNIVERSITY OF THE STATE OF NEW YORK

In the Matter of the §3020-a Proceeding

    -by-

SED# 17,502
SED# 17,698

THE NEW YORK CITY DEPARTMENT OF
EDUCATION,

                Complainant,

        -against-

KIM DEPRIMA,

                Respondent.

OPINION
AND
AWARD

NOV 1 4 2011

| | |
|---|---|
| BEFORE: | MARY L. CRANGLE, Hearing Officer |
| APPEARANCES: | For the Complainant: |
| | MICHAEL BEST, Counsel to the Chancellor |
| | By:  Jordana Shenkman, Of Counsel |
| | |
| | For the Respondent: |
| | JAMES R. SANDNER, NYSUT General Counsel |
| | By:  Christopher Callagy, Of Counsel |

Pursuant to the provisions of New York State Education
Law §3020-a, the undersigned was appointed to hear and
decide whether there is just cause for the proposed
disciplinary action against the Respondent, Kim DePrima.
Hearings were conducted in this matter at the offices of
the New York City Department of Education at 49-51 Chambers
Street in New York City on June 21, June 27, June 29,
August 2, August 8, August 17, September 13 and September

23, 2011.[1] Both parties placed their oral summations on the record on September 11, 2011.

Respondent, Kim DePrima ("Respondent"), a tenured teacher previously assigned to P.S. 26 within District 31 in Staten Island, defends the §3020-a charges brought against her by the New York City Department of Education ("Department"). The Charges brought against Respondent (Ex. D-1) read as follows[2]:

During the 2010-2011 school year, Respondent engaged in criminal conduct and conduct unbecoming her profession as a teacher as follows:

**SPECIFICATION 1:**  On or about January 7, 2011, Respondent acted together and in concert with Shawn Hicks to fire gun shots into the residence of Jermaine Gavins, in that Respondent:
   A.   Entered Jermaine Gavins' property with Shawn Hicks wherein Shawn Hicks displayed a firearm at Jermaine Gavins.
   B.   While Shawn Hicks pointed said firearm at Jermaine Gavins, Respondent stated in sum and substance to Jermaine Gavins, I TOLD YOU THAT YOU WAS DEAD, and Shawn Hicks then fired approximately five (5) 9 millimeter rounds into Jermaine Gavins' residence with said firearm.
   C.   Fled with Shawn Hicks in a vehicle belonging to Respondent's relative.
   D.   Possessed one unspent 9 millimeter cartridge, in that said cartridge was located in the vehicle Respondent fled in.

---

[1] In addition, prehearing conferences were conducted in this matter on June 7 and July 8, 2011 and a conference was also conducted on September 21, 2011 with respect to Respondent's rebuttal case.
[2] These Charges are referred to herein as the "initial set of charges" in light of the fact that a second set of Charges were subsequently served on Respondent.

**SPECIFICATION 2:**   On or about January 2011 through April 2011, Respondent's actions as detailed in the above-mentioned specifications, caused widespread negative publicity, ridicule and notoriety to the NYC Department of Education as said misconduct was reported in the New York area news reports and papers including but not limited to:

A.  On January 11, 2011, Staten Island Live.com ran an article about Respondent's conduct entitled **Trouble follows Staten Island teacher, held on $100k bail after bullets fly.**

B.  On February 4, 2011, Staten Island Live.com ran an article that included information about Respondent's conduct entitled: **Staten Island felon sought in gun cases nabbed in New Jersey.**

C.  On April 25, 2011, The New York Post ran an article that included information about Respondent's conduct entitled: **NYC's fire-proof criminal teachers go back to class.**

D.  On April 25, 2011, the Village Voice ran an article that included information about Respondent's conduct entitled: **Owner of Killer Dog, White Collar Crooks, Kid-Tackler Still Working as NYC Teachers.**

**SPECIFICATION 3:**   On or about January 7, 2011, Respondent was arrested and later charged with violating New York State Penal Law Sections 110/125.25(1) (Attempted Murder in the Second Degree), 265.03 (Criminal Possession of a Weapon in the Second Degree), 265.02(1) (Criminal Possession of a Weapon in the Third Degree), and 120.25 (Reckless Endangerment in the First Degree) for the action(s) as described in Specification 1 and failed to immediately report the arrest and/or failed to provide a criminal court complaint in violation of Chancellor's Regulation C-105.

### The Foregoing Constitutes:

- Just cause for disciplinary action under Education Law §3020-a;

- Neglect of duty;

- Criminal conduct;

- A violation of Chancellor's Regulation C-105;

- Negative Notoriety;

3

- Conduct unbecoming Respondent's position, or
  conduct prejudicial to the good order, efficiency,
  or discipline of the service;

- Substantial cause rendering Respondent unfit to
  perform properly her obligations to the service; and

- Just cause for termination.

Thereafter, at the beginning of the second day of
hearing, the Department served the Respondent with a second
set of charges which read as follows[3]:

During the 2008-2009, 2009-2010 and 2010-2011 school
years, Respondent engaged in criminal conduct and/or
conduct unbecoming her profession as a teacher as follows:

### IN PARTICULAR:

**SPECIFICATION 1:**  On or about and in between the time of
February 25, 2009 through January 7, 2011, in disregard of
the terms of her five-year felony probation for
Manslaughter, (implemented on February 25, 2009, Respondent
failed to refrain from consorting with disreputable people
including, but not limited to, convicted felons Shawn Hicks
and/or Jermaine Gavins.

**SPECIFICATION 2:**  On or about January 7, 2011, in disregard
of the terms of her felony probation for Manslaughter,
Respondent:

   A.   Consorted with convicted felon Shawn Hicks;

   B.   Consorted with convicted felon Jermaine Gavins;

---

[3] These Charges are referred to hereafter as the "second set of charges" to distinguish them from the initial
Charges brought against Respondent.

C.   Failed to lead a law abiding life when, on January 7, 2011, she acted in concert with Shawn Hicks to fire gun shots into Jermaine Gavin's home; fled the scene with Shawn Hicks in her car and possessed a live 9MM bullet in her car, therein violating New York State Penal Law Sections 110/125.25(1) (Attempted Murder in the Second Degree), 265.03 (Criminal Possession of a Weapon in the Second Degree), 265.02(1) (Criminal Possession of a Weapon in the Third Degree), 120.25 (Reckless Endangerment in the First Degree) and New York City Administrative Code 10-306(d) (Unlawful Possession of Ammunition).

D.   Failed to refrain from possessing a firearm when she was arrested for Possession of a Weapon based on acting in concert with Shawn Hicks to possess a firearm that was used in the conduct described above.

### The Foregoing Constitutes:

- Just cause for disciplinary action under
  Education Law §3020-a;

- Neglect of duty;

- Criminal conduct;

- Violation of probation;

- Conduct unbecoming Respondent's position, and/or
  conduct prejudicial to the good order, efficiency,
  or discipline of the service;

- Substantial cause rendering Respondent unfit to
  perform properly her obligations to the service; and

- Just cause for termination.


These Charges were consolidated (T. at 160).

## FINDINGS OF FACT

Respondent has been employed by the New York City Department of Education as a special education teacher for approximately 15 years (T. at 353). The instant matter concerns Respondent's off-duty conduct on January 7, 2011. While some of the testimony was conflicting and lacked credibility in many respects, I find the following facts based on the credible evidence in the record.

As of January 7, 2011, Respondent had recently been involved in a romantic relationship with Jermaine Gavins ("Gavins")(T. at 229, 247, 357) and she, as well as two of her children, had lived with him and members of his family at 59A Newark Avenue in Staten Island, New York for a period of time (T. at 356-357). Respondent moved out of 59A Newark Avenue in late December, 2010 after the relationship ended (T. at 228, 233, 356-357). Respondent and Gavins had problems in their relationship and there was tension between them at the time Respondent moved out (T. at 250, 257, 366). Gavins did not want Respondent to move out (T. at 238). Respondent and Gavins were both named on the lease for the 59A Newark Avenue premises at the time Respondent moved out (Ex. D-15). On January 5, 2011 a "Forcible Entry/Detainer" action was filed against them in the Civil Court of the City of New York – Richmond County

6

seeking to evict them from the premises and recoup unpaid January rent (Ex. D-15; T. at 252, 365)[4].

On the evening of January 7, 2011 Respondent went to 59B Newark Avenue, the property adjoining the residence where she had formerly lived with Gavins (T. at 361). Lakesha Dennis resided at 59B Newark Avenue along with members of her family, including her six children and her fiancé (T. at 320, 334, 336). Respondent and Dennis had been neighbors when Respondent resided at the adjoining 59A Newark Avenue premises (T. at 320-321, 361).

On her way to 59B Newark Avenue, Respondent, accompanied in her car by "Liza"[5], stopped to pick up Shawn Hicks at 65 Holland Avenue (T. at 364). Hicks did not live at 65 Holland Avenue, which is an apartment building (T. at 363), but Respondent agreed to pick him up at that location at his request (T. at 362-364). Respondent had known Hicks for at least seven to eight years (T. at 360) and had periodic interactions with him (Id.). For example, Hicks

---

[4] This matter was subsequently resolved with a Stipulation of Settlement signed by Respondent and Gavins (Ex. D-15).
[5] While Respondent testified that a female by the name of "Liza" accompanied her in the car when she drove to Dennis' house, there is no indication in the record as to who "Liza" was, or what her relationship was to Respondent (See, e.g., T. at 364). "Liza" did not testify in this proceeding.,

had done work at Respondent's mother's house, at Respondent's request (T. at 361, 430).[6]

When Respondent arrived at 65 Holland Avenue to pick Hicks, Hicks was accompanied by Gary Hernandez (T. at 364). Respondent did not know Hernandez prior to that time (T. at 362, 364, 432). Both Hicks and Hernandez got into the back of Respondent's red Toyota Corolla and Respondent proceeded to drive to 59B Newark Avenue (T. at 364).

Once they arrived at 59B Newark Avenue, Respondent along with Liza, Hicks and Hernandez went into Dennis' house (T. at 325, 367). At some point thereafter, Hicks, Hernandez and Respondent went outside and engaged in a verbal confrontation with Jermaine Gavins in front of Gavins' residence at 59A Newark Avenue (T. at 238, 327, 368, 437). For the reasons which will be discussed at length below, I find it more likely than not that Hicks and Hernandez, at Respondent's behest, engaged Gavins in a verbal exchange with the intent of intimidating and threatening him on Respondent's behalf. I also find, again for the reasons which will be discussed at length below, that during this confrontation, outside at the steps to 59A

---

[6] While Gavins and Hicks both testified that Respondent and Hicks had had a sexual relationship, Respondent denied that she was ever sexually involved with Hicks. In arriving at my decision in this matter I do not find it necessary to resolve this conflict in testimony.

Newark Avenue, Respondent was present and stated to Gavins words to the effect of "I told you that you was dead".

Gavins called 911 several times the evening of January 7, 2011, initially reporting that he was "being harassed" and that his ex had brought some people there to harass him (T. at 272; Ex. D-10 (the tape recorded 911 calls)). At approximately 10:05 PM, while Gavins was speaking to a 911 operator, Hicks fired gun shots into the front door of Gavins' residence at 59A Newark Avenue. Gavins told the 911 operator that "someone just shot my door". Gavins then identified Respondent by name as being involved, told the operator that Respondent and Hicks were leaving in Respondent's car, and described Respondent's red Toyota to the operator (Ex. D-10). Willie Foster, Gavins' stepfather who was also residing at 59A Newark Avenue at the time called 911 as well to report the shooting.[7] Furthermore, an unidentified neighbor also called 911 to report the shooting (Ex. D-10). When Hicks fired the shots into the door of 59A Newark Avenue, Gavins, his mother, his stepfather Willie Foster, and Fosters' children were present on the premises (T. at 134, 273-274, 305).

---

[7] Foster testified in this proceeding. He initially denied having called 911 that evening, but when confronted with the 911 tape recording of his call, acknowledged that he did so (T. at 306, 310).

After Hicks fired five shots into the door at 59A Newark Avenue, Hicks got into Respondent's red Toyota Corolla which was then parked on the street in front of 59A Newark Avenue, and, with Respondent in the driver's seat, Hicks in the passenger side front seat, and Hernandez in the back seat, Respondent drove away from that location (T. at 369-370, 373).

Respondent drove to Jonesy's Bar some 10 blocks away where she parked her car (T. at 373), and she, Hicks, and Hernandez entered the bar (T. at 373). Respondent was familiar with Jonesy's Bar because she used to tend bar there (T. at 373). When Respondent entered the bar, she saw a co-worker there, Wade Alston, who was at the bar having a drink (T. at 374). Respondent spoke to Wade Alston and asked him to drive her home[8] (T. at 374). While Respondent was conversing with Alston, Hicks was seated a few seats down at the bar (T. at 374). Hicks and Hernandez had at least one drink and left (T. at 374). About 40 minutes after Respondent arrived at that location, Respondent and Alston left Jonesy's Bar with Wade Alston driving Respondent's red Toyota (T. at 376; Ex. D-6). Almost immediately, Alston and Respondent were pulled over by the

---

[8] While identified as a witness for the defense, Alston did not testify during Respondent's case in chief. He did testify on rebuttal, but his testimony was limited solely to issues which had been raised in the Department's rebuttal case.

police (T. at 43, 377). The car was searched and a live round of ammunition was found on the floor by the passenger side front seat (T. at 45). Respondent was taken into custody and placed under arrest (T. at 44-45). Respondent did not say anything to the police officers at the scene other than she wanted a lawyer (T. at 45, 63, 197). At no time on January 7, 2011 did Respondent contact the police or call 911 (T. at 138, 195).

After Gavins' calls to 911 about the shooting, a number of police officers, including Officers Anzalone and Yun, and Detective Carroll, responded to 59A Newark Avenue after being dispatched at approximately 10:05 PM by the 911 operator (T. at 38, 133). When the officers arrived at the premises, they spoke to both Gavins and Foster about the incident (T. at 38-39). Gavins told Officers Anzalone and Yun that Gavins' ex-girlfriend, Respondent, and Hicks were involved (T. at 40, 133) and that Respondent had come out of the door of the adjacent premises and said to him "I told you yous was dead" (T. at 40, 59, 70). Gavins also told the police officers that Hicks had fired the shots (T. at 40), and that Hicks and Respondent had gotten into Respondent's red Toyota and driven away (T. at 40-41). Foster confirmed what Gavins told the police officers (T. at 134) and indicated that Respondent, Hicks, and Gavins

11

had been arguing outside the premises (T. at 134, 138). Officer Yun described Gavins' and Foster's demeanor at the scene as "terrified . . . they were very agitated . . . shaking (T. at 134). Police Officer Anzalone described their demeanor at the time as irate, nervous and upset (T. at 46).

The police officers also observed five bullet holes in the front door of 59A Newark Avenue (T. at 39-40, 89, 90, 133, 135; Ex. D-8). Five cartridge casings were retrieved from the scene (T. at 142).

A description of Respondent and Hicks, as well as Respondent's car, was put out over the police radio (T. at 135 - 137) and the police located Respondent's vehicle shortly thereafter parked in front of Jonesy's Bar (T. at 41-42). The police proceeded to observe it from unmarked police vehicles for about 40 minutes (T. at 41-42, 43) until Respondent and a male were seen leaving the bar and getting into Respondent's car (Id.). At that point the police stopped the car.

Gavins was in the back of a police car when Respondent was apprehended (T. at 268), identified her to the police, and signed a complaint against her (Ex. D-6). Both Gavins and Foster also went to the police station that night, spoke to police about the events, and provided

12

handwritten statements about the incident which they signed in the early morning hours of January 8, 2011 (T. at 242, 262; Ex. D-16 and Ex. D-17). Detective Guariano interviewed Gavins at the police station that night (T. at 179). Gavins told Guariano the substance of what he later memorialized in a written statement (T. at 180, 185; Ex. D-16) and insisted to Guariano several times that Respondent had said to him "I told you you were dead" (T. at 180). Gavins also signed a Domestic Incident Report, pursuant to procedure, because he and Respondent were ex girlfriend and boyfriend (T. at 52, 71; Ex. D-6). Gavins' statement, which he wrote and signed in the early morning hours of January 8, 2011, and acknowledged at the hearing in this proceeding as his statement (T. at 263-264), reads as follows:


120 Detective Squad
1/8/11 0200 hrs

At or about 9 PM on above mention date I was awaken from my sleep by someone pounding on my door. I answered and an unidentifiable guy tells me Kim brought him to speak To me. While conversating with this guy Hicks comes out of 59b and askes "Wat I wanna do" I then returned to my apartment and called 911. The police arrived promptly and took a statement as the officers are pulling away Hicks comes back out of the next door apt-59b and pulls a lack pistol from his hoody pocket Hicks teels me "them niggsa gone now what" I told him to shoot. Kim comes out of the next door apartment, leans over the rail and states "I told you you are dead mother fucker" My mother hears this and comes to the door so I push my mother away from the door close and lock it and call 911. As Im on the phone with

13

the operator shoot come through my doors.  I crept to the window to look out and I seen Kim driving Hick in the passengers' headed down toward Richmond Terrace. (Ex. D-16)

Detective Guariano also interviewed Willie Foster and took a written statement about the incident from him (T. at 186, 188).  Foster told Guariano that after the shots were fired, he saw Respondent pushing Hicks to get into her car (T. at 209). Foster's statement which he wrote, and signed in the early morning hours of January 8, 2011, and acknowledged at the hearing in this proceeding as his statement (T. at 297, 306-307) reads as follows:

> 120 Detective Squad
> 1/8/11 0210 hrs.

At approximately 9:30 PM I Willie Foster, saw Mr. Hicks pull out a gun and shot at the house which I was standing at the window – Then I saw Kim make them get in the car and pull off.  (Ex. D-17)

Police Officer Anzalone was present when Gavins and Foster were interviewed at the police station (T. at 46). Both Gavins and Foster reiterated to Officer Anzalone what they had previously told him at the scene (Id.). Both Gavins and Foster continued to appear irate, nervous and upset about the incident (T. at 46, 74).

The police investigation which followed, which included ballistics tests, showed that the bullet found on the floor in Respondent's car matched the bullets retrieved

14

at the scene of the shooting at 59A Newark Avenue (T. at 51, 144). Wade Alston was also interviewed as part of the investigation. Alston informed the police at the scene that Respondent had asked him to drive her home on the evening of January 7, 2011 because she said she was intoxicated (T. at 44) and that Respondent had told him to keep the car and that she would get it back from him the next day (T. at 113-114). Alston was subsequently interviewed by Detective Carroll (T. at 90-92; Ex. D-9) and told Carroll the same thing. Alston never told the police either at the scene, or later, that Respondent had told him she had been threatened by Hicks (T. at 93).

A criminal complaint was signed against Respondent (Ex. D-6). Respondent was not indicted (T. at 112) and the criminal complaint against her was dismissed on motion of the District Attorney on August 30, 2011. (Ex. R-5). The criminal matter against Respondent was not pursued because Gavins became uncooperative and changed his story, as did Foster (T. at 57-58, 64, 73, 242-243, 297, 307).

At the time of the January 7, 2011 incident, Respondent was on probation. Respondent had been placed on five years' probation on April 16, 2009 in Richmond Supreme Court because of a manslaughter conviction (Ex. D-12). Respondent's manslaughter conviction resulted from an

incident when pit bulls raised by Respondent and her codefendant, James McNair, mauled and killed a 90 year old neighbor. Respondent's probation was deemed violated as a result of her arrest on January 7, 2011 (Ex. R-1). Respondent was subsequently restored to probation and the Violation of Probation was dismissed (Ex. R-6).

Hicks was apprehended and subsequently pled guilty to a weapons charge, and was sentenced to two years incarceration (T. at 493, 523).

News reports appeared on Staten Island.Live on January 11, 2011 and again on February 4, 2011 detailing Respondent's arrest and the fact that she was a New York City public school teacher. Respondent lives and taught on Staten Island. Two articles also appeared in the New York Post on April 25 and April 26, 2011 describing Respondent's arrest, as part of a series critical of school employee disciplinary hearings. Another article appeared in the Village Voice on April 25, 2011 which discussed Respondent's arrest and the conduct which led to it.(Ex. D-5).

Respondent has been the subject of two prior §3020-a disciplinary proceedings (Exhibits D-3a, D-3b, D-4a and D-4b). In November, 2009, Respondent received a three month suspension without pay for engaging in criminal conduct and

16

conduct unbecoming a teacher as a result of her guilty plea

to a Class C Felony, Manslaughter in the Second Degree, for

recklessly causing the death of a 90 year old neighbor by

failing to secure two potentially violent dogs on her

property, and for neglect of duty as a result of time and

attendance violations (Ex. D-3b). In December, 2010

Respondent received a $500 fine for accepting pay for a day

off when she was not entitled to be paid for that day (Ex.

D-4b).


### DISCUSSION

I find, based on the credible evidence in this record,

that it more likely than not that Respondent acted in

concert with Hicks and engaged in the conduct alleged in

Specification 1 of the initial set of Charges brought in

this matter (Ex. D-1).

While Respondent denied that she was anything other

than an unknowing and innocent victim of Hicks' conduct on

January 7, 2010, I am not persuaded by her contentions in

this regard. Based on the credible evidence in the record I

conclude that Respondent was actively involved with Shawn

Hicks in the events which took place on January 7, 2011.

I do not find Respondent's assertion that she went to

59B Newark Avenue on January 7, 2011 merely to attend a

17

party to be credible. I find no persuasive evidence that there was a "party" at 59B Newark Avenue on the evening of January 7, 2011. The testimony in the record about such an event was vague, inconsistent, and inherently incredible. For example, Dennis testified that the "party" was a birthday celebration for herself and Respondent (T. at 321), yet Respondent testified that it wasn't a birthday party (T. at 431). There is no credible evidence that any such "party" was planned in advance. The "guests" consisted solely of Respondent, Respondent's niece Josie, "Liza", Dennis' children and fiancé who resided at 59B Newark Avenue with her, and Shawn Hicks who happened to bring Gary Hernandez along with him. Dennis testified that the "party" only lasted for two hours, from 6:00 pm to 8:00 pm (T. at 344), while Respondent testified that she arrived at the "party" around 7:30-8:00 PM and left around 10:00 PM (T. at 434).[9]

I find it more likely than not that Respondent initiated the visit to Dennis' premises and that the assertion of a "party" taking place was contrived in an effort to provide a legitimate explanation for why Respondent and Hicks would have been at that location at

---

[9] Dennis also testified that she was in bed by 10:00 PM that evening and heard no gunshots. Her testimony in this regard in face of the uncontroverted evidence that five gunshots were fired into the front door of the premises adjacent to hers at around 10:05 PM that evening further undermines the credibility of her testimony concerning the events of January 7, 2011.

that time. I also do not find it logical or reasonable that Respondent having only recently moved out of the adjoining premises under less than amicable circumstances, and having a rent dispute with Gavins, would have decided to visit the adjoining premises simply for social reasons.

Furthermore, I do not believe Respondent's contention that she only picked up Shawn Hicks on the way to 59B Newark Avenue because Dennis had also invited Hicks to the party and asked her to do so. The testimony concerning the circumstances under which Respondent was allegedly asked by Dennis to pick him up and bring him to 59B Newark Avenue was vague, illogical, and inherently incredible. For example, Dennis supposedly asked Respondent to pick Hicks up, yet Dennis testified she did not know where Hicks lived. There is likewise no credible explanation for the incongruity of Hick's presence at the "party" or why he would come armed with a weapon to a party.

I find it more likely than not that it was on Respondent's initiative that Hicks accompanied her to 59B Newark Avenue and that Respondent asked Hicks to accompany her to that location so that Hicks could intimidate and/or

threaten Gavins on her behalf. There is no other plausible explanation for Hicks' presence.[10]

Respondent had a motive for wanting Gavins threatened. Respondent was the lead name on the lease at 59A Newark Avenue and a court action had recently been filed against her seeking, in part, back rent. Respondent testified that she moved out of 59A Newark Avenue in late December of 2010 because she did not want to be responsible for the rent. Respondent and Gavins had just broken up after living together for at least a year; there was tension in their relationship and Gavins had not wanted Respondent to move out. There was also a lingering issue of responsibility for the rent due on 59A Newark Avenue.

Given these circumstances I find it more likely than not that Respondent wanted to convey to Gavins in the strongest way possible that their relationship was over and that she was not prepared to undertake any further financial responsibilities with respect to 59A Newark Avenue. I find it more likely than not that Respondent wanted Gavins out of her life and she turned to her friend Shawn Hicks to convey that message to Gavins[11].

---

[10] Gavins confirmed that, testifying that "I knew Shawn won't come where he knows I'm at too much unless there's a reason for it" (T. at 243).

[11] I do not credit Respondent's testimony that her split with Gavins was amicable. It is not reasonable or logical under the circumstances.

Not only did Respondent bring Hicks to Gavins'
residence that evening, and had a motivation in doing so,
there is other credible evidence in the record to support
the conclusion that she was a knowing participant in what
occurred thereafter.

The record establishes that after arriving at Dennis'
house, Hicks and Hernandez went outside to 59A Newark
Avenue and engaged Gavins, harassing him about Respondent.[12]
Gavins called 911 to complain. The content of Gavins' 911
calls demonstrate Respondent's involvement with Hicks in
the events which transpired on the evening of January 7,
2011 at 59A Newark Avenue and belie Respondent's contention
that she was merely an innocent bystander when Hicks
ultimately fired five shots into the front door of 59A
Newark Avenue. When the police later arrived at their
premises, Gavins and Foster corroborated what they had told
the 911 operators, and they both again corroborated
Respondent's active involvement with Hicks in the
interviews they provided at the police station thereafter,
and in their written statements. It is clear that
Respondent was the subject matter of the dispute between
Gavins and Hicks that evening, and that it was on

---

[12] While both Respondent and Gavins testified that Gavins and Hicks did not like each another, there is no credible evidence in the record that their interactions on January 7, 2011 concerned anything other than Gavins' relationship with Respondent.

Respondent's behest, that Hicks fired the five shots into Gavins' front door. There is no other plausible explanation.[13]

As found above, Respondent also demonstrated her involvement in Hicks' conduct by contemporaneously telling Gavins words to the effect of "I told you that you was dead". Respondent does not deny being outside 59A Newark Avenue on the evening of January 7, in the presence of Hicks, and addressing Gavins. Although Respondent disputed ever saying those precise words to Gavins at the time, contending that what she told Gavins was "We're not together . . . I'm allowed over here"; that the relationship was over" (T. at 368, 437), I find to the contrary. Gavins, in essence, confirmed that Respondent did tell Gavins that he was dead. Gavins testified that he exchanged words with Respondent the night of January 7, 2011, outside his premises at 59A Newark Avenue, and that "When I was like, oh, is this seriously how it's going to go down between us. And she was like, what can I tell you, we're dead. Like, that's it, it's over" (T. at 238).[14]

---

[13] I do not credit Respondent's testimony that she did not know that Hicks was armed that night. While I do not credit Hicks' testimony that Respondent had arranged with him to commit a contract killing of Gavins, I do find that Respondent knew of Hick's background, particularly as a gang member, and it was for those reasons that she sought out Hicks to threaten and/or intimidate Gavins on her behalf.

[14] While Gavins, in his testimony, attempted to change his choice of words in describing what Respondent had said to him that evening, and denied he took Respondent's words as a threat, I do not find his testimony in this regard to be credible. I had the opportunity to observe his demeanor during his testimony and it

22

Furthermore, the record is uncontroverted that after the shooting, Respondent drove her car, with Hicks and Hernandez in it, to Jonesy's Bar on Holland Avenue where they all got out of the car, went inside, and Respondent remained there for about 40 minutes before leaving with Alston. At no time did Respondent ever contact 911 or call the police about the events which had transpired. Despite the fact that Respondent had a cell phone with her, she made no telephone calls after she went into Jonesy's Bar although clearly she had the ability and opportunity to do so. Furthermore, Respondent never told Wade Alston there was any reason why she wanted him to drive her home other than that she was intoxicated. When stopped by the police officers after leaving Jonesy's Bar, Respondent did not convey any concerns to them and refused to speak except to ask for a lawyer. This course of conduct is certainly more consistent with being an active participant in the night's horrific events rather than being simply an innocent observer.[15]

_____

supports my conclusion that Gavins was being untruthful in how he now was describing the nature of Respondent's involvement in the events of January 7, 2011. Rather, I credit his contemporaneous statements to the police as more accurately reflecting what he saw and heard on the night in question.
15 Although Respondent testified that Hicks put a gun to her head after he got in her car at 59A Newark Avenue and told her to "drive", and that she felt threatened as a result, the overwhelming credible evidence belies her contention in this regard. For example, Respondent could provide no reasonable explanation for why, if this were true, she made the choice to drive to Jonesy's Bar, or why she would go inside with Hicks and Hernandez and remain inside for an extensive period of time.

For the reasons set forth above, based on a thorough review of the entire record in this matter, and having had the opportunity to observe and assess the demeanor of the witnesses, and consider their potential motivations to fabricate, exaggerate, or collude, and after considering what is more reasonable or likely to have occurred under the circumstances, I conclude that the Department has met its burden of proof with respect to the allegations set forth in Specification 1 in this matter. I further find that by engaging in the conduct set forth in Specification 1, Respondent engaged in conduct unbecoming her profession as a teacher. Accordingly, Specification 1 of the first set of Charges in this matter is sustained[16].

I also find that the Department has proven, by the requisite preponderance of the evidence, the allegations in Specification 2 of the initial set of Charges.  There can be no serious dispute that there was significant negative publicity concerning the events of January 7, 2011 involving Respondent and Shawn Hicks, Respondent's arrest as a result, and the fact that Respondent was a teacher in

---

[16] The Department also charged Respondent with having engaged in criminal conduct as a result of the events charged in Specification 1. While I have found that Respondent engaged in the acts alleged in Specification 1 and that this constituted conduct unbecoming her profession, I decline to also find that she engaged in criminal conduct as a result. That conclusion is one for the criminal courts, not a §3020-a arbitrator. However, the fact that Respondent was not indicted or convicted of criminal conduct in this matter does not mean that the underlying conduct did not occur, or that it is not properly at issue in this proceeding. The legal standard of proof beyond a reasonable doubt applied in a criminal proceeding is more stringent than the legal standard of proof by a preponderance of the evidence applied in this proceeding.

the New York City school system. Respondent does not deny the negative media coverage or the humiliation it caused the Department (T. at 404). Most of the news articles emphasized the fact that this was not Respondent's first involvement in criminal conduct and referred, as well, to her previous conviction for manslaughter.

Respondent argues that it is unfair to charge her based on negative publicity which refers back to a prior matter which has been adjudicated both in the courts and in a separate §3020-a proceeding. However, but for Respondent's involvement in the events of January 7, 2011, there would have been no reason for the press to refer back to the prior matter of her manslaughter conviction. The net result is that it was the Respondent's conduct which caused the negative publicity again in this case and cast the New York City Department of Education in a negative light. Therefore, I find that the Department has proved the allegations set forth in Specification 2, and accordingly, Specification 2 of the initial set of Charges is sustained.

On August 17, 2011 the Department moved to dismiss Specification 3 of the initial set of charges (T. at 484). Accordingly, Specification 3 is dismissed.

The second set of Charges, as detailed above, address Respondent's prior conviction for manslaughter, and the

25

conditions imposed on her as part of her sentence to five years' probation. The Department contends that the evidence in this matter establishes that Respondent disregarded the terms of her probation by consorting with disreputable people and convicted felons, and by failing to lead a law abiding life and refrain from possessing a firearm.

The record before me establishes that Respondent was, on January 7, 2011, on probation as a result of her manslaughter conviction. The court imposed probation, although initially subject to revocation because of Respondent's arrest, was reinstated as of September 13, 2011 when Respondent was restored to probation. I am unpersuaded that I have jurisdiction to determine that Respondent violated her probation. I find such a determination to be within the exclusive jurisdiction of the court which sentenced Respondent to probation. To the extent that Specifications 1 and 2 of the second set of Charges allege other than a violation of probation, I find such allegations to be duplicative of the allegations set forth in Specification 1 of the initial set of charges. Accordingly, I dismiss Specifications 1 and 2 of the second set of Charges.

Having found that Respondent engaged in conduct unbecoming her profession as a teacher as a result of her

26

involvement in the events of January 7, 2011, I next turn
to consideration of the appropriate penalty to be imposed.

Respondent contends that even if I were to find that
she engaged in the conduct alleged in Specification 1, this
does not constitute grounds for disciplinary action because
the conduct at issue occurred off-duty and there is no
demonstrated nexus to Respondent's ability to perform her
duties as a teacher. The Department alleges otherwise; that
Respondent's conduct was so egregious that it undermines
her capacity to act as a role model for students and thus
adversely impacts on her fitness to return to the
classroom.  The Department further contends that the
negative publicity concerning Respondent's conduct has so
compromised the credibility of the Department that, again,
termination is the appropriate penalty to be imposed.

After thoroughly weighing all the evidence,
considering the arguments advanced by both parties, and
reviewing the case law each submitted in support of their
respective positions, I conclude that termination is the
appropriate penalty to be imposed in this matter.

As has been held in other cases, the fact that the
conduct at issue occurred outside of school and did not
involve students, school personnel, or school property does
not end the inquiry as to whether there is a nexus between

27

the conduct and the performance of a Respondent's duties as a teacher.

I find that the Department has proven such a nexus here. A significant part of a teacher's responsibility is to be a role model to her students. I am convinced that Respondent has demonstrated by her conduct in this case that she lacks this requisite quality. While certain aspects of Respondent's private life may be of no legitimate concern to the Department, in this case the fact that Respondent engaged in the type of behavior at issue is a matter of legitimate concern to the Department.

This case is not about Respondent having questionable taste in men as she contends. Rather, it is about the conduct which Respondent engaged in on January 7, 2011 and its impact on her fitness to teach. Respondent involved herself in a criminal endeavor to advance her personal interests. The fact that Respondent was neither indicted nor convicted of a crime as a result is not dispositive of this matter.  The fact that the District Attorney ultimately chose not to pursue the matter does not mean the conduct did not occur.

While I agree that there is no evidence in this record that Respondent was not a satisfactory teacher as of January 7, 2011, that does not conclude the inquiry into

28

whether she continues to be fit to teach. Based on my
findings in this case I conclude that Respondent cannot be
a role model for impressionable students, and particularly
special education students who have particular needs and
limitations, when she addresses adversity and conflict in
her personal life by resorting to physical violence that
puts innocent persons' lives in jeopardy. Respondent has
also shown such an astounding lack of good judgment by her
involvement in the events of January 7, 2011 that I find
she can no longer be trusted to exercise the type of
judgment required of teachers working with students in New
York City schools. Her behavior was such that I cannot
require the Department of Education to assume the risk
that, in the future, Respondent could engage in conduct
which would jeopardize the well being of students entrusted
to her care.

In this regard, I take into consideration the fact
that this is not the first documented instance where
Respondent has demonstrated a lack of judgment which inured
to the harm of others. As discussed above, on January 7,
2011 Respondent was on probation as a result of her
manslaughter conviction. She had also been the subject of a
§3020-a proceeding as a result and by decision dated
November 7, 2009 was found guilty of engaging in criminal

29

conduct and conduct unbecoming a teacher and suspended without pay for three months. Certainly this should have been sufficient to place Respondent on notice that her continued employment as a teacher would be in significant jeopardy if there was a further incidence of the same or similar type behavior. However, just 2 months after the decision in her prior §3020-a proceeding, Respondent again involved herself in criminal behavior that placed innocent lives in danger and, again, the Department of Education was subjected to hostile press concerning Respondent's continued employment as a teacher.

In arriving at an appropriate penalty in this matter, I have also taken into consideration Respondent's failure to accept responsibility for her conduct on January 7, 2011. While Respondent expressed remorse for having made "bad judgments" in associating with Shawn Hicks, I have found her testimony about the actual events which occurred on January 7, 2011 to be less than credible. Respondent still seeks to play the innocent victim in the face of overwhelming evidence to the contrary. This pattern of denial and inability to accept responsibility or face reality, only exacerbates the risk in placing her back in a classroom.

This is Respondent's third 3020-a proceeding and the second one involving criminal behavior. To the extent that the Department would have any obligation to remediate, or Respondent would have any right to progressive discipline, under these circumstances, I find both have been satisfied.

Finally, I am not persuaded that there are any mitigating circumstances which might favor a penalty less than termination. Given the circumstances of this matter, I cannot find Respondent's years of service to be a mitigating factor. Respondent's conduct at issue in this case is simply too serious and outweighs whatever mitigating effect her years of service might have, under different circumstances, on an appropriate penalty. I can find no basis to afford Respondent yet another opportunity to return to the classroom.

## CONCLUSION

For the reasons set forth above, and in accordance with the findings set forth above, I conclude that the Department has met its burden of proving, by a preponderance of the evidence, that Respondent engaged in conduct unbecoming her profession as charged in Specification 1 of the initial set of Charges and that this conduct resulted in negative publicity, ridicule and

31

notoriety to the New York City Department of Education as charged in Specification 2 of the initial set of Charges. Clearly Respondent's conduct constitutes just cause for disciplinary action.  Furthermore, for the reasons set forth above, I am persuaded that it constitutes just cause for termination. There is simply no evidence in this record to support a lesser penalty.

### AWARD

With respect to the initial set of Charges and Specifications before me in these proceedings, I find as follows:

(1)   Specification 1 is sustained.

(2)   Specification 2 is sustained.

(3)   Specification 3 is dismissed.

With respect to the second set of Charges and Specifications before me in these proceedings, I find as follows:

(1)   Specification 1 is dismissed.

(2)   Specification 2 is dismissed.

Based on the Charges and Specifications, and for the reasons previously set forth, there is just cause for

disciplinary action.  The appropriate penalty to be imposed

on Respondent is termination.

Mary L. Crangle
Hearing Officer

Dated: 11/11/11

State of New York:
County of Albany :  SS:


On this 12Tu day of November, 2011, before me
personally came and appeared MARY L. CRANGLE, known to me
to be the individual described herein and who executed the
foregoing instrument in my presence.

Notary Public

SCOTT MICHAEL SALVAGNI
NOTARY PUBLIC IN THE STATE OF NEW YORK
QUALIFIED IN ALBANY COUNTY NO. 01SA6237948
MY COMMISSION EXPIRES MARCH 28, 2015

1     CRIMINAL COURT OF THE CITY OF NEW YORK

2     COUNTY OF RICHMOND          PART AP-1

3     --------------------------------------------X

4     THE PEOPLE OF THE STATE OF NEW YORK

5

6                 -against-        DOCKET #2011RI000257

7     KIM DEPRIMA

8     --------------------------------------------X

                        67 Targee Street

9                         Staten Island, New York

                        August 30, 2011

10

    B E F O R E:

11

                HONORABLE ALAN MEYER,

12                 Criminal Court Judge

13     A P P E A R A N C E S:

14                 DANIEL M. DONOVAN, JR., ESQ.

                District Attorney, Richmond County

15     BY:     GUY TARDANICO, ESQ.

                Assistant District Attorney

16                 for the People

17                 MICHAEL RYAN, ESQ.

                for the Defendant

18

19

20

21

22

23     KATHLEEN SAVAGE

    OFFICIAL COURT REPORTER

24

25

1           COURT OFFICER:  Kim DePrima, 2011 257.

2           THE COURT:  Defendant on ROR status and present.

3           People?

4           MR. TARDANICO:  Your Honor, I understand that it's

5     on for Grand Jury today and final marking.  I would like --

6           THE COURT:  It's not the final marking.  It had

7     been final marking for April 11th and adjourned to May 25th,

8     stayed warrant and then adjourned again for today's date,

9     chargeable time.  Arraignment date of January 9th.

10          MR. TARDANICO:  Well, Judge, I just have a brief

11    record to make, before dismissing the case against the

12    defendant, if I can.

13          THE COURT:  Go ahead.

14          MR. TARDANICO:  Your Honor, Kim DePrima was

15    arrested after the complainant in this case implicated taking

16    part in a shooting directed at him in front of his residence.

17    Specifically, the complainant and family allege DePrima told

18    the complainant he was dead, but Shawn Hicks, who was

19    separately charged, pulled out a gun and shot the

20    complainant's front door, shot at the complainant's front

21    door.  Based on allegations, this case was presented to the

22    Grand Jury, which resulted in an indictment against Hicks and

23    vote of no action against Kim DePrima.

24          THE COURT:  No action or no true bill?

25          MR. TARDANICO:  No action, Your Honor.

1    THE COURT:  Okay.

2    MR. TARDANICO:  Hicks has since pled guilty to this

3 incident, and did not implicate DePrima during his --

4 DePrima's role during his allocution.

5    Since initially presenting this case to the Grand

6 Jury, the complainant has gone from claiming he did not wish

7 to testify against Kim DePrima to recanting positions of his

8 original allegations against DePrima.  Therefore, it is the

9 People's position that although DePrima's original arrest was

10 supported by probable cause, it is now our contention

11 complainant's subsequent arrest resulted in insufficient

12 evidence to move forward against this defendant.  Therefore,

13 the People move to dismiss the charges against Kim DePrima,

14 as there is insufficient evidence to meet our statutory

15 burden.

16    THE COURT:  So it's not 180.10 dismissal, dismissal

17 with prejudice.  Sealed 160.50, as well.

18    You may step out.

19    MR. RYAN:  Thank you very much, Your Honor.

20

21    CERTIFIED TO BE A TRUE AND ACCURATE TRANSCRIPT OF
THE PROCEEDINGS AS REPORTED BY ME.

22

23 KATHLEEN SAVAGE
  Official Court Reporter

24

25

SUPREME COURT OF THE STATE OF NEW YORK          NO FEE
RICHMOND COUNTY
COUNTY COURT HOUSE
18 RICHMOND TERRACE
STATEN ISLAND, NY 10301

## CERTIFICATE OF DISPOSITION INDICTMENT

DATE: 09/26/2011                    CERTIFICATE OF DISPOSITION NUMBER: 3082

PEOPLE OF THE STATE OF NEW YORK      CASE NUMBER:            00298-2008
                VS.                  LOWER COURT NUMBER(S):
                                     DATE OF ARREST:         07/16/2008
                                     ARREST #:               S08608472
                                     DATE OF BIRTH:          01/15/1971
DEPRIMA,KIM                          DATE FILED:             09/26/2008
DIPRIMA,KIM(AKA)

_____
                DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 02/25/2009 THE ABOVE NAMED DEFENDANT WAS
CONVICTED OF THE CRIME(S) BELOW BEFORE JUSTICE  COLLINI,R THEN A
JUSTICE OF THIS COURT.

MANSLAUGHTER 2nd DEGREE PL  125.15 01 CF

THAT ON 04/16/2009, UPON THE AFORESAID CONVICTION BY PLEA  THE HONORABLE
COLLINI,R  THEN A JUDGE OF THIS COURT, SENTENCED THE DEFENDANT
TO

MANSLAUGHTER 2nd DEGREE PL  125.15 01 CF
ORDER OF PROTECTION = 8 YEAR(S)
PROBATION = 5 YEAR(S)

CVAF = $25 (PAID)
DNA  = $50 (PAID)
SURCHARGE = $300 (PAID)

ADDITIONAL COMMENTS:     THAT ON 9/13/11, VIOLATION WITHDRAWN, RESTORED TO
PROBATION.

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 09/26/2011.

_____
                CLERK OF COURT

_____
                COURT CLERK

SUPREME COURT OF THE STATE OF NEW YORK        NO FEE
RICHMOND COUNTY
COUNTY COURT HOUSE
18 RICHMOND TERRACE
STATEN ISLAND, NY 10301

CERTIFICATE OF DISPOSITION INDICTMENT

DATE: 09/26/2011                    CERTIFICATE OF DISPOSITION NUMBER: 3082

PEOPLE OF THE STATE OF NEW YORK        CASE NUMBER:           00298-2008
                VS.                    LOWER COURT NUMBER(S):
                                       DATE OF ARREST:        07/16/2008
                                       ARREST #:              S08608472
                                       DATE OF BIRTH:         01/15/1971
DEPRIMA,KIM                            DATE FILED:            09/26/2008
DIPRIMA,KIM(AKA)

_____
            DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 02/25/2009 THE ABOVE NAMED DEFENDANT WAS
CONVICTED OF THE CRIME(S) BELOW BEFORE JUSTICE  COLLINI,R THEN A
JUSTICE OF THIS COURT.

MANSLAUGHTER 2nd DEGREE PL  125.15 01 CF

THAT ON 04/16/2009, UPON THE AFORESAID CONVICTION BY PLEA  THE HONORABLE
COLLINI,R  THEN A JUDGE OF THIS COURT, SENTENCED THE DEFENDANT
TO

MANSLAUGHTER 2nd DEGREE PL  125.15 01 CF
ORDER OF PROTECTION = 8 YEAR(S)
PROBATION = 5 YEAR(S)


CVAF = $25 (PAID)
DNA  = $50 (PAID)
SURCHARGE = $300 (PAID)


ADDITIONAL COMMENTS:     THAT ON 9/13/11, VIOLATION WITHDRAWN, RESTORED TO
PROBATION.


IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 09/26/2011.

_____
         CLERK OF COURT


_____
         COURT CLERK



**CONIGATTI & RYAN, LLP**
Attorneys at Law
67 New Dorp Plaza
Staten Island, New York 10306

Tel. (718) 351-1111
Fax. (718) 351-8616

Thomas R. Conigatti*
Michael J. Ryan*

*Also admitted in N.J.

February 4, 2011

<u>Via Fax (212) 228-9253 and Mail</u>

Keith J. Gross, Esq.
Associate Counsel
NYSUT
52 Broadway, 9th Floor
New York, NY 10004

Re:    **DePRIMA, KIM**
       SS#:   099660382
       <u>PRP# 83519</u>

Dear Mr. Gross:

      Re the above individual, please be advised that Ms. DePrima appeared in Richmond County Supreme Court, before the Hon. Robert Collini, J.S.C. on the above date. A Violation of Probation was filed with the Court and the sole specification was the new arrest. No other allegations of misconduct were made. I have attached a copy of the Violation of Probation for your records.

      Ms. DePrima pled not guilty and bail was set in the amount of $1,000.00. Ms. DePrima's brother Steven posted bail and she was released. The matter has been adjourned until March 4, 2011 for an update on the open case.

      I have attached additional reports based upon the accounts of Lakeisha Dennis and Wade Alton for your information.

      Should you have any questions or require any additional information, please do not hesitate to contact me.

                 Yours very truly,

                 Michael J. Ryan

MJR:df
Encls.

Upon your review of the attached documents, I urge you to conclude that Ms. DePrima was in fact the victim of a crime committed by Shawn Hicks. Ms. DePrima is not a co-perpetrator as initially alleged by the Richmond County District Attorney. I further urge you make the necessary arrangements to dismiss the Civil Forfeiture proceedings against Ms. DePrima.

If you have any questions or require additional information, please do not hesitate to contact me.

Yours very truly,

Michael J. Ryan

MJR:df
Encls.
C: Kim DePrima

11/29/2011 15:33 FAX

Jan 27 11 06:20p

1789874061          p.1



## TRI STATE, INC.
· Investigations

Phone: 718-354-7927
Fax 718-987-4061

P.O. Box 60712
Staten Island, NY 10306

January 27, 2011

Interview:
Jermaine Gavins
76 Grove Ave
Staten Island NY 10302
D.O.B. 4/23/86
Phone:         947-336-2109

File Title:    Kim Deprima

Page 1 of 2

1.     On January 27, 2011 the undersigned responded to 8 Van Name Ave and conducted an interview with Jermaine Gavins concerning an incident that occurred on January 7. 2011 at approximately 10:05 pm at 59A Newark Ave, Staten Island N.Y.

2.     Undersigned asked Jermaine if he was in the vicinity of 59A Newark Ave on January 7, 2011 at approximately 10:05 pm an if so would he convey to the undersigned the events that took place. Jermaine stated, "On Jan 7, 2011 at 59A Newark Ave I was awaken by knocking on my door. I went outside were I ran into Hicks. We exchanged some words feeling uncomfortable at my house I called police, they arrived and told me if you touch her you go to jail. As they were leaving Hicks comes out of next door and pulls a black pistol out of his left hoody pocket. We start exchange words again and Kim comes outside. I ask was she serious and she said something dead, I thought she said I was dead, but what was said was 'were dead' meaning our relationship is over. I am not afraid of Kim, not do I wish to press any charges against her, I don't believe she knew of the gun and I don't think she's looking to hurt me or my family. I believe that Hicks acted on his own and should be held souly responsible for the incident. (Signed statement attached)

Case 1:12-cv-03626-MKB-LB   Document 1   Filed 07/20/12   Page 92 of 127 PageID #: 92



# TRI STATE, INC.

• Investigations

P.O. Box 60712
Staten Island, NY 10306

Phone: 718-354-7927
Fax: 718-987-4067

Page 2 of 2

3.   Undersigned asked Jermaine if he had heard Kim and Hicks planning to
do anything at the party. Jermaine stated, "No, I did not." Undersigned
asked Jermaine how long he and Kim went out together, Jermaine stated,
"We went out for 2 ½ years before we broke up." Undersigned asked
Jermaine are you afraid of Kim? Jermaine stated, "No, I am not afraid of
her." Undersigned asked Jermaine does he want to get an order of
protection against Kim. Jermaine stated, "No, there is no need for an
order of protection."

4.   Undersigned asked Jermaine is he going to press charges against Kim.
Jermaine stated, "I am not going to press charges, I told the D.A. and the
officer who arrested her that I wasn't going to press charges."

Daniel _____ Investigator

11/29/2011 15:33 FAX ☑018/018

Jan 27·11 06:20：                  1789874061        p.2

DATE 1-27-11  PLACE kitchen - 8 Jan. Name. 10302
I, THE UNDERSIGNED Jesmaine Gavins
ADDRESS Jan name / 7B Grade ave
DATE OF BIRTH 4-23-80  S/S #
PHONE # 347-336-8109
MAKE THIS STATEMENT VOLUNTARILY OF MY OWN FREE WILL WITHOUT
ANY THREAT, COERCION, OFFER OF BENEFIT, FAVOR OR OFFER OF FAVOR
BY ANY PERSON OR PERSONS.

SAYS: On Jan 7, 2011 At 59 a Newark ave I was awoken
By knocking on my door. I went outside was, Ran
into Hicks we exchanged some words feeling
uncomfortable At my House I called police they Arrived
and told me If you touch Her you go to Jail". As they were
leaving Hicks came out of the next door and
pulled a black pistol out of His left Hardy
pocket we Start to exchange words again
with Him words outside, I Ask was she
be and and she said Something Dead
I thought she Said I was dead but
what it was Said was "were dead" meaning
Our Relationship is over. I am not Afraid
of Him nor do I wish to press any charges
against Her I don't believe she knew of the
gun and i don't think she's looking to
Hurt me or my Family I believe that Hicks
Acted on His own And should be Held
Solely Responsible for the incident

_Jesmaine Gavins_

I HAVE READ THIS STATEMENT CONSISTING OF 1 PAGE(S) AND THE FACTS
CONTAINED THEREIN ARE TRUE AND CORRECT TO THE BEST OF MY
KNOWLEDGE.
PAGE 1 OF 1 PAGE(S)    SIGNED _Jesmaine Gavins_
DATE 1/27/11  TIME 12.41 AM/PM    WITNESS

11/29/2011 15:32 FAX ☑010/018

Jan 31 11 08:14p                                1789874061              p.2



## TRI-STATE, INC.

• Investigations

P.O. Box 60712
Staten Island, NY 10306

Phone: 718-364-792_
Fax: 718-987-406_

January 31, 2011

Interview:
Wade Alston
2928 Richmond Terrace
Staten Island NY 10303
D.O.B:        12/24/63
Phone:        646-407-3205

File Title:        Kim Deprima

Page 1 of 2

1.    On January 31, 2011 the undersigned responded to 2928 Richmond
Terrace and conducted an interview with Wade Alston concerning an
incident that occurred on January 7, 2011 at approximately 10:30 pm at
Jones Bar Staten Island N.Y.

2.    Undersigned asked Wade if he was in the vicinity of Jones Bar on
January 7, 2011 at approximately 10:30 pm an if so would he convey to
the undersigned the events that took place. Wade stated, "On Jan 7, 2011
at approximately 10:30pm I was at Joney's Tavern eating food from
Wendy's when Miss Deprima entered the bar with two men seconds
behind her. She walked past me and stood at the one chair away from me
and was saying something. I wasn't saying or listening to what she was
saying. The she says Wade they just shop up my house. I looked at her
and she looked horrified and the two guys behind her one wearing a
hoodie and the other wearing at hat. I looked at her and she still looked
horrified. A few minutes later she askee if I could drive her home. I
looked at her and she's shaking. I told as soon as I finish eating. The guy
with the hoodie on is leaded back in the chair with the top of the hood
covering his face, the other guy is at the Jukebox. I continued eating. She
asked again and soon went to the bathroom. The 2 guys left the bar while
she was in the bathroom. She come from the bathroom and asked again if
I would take her home. I finished eating and exited the bar with Kim.



# TRI STATE, INC.

• Investigations

P.O. Box 60712
Staten Island, NY 10306

Phone: 718-364-792
Fax: 718-987-436

**Page 2 of 2**

I opened the doors and started her car, not even 20 houses from the bar the Police stopped us and pulled us off the car. I was questioned and let go. I returned to the bar and noticed the guy with the hat come back into the bar. He brought a drink and left. I watched the officers question him and walk away, 5 minutes later he comes in the bar again then leaves." (Signed statement attached).

3.    Undersigned asked Wade did he see a gun on either of the two men who followed Kim into the bar. Wade stated, "No, I did not." Undersigned asked Wade did Kim say which one of the two men had the gun and did the shooting at her house. Wade stated, "No, she was shaking and you could see how scared she was. She wanted me to take her home."

4.    Undersigned asked Wade if he would testify in court. Wade stated, "Yes, I will."

Daniel Ya___ Investigator

Jan 31 11 08:55p                          1789874061                    p.4

DATE _1-31-2011_   PLACE: _2928 Richmond Terrace_
I, THE UNDERSIGNED _Wade Alston_
ADDRESS _2928 Richmond Terrace_
DATE OF BIRTH _12/03/63_ S/S # _____   PHONE # _646-407-3205_
MAKE THIS STATEMENT VOLUNTARILY OF MY OWN FREE WILL WITHOUT
ANY THREAT, COERCION, OFFER OF BENEFIT, FAVOR OR OFFER OF FAVOR
BY ANY PERSON OR PERSONS.

SAYS: On January 7, 2011 at approximately 10:30 p.m. I
was at Jersey's Tavern eating food from Wendy's. When
Miss Dyrina entered the bar with two men seconds behind
her. She walked past me and stood at the one chair saying
leave me and was saying something. I wasn't saying or listen-
ing to what she was saying. Then she says Wade they
just shot up my house. I looked at her and she looked
terrified and the two guys behind her are wearing a
hoodie and the other wearing a hat. I looked at her
and she still looked horrified. A few minutes later she asked
if I could drive her home. I looked at her and she's
shaking. I told her as soon as I finish eating. The
guy with the hoodie on is leaned back in the chair with
the top of the hood covering his face. The other guy is
at the Juke box. I continued eating. She asked again
and soon went to the bathroom. The 2 guys left
the bar while she was in the bathroom. She came from
the bathroom and asked again if I would take her home.
I finished eating and exited the bar with her. I
opened the doors and started her car. Not even 20
paces from the bar the Police stopped us and
pulled us out the car. I was questioned and

I HAVE READ THIS STATEMENT CONSISTING OF _2_ PAGE(S) AND THE FACTS
CONTAINED THEREIN ARE TRUE AND CORRECT TO THE BEST OF MY
KNOWLEDGE.
PAGE _1_ OF _2_ PAGE(S)

SIGNED _____

and let go. I returned to the bar and
noticed the guy with the hat came back into
the bar. He brought a drink and bottle. I watched
the officers questioned him and walk away. 5
minutes later he comes in the bar again then
leaves.

PAGE 2 OF PAGE(S)

SIGNED

DATE 2-2-2011 PLACE 59B NEWARK ave Apt 1.S. I. NY 103
I, THE UNDERSIGNED Lakesha Dennis
ADDRESS 59B Newark ave, Apt 1.S.I. N.Y 10302
DATE OF BIRTH 1-9-79 S/S # _____ PHONE # 718-720-1085
MAKE THIS STATEMENT VOLUNTARILY OF MY OWN FREE WILL WITHOUT
ANY THREAT, COERCION, OFFER OF BENEFIT, FAVOR OR OFFER OF FAVOR
BY ANY PERSON OR PERSONS.

SAYS: That the night of January 7, 2011
Friday, I Lakesha Dennis called Kim Deprima
to come over and celebrate our birthday
together. Kim brought a case beer, which she
drunk 2 beers and her male associate Hicks
brought a personal bottle of VODKA for himself
which he drunk straight. Hicks was really drunk
to the point he caused a minor dispute with
a neighbor name Angel (Jermaine Gavins). Kim and
I heard outside a agruement which caused for
Kim and I to step outside my door and heard
the commotion between angel and Hicks. Kim
told Hicks to come inside, Hicks didn't want
to listen to Kim he they think I'm a game.
I told Kim to take Hicks away, Kim said
OK. I told Kim if she wanted to come
back she could just without Hicks. Kim pulled
out my drive way Hicks was standing on
the sidewalk as Kim pulled out. I turned over
around in went upstairs in my house. I didn't hear
any guns shots, or no what happened until the
police came to my door, and asked me about any shooting

I HAVE READ THIS STATEMENT CONSISTING OF 2 PAGE(S) AND THE FACTS
CONTAINED THEREIN ARE TRUE AND CORRECT TO THE BEST OF MY
KNOWLEDGE.

PAGE 1 OF 2 PAGE(S)                    X Lakesha Dennis
                                       SIGNED

DATE 2/2/11 TIME 1.30 AM/PM

I told the officer I did not hear any gun shots. They asked about Kim and the two guys she was with I told them they had lefted. The police gathered the shells and angel went with the police in the police car.

PAGE 2 OF 2 PAGE(S)

SIGNED

`SHEET 1

THE STATE EDUCATION DEPARTMENT
THE UNIVERSITY OF THE STATE OF NEW YORK

In the Matter of
NEW YORK CITY DEPARTMENT OF EDUCATION
v.
KIM DEPRIMA
Section 3020-a Education Law Proceeding (File
#17,502/#17,698)

DATE:                    August 8, 2011

TIME:                    10:00 a.m. to 1:00 p.m.

LOCATION:                NYC Department of Education
                         Office of Legal Services
                         49-51 Chambers Street
                         New York, NY 10007

BEFORE:                  MARY CRANGLE, ESQ.
                         HEARING OFFICER

8-8-11 In the Matter of Ms. DePrima

SHEET 2

INDEX

222

APPEARANCES:                      1
FOR THE COMPLAINANT:     2
   JORDANA SHENKMAN, ESQ., of Counsel   3
   NYC Department of Education   4
   Office of Legal Services   5
   49-51 Chambers Street   6
   New York, NY 10007   7
   Telephone: (212) 374-6741   8
FOR THE RESPONDENT:   9
   CHRIS CALLAGY, ESQ., of Counsel   10
   NEW YORK STATE UNITED TEACHERS   11
   52 Broadway, 9th Floor   12
   New York, New York 10004   13
   Telephone: (212) 533-6300   14

INDEX
WITNESSES
Name:   Page:
J. Gavins:
   Sworn   227
   Direct by Callagy   227
   Cross by Shenkman   246
   Redirect by Callagy   291
W. Foster:
   Sworn   294
   Direct by Callagy   295
   Cross by Shenkman   300
EXHIBITS
RESPONDENT   DESCRIPTION   I.D.  IN EV.
DEPARTMENT OF EDUCATION DESCRIPTION   I.D.  IN EV.
20   Statement, Mr. Gavins   267   272
   2 pages

KIM DEPRIMA - 08/08/11

   (The hearing commenced at 10:00 a.m.)

THE HEARING OFFICER: This is the fifth day of hearing in the matter of the 3020-a proceeding brought by the New York City Department of Education against Kim DePrima. There are two SED file numbers in this matter: 17,502 and 17,698.

My name is Mary Crangle. I'm the Hearing Officer in this matter. May I have the appearances please?

MS. JORDANA SHENKMAN: Jordana Shenkman for the Department of Education.

MR. JUSTIN DICKMAN: Justin Dickman, law clerk.

MR. CHRIS CALLAGY: Chris Callagy, here for Respondent and my boss, Richard E. Casagrande.

THE HEARING OFFICER: Let the record reflect please that the Respondent is also present in the hearing room. We're ready to begin the Respondent's case. Mr. Callagy, before you call your first witness, do you wish to make an opening?

MR. CALLAGY: Very briefly, yes.

THE HEARING OFFICER: Okay.

MR. CALLAGY: Hello, everybody. Ms. Crangle, as often happens in cases that go through

223

KIM DEPRIMA - 08/08/11

this forum, it's not a very complex case. It's fairly simple; very serious in its allegations, but fairly simple. You will hear in our presentation of the defense that Kim DePrima was present at a party at a former neighbor's house, and still friend of hers, Lakisha Dennis [phonetic].

She went there because they had been, over the prior couple of years, in the habit of celebrating each other's birthdays. The wrinkle for this particular celebration was that Ms. DePrima had only recently left the residence next door, where she had been living with, among other people, Jermaine Gavins.

Ms. DePrima was asked if she could pick up a couple of people. Well, at least one—I'm sorry, two individuals to the party. She was asked by Ms. Dennis to do so and she said okay, I'll pick them up. She had a passing acquaintance with one of them, Shawn Hicks [phonetic]. And when I say passing, you will hear that there was never any romantic relationship of any kind, that Hicks had been helpful a couple of occasions in the past, doing things like helping move boxes and stuff like that, but she did not know him well.

She did not know his criminal history, which

224

KIM DEPRIMA - 08/08/11

1   in fact, he has.  She knew that he had been in
2   trouble.  She knew that because a girlfriend of hers,
3   who had been seeing him, told her.  But she didn't
4   know the nature of the trouble, nor did she know
5   whether or not Mr. Hicks was classified in a
6   particular way, as in being a felon, for purposes of
7   the criminal justice system.  She didn't know that.
8        Now, Mr. Jermaine Gavins, who you'll hear
9   from, also has a criminal history.  Indeed, so does
10  Ms. DePrima, because as you have heard, in a prior
11  3020-a, the 3020-a dealt with underlying facts in a
12  criminal proceeding involving a maul and killing of a
13  neighbor at that time, because a pit bull had gotten
14  loose and killed a neighbor.  It wasn't her pit bull,
15  but she did live there.  And that was the subject of a
16  prior 3020-a, and hence, the nature of her criminal
17  history.  So she also had that criminal history.
18       Jermaine Gavins will tell you that he never
19  told Kim DePrima about his criminal past, other than
20  he had one.  Never mentioned that he was a felon,
21  never mentioned anything about the nature of it.
22       Now, the nature of the charges that I know
23  there have been consolidated, but I think it's fair to
24  say that the nature of the charge is that somehow Kim

226

KIM DEPRIMA - 08/08/11

1   never indicted.  As she sits here today, she has a
2   court appearance later this month which she has every
3   reason to believe, from what she has been told that
4   the charges against her will be dropped.
5        Now, Kim DePrima is a teacher of a number of
6   years, seven or so, within the city system and no
7   one's ever questioned her ability to teach.
8   Obviously, the issue before you will be to determine
9   whether or not she possesses the sort of fitness
10  necessary to continue as a teacher.  And I think after
11  you hear all of our evidence, you'll see that she's
12  not guilty of what she was charged with.  And she's
13  already paid a price for what she had been charged
14  with in the prior proceeding.
15       So, on that basis, I'm confident, you know,
16  that you will recognize that she's not guilty.  With
17  that, we would call our first witness.
18       THE HEARING OFFICER:  Thank you.  And who is
19  your first witness?
20       MR. CALLAGY:  Jermaine Gavins.
21       THE HEARING OFFICER:  Okay, can we go off
22  the record please?
23       [Off the record]
24       [On the record]

225

KIM DEPRIMA - 08/08/11

1   DePrima was involved in a criminal act or acts on that
2   given night when Shawn Hicks, at that party, fired
3   rounds into the Gavins' residence where Kim DePrima
4   had recently been living.
5        What you will learn from Kim and Jermaine
6   and Ms. Foster and Lakisha Dennis, that Kim DePrima
7   had nothing whatsoever to do with that, other than
8   having brought this guy Hicks to a party because she
9   was asked to do so on her way there.
10       Now, the night in question, you'll hear from
11  the witnesses that, indeed, as you've heard already
12  from certain witnesses for the Department, Ms. DePrima
13  was implicated that night in what happened, by,
14  principally, Jermaine Gavins.  Subsequent to his one
15  or two meetings with detectives, all in the span of
16  about 24 hours, Mr. Gavins contacted the police and
17  said. "I retract my statement." I was angry when I
18  made it.  I saw nothing of Kim DePrima that night.  I
19  didn't speak to Kim DePrima.  I didn't see her
20  involved in any way.  She made no threats.  That's
21  what he tells the police.
22       Now, eventually Kim DePrima testifies at a
23  grand jury that, among other things, is looking into
24  the allegations against Hicks and herself.  She is

227

KIM DEPRIMA - 08/08/11

1        THE HEARING OFFICER:  Mr. Gavins, would you
2   raise your right hand please?  Do you swear or affirm
3   that the testimony you're about to give in this matter
4   will be the truth, the whole truth and nothing but the
5   truth?
6        MR. JERMAINE GAVINS:  Yes, ma'am.
7        THE HEARING OFFICER:  Okay.  Please be
8   seated.  Would you please spell your name for the
9   court reporter?
10       MR. GAVINS:  Name is Jermaine Gavins.  First
11  name J-E-R-M-A-I-N-E, last name G-A-V-I-N-S.
12       THE HEARING OFFICER:  Okay.  Mr. Gavins, as
13  I'm sure Mr. Callagy has explained to you, this
14  proceeding is being recorded, so it's extremely
15  important that you keep your voice up so that we all
16  can hear everything you say.  And also, please make
17  sure all your responses are verbal, since obviously a
18  tape recorder can't pick up when you nod your head.
19       MR. GAVINS:  Yes, ma'am.
20       THE HEARING OFFICER:  Okay.  Mr. Callagy?
21       MR. CALLAGY:  Thank you very much.
22  DIRECT EXAMINATION
23  BY MR. CALLAGY
24       Q.  Good morning, Mr. Gavin.

SHEET 4

228

GAVINS - DIRECT - CALLAGY

1
2      A.  Good morning, sir.
3      Q.  Would you please tell us where you
4  live presently?
5      A.  I live at 76 Grove, Staten Island, New
6  York, 10302.
7      THE HEARING OFFICER:  Pardon me?
8      MR. GAVINS:  72 Grove, Staten Island, New
9  York, 10302.
10      THE HEARING OFFICER:  Thank you.
11      Q.  And how long have you lived there?
12      A.  For the better part of this year.
13  Well, a year, in full, almost.
14      Q.  Okay.  Where did you live prior to
15  that?
16      A.  I lived at 59-A Newark Avenue.
17      Q.  And when you lived at 59-A Newark
18  Avenue, who did you live with?
19      A.  For a while, me and Ms. DePrima lived
20  together.
21      Q.  Okay.  Was there anyone else living
22  there?
23      A.  Besides the kids. not really.
24      Q.  Okay.  When you say for a while you
25  and Ms. DePrima lived there, what was the nature of

230

GAVINS - DIRECT - CALLAGY

1  You don't tell someone you just met, like, how are
2  you, I'm a felon.  You know, like, it wasn't the way--
3  it's not the way I do things with people.  Like, it
4  takes a certain amount of time to trust somebody
5  enough to let them into my personal life, because some
6  people are judgmental.
7      Q.  Well, did you ever find the
8  appropriate point to share that kind of information
9  with Ms. DePrima?
10      A.  To be perfectly honest, our
11  relationship was pretty short.  You know, so, I don't
12  know, it wasn't like pillow talk.  And during the day,
13  I had things to do.  When I came home at night, it
14  wasn't really like, well, oh I forgot to remind you,
15  I've been locked up a couple of years ago.  So, you
16  know like.
17      Q.  Are you working right now?
18      A.  Yeah, I just recently started PCC
19  Calling Center on Bradley Avenue in Staten Island.
20      Q.  What is that?
21      A.  That is telemarketing.
22      Q.  And what is your position?
23      A.  I'm just a regular customer service
24  agent.  You know, your name, your number, your address

229

GAVINS - DIRECT - CALLAGY

1
2  your relationship at that time?
3      A.  We were in a relationship and living
4  together.
5      Q.  When you say relationship, do you mean
6  romantic relationship?
7      A.  Yes, sir.
8      Q.  Okay.  For how long had you been
9  involved with each other?
10      A.  From say maybe December to December,
11  November, about a year.
12      Q.  A year, did you say?
13      A.  About a year or so.
14      Q.  Okay.  How did you meet, if you know?
15      A.  I think I was doing a painting job at
16  her house.
17      Q.  Now, do you have a criminal record?
18      A.  Yes, sir. I do.
19      Q.  Do you know what it is?
20      A.  I know that it was maybe burglary in
21  the third. robbery in the third, in 1999.  Outside of
22  that, probably a misdemeanor here and there, you know.
23      Q.  Did you ever speak to Kim DePrima
24  about your criminal past?
25      A.  No. I didn't really find a reason to.

231

GAVINS - DIRECT - CALLAGY

1
2  pops up on the screen.  And I say, good morning, this
3  is Jermaine Gavins from PCC Calling Center, calling to
4  offer you a special promotion or whatever they might
5  have me do that day.
6      Q.  Did you know a person by the name of
7  Shawn Hicks back then?
8      A.  Yeah, I do know Shawn Hicks.
9      Q.  And how did you know Shawn Hicks?
10      A.  He came to, like, some events that I
11  was at.  Like, it wasn't really oh well, who's that,
12  who's that?  It was more like, well this is such and
13  such a person, and this is Ang [phonetic], this is--
14  you know, it was like a whole group meeting for the
15  people who happened to be a barbecue or whatever, and
16  we didn't know each other, so...
17      Q.  Other than that, did you ever hang out
18  with Shawn Hicks?
19      A.  Never.
20      Q.  Now, did Ms. DePrima ever share with
21  you anything about her past in terms of the criminal
22  justice system?
23      A.  No.
24      Q.  Did you ever meet any official
25  associated with the criminal justice system and Ms.

8-8-11 In the Matter of Ms. DePrima

SHEET 5

232

GAVINS - DIRECT - CALLAGY

1
2  DePrima?
3      A.  I've seen people come to the house
4  before, like while I was doing babysitting or
5  whatever. Like, there would be a specific lady or
6  whatever, but I never knew what the nature of her
7  being there was for. She would just come knock on the
8  door. She'd ask for Kim. If Kim was at work, I'd
9  tell her Kim's at work. If Kim was upstairs, I'd be
10  like, Kim's upstairs. Their conversation was never
11  open to me like that, so. And I never asked, I
12  thought that was prying. You know what I mean?
13      Q.  Did you ever come to learn who that
14  individual person was?
15      A.  I did come to learn who that was.
16      Q.  Who was it?
17      A.  That was her probation officer.
18      Q.  Okay. Did that cause you to do
19  anything when you learned that she had a probation
20  officer?
21      A.  Not really, because at the time we
22  were going in separate directions. So, you know, it
23  was like, okay, you got a probation officer. Well
24  you're living in Willowbrook and I'm moving to Port
25  Richmond. You know what I mean, so I really--

233

GAVINS - DIRECT - CALLAGY

1
2      Q.  Earlier--sorry. Mr. Gavins, you
3  mentioned kids, what kids lived with you when you were
4  at Newark Avenue?
5      A.  There's Tommy, her 12 year old, and
6  Poppa--well James, the baby.
7      Q.  Okay. How old is the baby, or how old
8  was the baby then?
9      A.  The baby was months old. And now he
10  is around three. His birthday was recent, if I'm
11  correct still on that.
12      Q.  I want to draw your attention, Mr.
13  Gavins, to a winter night when there was a party next
14  door at Lakisha Dennis'.
15      A.  Okay.
16      Q.  When you were living at 59 Newark
17  Avenue.
18      A.  Okay.
19      Q.  Do you remember that night?
20      A.  Yes, I do.
21      Q.  What do you remember about it?
22      A.  The night of the next door neighbor's
23  party, well Kim no longer lived there. She had been
24  gone for a little while. And I was only living there
25  because my apartment wasn't ready in Port Richmond at

234

GAVINS - DIRECT - CALLAGY

1
2  the time. Well I was upstairs asleep. The noise of
3  whatever have you, I woke up. I went downstairs. The
4  two guys were already outside.
5      Q.  When you say two guys, who are you
6  talking about?
7      A.  I'm talking about Hicks and Wise
8  [phonetic]. Like, I don't know their real names. I'm
9  guessing Hicks' real name is Hicks, but Wise, I don't
10  know his real name. I just know him as Wise. They
11  were already outside. I guess my step-father and my
12  brother were already outside. So I went outside
13  because I did know that due to something prior, me and
14  Hicks didn't like each other already anyway. We
15  already had tension between us. So I didn't know what
16  he was discussing with my step-father or what the
17  situation was. I took a walk outside. Of course, two
18  people who have tension, the tension is still there.
19  We never solved nothing, we just pretty much parted
20  ways with each other for a while. And--
21      Q.  Where did you go?
22      A.  Who me?
23      Q.  Yeah.
24      A.  I stayed at 59 Newark. He went his
25  way. Like we met in different places, like the same

235

GAVINS - DIRECT - CALLAGY

1
2  circle of friends I guess you'll call it. So if you
3  invite me to a barbecue, you can invite him too
4  because you know us both, but you don't know we got
5  that tension between us. So that's--
6      Q.  Okay. Just looking to that night in
7  particular, Mr. Gavins, what happened after you first
8  went outside?
9      A.  When I first went outside, it was him
10  and my step-father, I guess discussing something. I
11  went downstairs. I looked around. I seen her car.
12  Now, I didn't know--
13      Q.  You see her car?
14      A.  I seen her car but it was parked at
15  the next door--
16      Q.  Who's car?
17      A.  Kim's car.
18      Q.  Okay.
19      A.  But it was parked next door, like in
20  the driveway. So I go outside. Wise is at the top of
21  the stairs, Hicks is at the bottom of the stairs--
22      Q.  Now, when you say stairs, can you
23  describe those stairs?
24      A.  Well, you know what a duplex, four-
25  plex looks like. The middle houses' stairs are higher

8-8-11 In the Matter of Ms. DePrima

236

GAVINS - DIRECT - CALLAGY

1
2  up slightly than the end houses. So I was at the end
3  house, and Wise was at the inner house with the stairs
4  going slightly higher up. I went down the stairs that
5  I came out the front door. Wise was still all the way
6  up the stairs. Hicks was at the bottom of, I guess,
7  the next door neighbor's stairs I'd have to say. I
8  don't know what they was discussing, because when I
9  walked into the conversation, it was kind of like:
10  what up? You know, what's up? Like, is there a
11  problem or something? And that's how me and his
12  conversation started. Like, what's up? Like, is
13  there some sort of problem, anything like that? Of
14  course, things are said. You could tell he drunk
15  because he got a real arrogance to him like, I don't
16  know, but--
17      Q. When you say he, who are you referring
18  to?
19      A. Hicks. You know what I mean, you
20  could tell he was drunk because he's speaking now
21  like, I don't know, like he wants to be assertive,
22  somehow in charge, I guess. Whatever, you know what I
23  mean, like--but I already knew we had that tension, so
24  I really didn't expect anything less out of him. So
25  I'm sitting there, we having our little back and

237

GAVINS - DIRECT - CALLAGY

1
2  forth. I said, you know what, I know how to deal with
3  this, because I also, you know, live in the same
4  neighborhood, so you hear about a person. You hear
5  what a person's tendencies are like, especially when
6  there's tension. So I said, you know what, instead of
7  getting into an all-out fight, whatever may have you,
8  because my mother is here, my step-father is here,
9  like I'll try to deal with it responsibly. I'm
10  walking up the stairs, and I guess Lakisha or whoever
11  opened the door to her apartment at the time, and I
12  seen Kim and the front door. So I tried to say
13  something to her. I don't know if she heard me, what
14  have you, but you know know, she looked and then closed the
15  front door. So I went in the house, picked up my
16  phone, dialed 911 and was like, yeah, listen, my
17  girlfriend and her friends are here harassing me. You
18  know what I mean? Like, I don't know what else you
19  want me to tell you. Figuring that if I had an
20  officer intervene, like it would alleviate from what I
21  know is very much likely to happen, because I've been
22  their situations like this before.
23      Q. Mr. Gavins, what would make you
24  believe at that point in time that Ms. DePrima was
25  harassing you?

238

GAVINS - DIRECT - CALLAGY

1
2      A. Well, that's kind of where the bad
3  part kicks in. She never said nothing to me. She was
4  in the house. But I figured if they came with her,
5  you know what I mean, her responsibility, straight
6  off.
7      Q. Did she say anything to you at all
8  through the course of that entire evening?
9      A. Through the course of that entire
10  evening, we probably exchanged words once, when I was
11  like oh, is this seriously how it's going to go down
12  between us. And she was like, what can I tell you,
13  we're dead. Like, that's it, it's over.
14      Q. What did that mean to you?
15      A. What did it mean to me or what did she
16  mean by it?
17      Q. What did you take it to mean?
18      A. Oh, I took it as, you know, whatever's
19  going to happen is going to happen. Like, you got to
20  mind me; I'm already beefing with him. And now
21  there's a bunch of other people outside. So, you
22  know, plus it's an emotional thing. You know, like we
23  really didn't have it bad when we was together and the
24  breakup I felt was unnecessary. We could have dealt
25  with whatever we needed to deal with differently. You

239

GAVINS - DIRECT - CALLAGY

1
2  know, I haven't heard from her since we separated
3  ways, so I didn't know how to take a lot of things
4  when it came down to certain things. But on that
5  particular night, you know what I mean, like, there
6  was a little bit of emotion involved. I won't even
7  lie. Like--
8      Q. Did anything she say threaten you in
9  any way?
10      A. No. She never threatened me. Though,
11  I might have felt emotional enough that she wasn't
12  controlling her friends. You know what I mean? So--
13      Q. What did that lead you to do, if
14  anything? That you felt emotional.
15      A. It pissed me off. Like, at the time
16  being I was mad enough to do just about anything.
17      Q. Did you meet with any person of the
18  NYPD that night?
19      A. Yeah, like the first time I called the
20  cops, it was the harassment. I was like, yo, they're
21  harassing me. Well, my girlfriend and her friends are
22  harassing me. My ex-girlfriend, excuse me. See what
23  I mean? Like, but at the time it was like the cops
24  came and they come to my house and they're like, well,
25  if you touch her, you're going to jail. And I'm like,

Ubiqus Reporting, Inc.    8-8-11 In the Matter of Ms. DePrima

240

GAVINS - DIRECT - CALLAGY

1
2   great. Like I already know that, check my history,
3   But what I am telling you is there's a potential for
4   something even worse to happen. Cops never went next
5   door, never intervened with anything, just threatened
6   to send me to jail. So, after the cops left, I don't
7   know what they were doing next door. I know that, I'm
8   guessing, that somebody told Hicks to come inside, or
9   he just went inside when he seen the cops pull up.
10  But I know when the cops was leaving, he wasn't
11  outside. When they got in the car, he walked outside.
12  And with the car still sitting there--
13      Q. How do you know that?
14      A. Because I was the one who held the
15  door open while the cops left.
16      Q. What happened?
17  -    A. When they got in the car, didn't even
18  leave yet, he walks down the stairs, pulls out his gun
19  and cocks it. So I'm like, okay, a lot of fucking--
20  excuse my language--but that's how I was feeling at
21  the time. A lot of good they did for me. Like, I'm
22  trying to deal with this problem as without as much
23  trouble as I know can happen.
24      Q. What'd you do, Mr. Gavins, after he
25  cocked the gun?

241

GAVINS - DIRECT - CALLAGY

1
2       A. He went down the stairs and turned to
3   come back up my stairs. He went down their stairs and
4   turned to come back up my stairs. So I stood there. I
5   waited until he got to the door and I told him, shoot.
6   But he didn't want to shoot me. So he was just like,
7   oh, what's the problem now and blah-blah-blah, cops in
8   here now. I'm like, and? But then by then my
9   mother's walking up behind me because now she's
10  hearing me and him beefing with each other. So I see
11  my mother. I'm like, you know what, we'll deal with
12  each other later. I closed the door. Now,
13  everybody's inside and [sound effect] through the
14  door. By the time I opened the door back up, the car
15  is gone, everybody's gone.
16      Q. What'd you do?
17      A. I called the cops.
18      Q. What happened?
19      A. They came over; they're asking all
20  types of questions. I'm like, well, you know, I used
21  a whole bunch of profanity because I'm feeling like
22  when I first called you and you could have stopped
23  this problem from happening, you didn't. So now, you
24  know, just in not to get myself or nobody else in
25  trouble, I got to call you again, but this time with

242

GAVINS - DIRECT - CALLAGY

1
2   bullets through my door. Like, it was a problem.
3   They took me to--where'd they take me to? First, they
4   took me to Holland Avenue. And she was walking--I
5   watched them arrest her and everything, it was like--
6       Q. When you say she, who are you
7   referring to?
8       A. Kim. Kim was walking, like I'm
9   guessing, I don't know where she was going. I was in
10  the car. But she was walking and they arrested her.
11  Then we went back to the precinct and they asked me
12  for my statement, stuck me in a room--
13      Q. You gave a statement?
14      A. Yeah, I gave them a statement. But I
15  was hell bent on destroying her. I later on retracted
16  that statement because it wasn't the truth. Like, I
17  don't know what to tell them. At the time, I felt
18  like burying her, because I felt like it was her fault
19  for bringing those people there and not controlling
20  them. You know what I mean? So, like I said, it was
21  an emotional thing. I told the district attorney and
22  everybody else, I'm not pressing charges on her
23  because she has a good rapport with my little brother,
24  has a good rapport with my mother. Like, I don't
25  think she could truly control what he did, because me

243

GAVINS - DIRECT - CALLAGY

1
2   and him did have prior tension with each other, and
3   sometimes that's just how we get stuff out. Like, I
4   don't know.
5       Q. Mr. Gavins, how did you even know that
6   Kim DePrima had anything to do with Shawn Hicks that
7   night?
8       A. Because her car was parked there. And
9   I know Shawn won't come around where he knows I'm at
10  too much unless there's a reason for it. You know
11  what I mean? Like if you're going to a party, we live
12  in a small neighborhood. If you're hanging out with
13  the neighbor next door, getting a puppy, a whole lot
14  of things will bring people into each other's
15  vicinities, even when we don't like each other.
16      Q. Mr. Gavins, who did you contact to
17  take back your statement?
18      A. Some detective came by. I'm not sure
19  of his name. He came by and I told him, like, yeah, I
20  don't want to press charges. Then I believe Jennifer
21  Cecilia [phonetic] called me, and I told her I don't
22  want to press charges.
23      Q. Who was she?
24      A. Huh?
25      Q. Who was she?

244

GAVINS - DIRECT - CALLAGY

1
2     A. Jennifer Cecilia, she works with
3  Wanda. I don't--the district attorney's office I'm
4  guessing. She works with Wanda though, that's about
5  the gist of it.
6     Q. All right. Were you ever called to
7  testify in a grand jury proceeding?
8     A. Was I? I don't think I was, not for
9  any criminal case. Because like I said, shortly after
10 they took the statement and everything else, maybe two
11 or three days, even before she first went to court, I
12 told them, yeah, listen, I'm not going to press
13 charges. Like, I'm sorry, I may have said some things
14 that wasn't completely true. And I told them, like,
15 yo listen, I may have said some things that wasn't
16 completely true. So they was like. well, either which
17 way, we're going to proceed. I was like, all right,
18 proceed, by all means. But I knew I had a prior beef
19 with Shawn. So I can't say that--you know what I'm
20 saying, I never heard her say anything. I didn't
21 really see her except for once on the porch, and I
22 don't know if that was leaving or coming or going, I
23 really don't, because I was I was going back in my
24 house. So--
25     Q. Do you have anything against Kim

245

GAVINS - DIRECT - CALLAGY

1
2  DePrima, as you sit here today?
3     A. No. Like I said, I see her from time
4  to time. Like. she'll come through; she'll drop off
5  the baby. Because, you know, we had the baby since it
6  was younger; we love the kid to death. She takes my
7  little brothers and them. Like, I have a
8  developmentally disabled little brother who adores
9  Kim. She does math with him, all the rest of that.
10 Like, when they come back from their little day trips,
11 they'll tell us about it. Like, yeah, I was in the
12 pool. We did this; we did that. So her rapport with
13 my family is still good. We're just--we're cordial I
14 guess you would say.
15    Q. Did you speak with Ms. DePrima about
16 your testimony today?
17    A. No, I haven't spoke to Kim in a couple
18 of days or so.
19    Q. Did you speak with anyone about your
20 testimony today?
21    A. No.
22    Q. Did you speak with me?
23    A. I had a little like five-minute
24 session with you just a minute ago.
25    Q. Nothing further.

246

GAVINS - DIRECT - CALLAGY

1
2     THE HEARING OFFICER: Are you going to cross
3  examine or do you need a minute?
4     MS. SHENKMAN: A few minutes please.
5     THE HEARING OFFICER: Okay. Go off the
6  record for a minute or two. Just sit still.
7     MR. GAVINS: Okay.
8     THE HEARING OFFICER: Okay.
9     [Off the record]
10    [On the record]
11    THE HEARING OFFICER: We're back on the
12 record please. Ms. Shenkman is going to ask you some
13 questions. So please, again, keep your voice up and
14 answer the questions. Okay?
15    MR. GAVINS: Yes, ma'am.
16    THE HEARING OFFICER: Thank you.
17 CROSS-EXAMINATION
18 BY MS. SHENKMAN:
19    Q. Good afternoon, Mr. Gavins.
20    A. Good afternoon.
21    Q. I'm going to be asking you some
22 questions on cross examination, okay?
23    A. Okay.
24    Q. All right. You told us that you were
25 involved previously in a romantic relationship with

247

GAVINS - CROSS - SHENKMAN

1
2  Kim DePrima, correct?
3     A. Yes, ma'am.
4     Q. Okay. And you told us that that
5  lasted about a year?
6     A. Somewhere in there, yeah, give or
7  take, around a year or so.
8     Q. Okay. So, around a year before the
9  incident of the shooting happened. Is that right?
10    A. Before that incident of the shooting?
11 As specific months, like yeah, but I can't tell give
12 or take a month, two months, you know because, like I
13 said, I have things that I did in my life during the
14 day or whatever. She had her own life already set
15 out. So yeah, like give or take a year around the
16 time this happened.
17    Q. Okay. Because the day of the shooting
18 that we talked about was on January 7th of 2011,
19 right?
20    A. Okay.
21    Q. And at the time of the shooting you
22 guys were already broken up?
23    A. Yeah, we were separated for a little
24 while at that time.
25    Q. Okay. I think you told us at that

248

GAVINS - CROSS - SHENKMAN

1    time you had been separated for around two months.
2    MR. CALLAGY: Objection - -.
3    THE HEARING OFFICER: Well, why don't you
4    rephrase the question?
5    Q. I believe your testimony was that you
6    hadn't been living together for about two months at
7    the time that the shooting happened?
8    MR. CALLAGY: Objection.
9    THE HEARING OFFICER: Ask him a question
10   would you please, instead of...
11   Q. At the time that the shooting happened
12   on January 7th, 2011, were you still together with Kim
13   DePrima?
14   A. No. We were separated.
15   Q. Okay. How long had you been
16   separated?
17   A. For a while. Like, I guess since the
18   letter came. Like, we got a letter. There was really
19   no discussion, it was more like, you know, this isn't
20   working too much, we're going to have to go our
21   separate ways. I don't know--
22   [Crosstalk]
23   Q. I'm going to interrupt you for a
24   second because I'm not sure what letter you're talking
25

249

GAVINS - CROSS - SHENKMAN

2    about.
3    A. The eviction letter. I guess the bank
4    was taking over the houses so whatever, because the
5    landlord wasn't answering calls, wasn't making
6    repairs, wasn't showing up period.
7    Q. So you got a letter of eviction?
8    A. Yeah, the whole complex did.
9    Q. At that point were you still in a
10   romantic relationship with Kim DePrima or you were
11   broken up already?
12   A. No. At that point we were still
13   pretty much around each other, but it was, like, right
14   after that letter, she left and I was still there,
15   because my apartment wasn't ready. I, like, started
16   doing the apartment hunting then, so...
17   Q. Okay. So, is it fair to say that this
18   whole thing happening with the eviction contributed to
19   your breakup?
20   A. Yes, very much so.
21   Q. And it's something that you guys
22   argued about. You must have, right?
23   A. There wasn't really an argument.
24   Like, I have to be honest, we really didn't argue. It
25   was more like a real short discussion with no closure.

250

GAVINS - CROSS - SHENKMAN

2    But it wasn't an argument. We weren't like well what
3    the--who's this, blah-blah-blah that. It was neither
4    one of our faults that the eviction ever came through.
5    The landlord abandoned his own property. But it put
6    us in a position because we're going from a couple
7    living together, working on building trust or
8    whatever, to, you know, I know you have a lot of male
9    friends in your life, you know I have a lot of female
10   friends in my life and now it's a trust issue.
11   Because now it's not like, well, you're coming home to
12   me or I'm coming home to you. You know, now it's
13   different circles, different places, different things,
14   so...
15   Q. Okay. So the fact that there was an
16   eviction out there contributed to the breakup for a
17   lot of different reasons.
18   A. Yes.
19   Q. And also there were trust issues in
20   your relationship.
21   A. Okay, yeah, there was.
22   Q. And you suspected that she was with
23   other men and she suspected that you were with other
24   women. Is that your testimony?
25   A. I suspected that she could be. She'd

251

GAVINS - CROSS - SHENKMAN

1    have more time to. I knew there were guys around her
2    that were interested in her. Like, I already was
3    aware of that, so I figured, you know, without us
4    living together there's no real--I guess you would say
5    like I would have to totally rely on her word as
6    opposed to what I can see myself. And maybe that
7    caused issues for me. I don't know how she felt about
8    it. But that was my primary argument that we
9    shouldn't go in separate ways. We should probably get
10   a one-bedroom, maybe a two-bedroom together and try to
11   work it out from there. But, you know, she wasn't in
12   total agreeance with that, so...
13   Q. Okay. And well legally you both owed
14   money on the place, right?
15   A. No. When we went to court they said
16   there's no judgment against us, nothing. Just have to
17   be vacated before February some time.
18   Q. Okay. Well you're rent was 1,550 a
19   month, correct?
20   A. Correct.
21   Q. And it hadn't been paid for the month
22   of January. Isn't that right?
23   A. No, I don't think--well, wait,
24   January, February, I think I went to court, to the

8-8-11 In the Matter of Ms. DePrima

SHEET 10

252

GAVINS - CROSS - SHENKMAN

1  civil court in January. And when I spoke to the
2  lawyer he let us all know, because everybody, the
3  whole complex was being evicted, that there would be
4  no judgment held against us because the landlord
5  wasn't coming through, wasn't answering calls,
6  nothing. So there was no lien and there was no
7  judgment. I asked for the extended time, up until
8  February, because like I said, I was still apartment
9  hunting. I didn't have an apartment at the time. I
10  was still living at 59 Newark.
11  Q. Isn't it true that the rent of 1,550
12  wasn't paid in January for that extra month that you
13  were there?
14  A. No, the rent was not paid in January.
15  Q. Okay. Is it fair to say that that
16  also caused some stress at this time?
17  A. No.
18  Q. I would like to show the witness what
19  has been marked as--yes, thank you--I guess that's D-
20  15 in evidence.
21  THE HEARING OFFICER: Okay. The witness has
22  the document.
23  Q. Looking at the first page of this
24  document, where it says filing information and then it

253

GAVINS - CROSS - SHENKMAN

1  says filing date: January 5, 2011. And it says
2  eviction: yes. Do you see that part?
3  A. Yes, right here in my...
4  Q. That eviction notice happened two days
5  before the shooting incident, correct?
6  A. I'm not entirely sure. I can't say
7  which date this was because the entire complex as a
8  collective was going to civil court on like the same
9  day. That's how I pretty much found out about it.
10  Q. Okay. Well according to this
11  document, the filing date reads January 5th, 2011.
12  Correct?
13  A. Okay.
14  Q. And both your name and Kim DePrima's
15  name are listed as debtors on this document, correct?
16  A. Okay. Yes, ma'am.
17  Q. Okay. And take a look at the second
18  page. Do you recognize this?
19  A. Yes, I do.
20  Q. And both your name and Kim DePrima's
21  name are listed as respondents in this document,
22  correct?
23  A. Correct.
24  Q. And in the third paragraph of this

254

GAVINS - CROSS - SHENKMAN

1  document, it lists your rent as 1,550 for the month of
2  January 2011. Correct?
3  A. Okay.
4  Q. Is that correct?
5  A. Yes, ma'am.
6  Q. So this was a stressful time for you?
7  A. It wasn't the easiest time, so yeah,
8  there was a little stress.
9  Q. And your new apartment, you told us,
10  wasn't even ready yet. Correct?
11  A. No, ma'am, it wasn't.
12  Q. Okay. So you had some anxiety maybe
13  about where you were going to be living.
14  A. Right, yeah.
15  Q. And isn't it true that this is one of
16  the things that you and Kim fought about on that day
17  of the shooting?
18  A. No.
19  Q. Okay.
20  A. I didn't even speak to Kim on the day
21  of the shooting. And it says I'm responsible for it
22  if I'm no vacated by February. I told you that they
23  told me I had no judgment against me, nothing, as long
24  as I was out by February. I asked for the extended

255

GAVINS - CROSS - SHENKMAN

1  time until February.
2  Q. Okay. So is it your testimony today
3  that when you spoke to Detective Guariano [phonetic]
4  from NYPD, who interviewed you about the shooting on
5  January 8th. 2011, and you told him that you and Kim
6  were fighting that day about this eviction notice, are
7  you saying that that's not the truth, that you never
8  told him that?
9  A. No. What I'm saying is the truth is
10  that whatever detective or officer I did speak to, I
11  told them that I didn't feel like she had permission
12  to be there due to the fact that she gave up the
13  apartment and I went to civil court and they gave me
14  an extension. It had nothing to do with the payment.
15  Q. Okay.
16  A. It had nothing to do with anything
17  more than her being at the premises, knowing that
18  she'd already given it up and that I was still
19  residing there.
20  Q. Okay. So there was some tension on
21  the day of the shooting between you and Kim regarding
22  you believing that she didn't have a right to be
23  there. Is that right?
24  A. That's correct. But I never discussed

GAVINS - CROSS - SHENKMAN

1 that with her. That's just me, my personal tension
2 towards her. I believe that she shouldn't have been
3 over there knowing she gave the apartment up. She
4 went off to wherever she was going to. I was still at
5 the apartment until my new apartment was ready. So,
6 yeah, I felt like maybe she shouldn't have came around
7 and brought her rowdy friends or whatever, because she
8 already knew that I was still going to be there.
9       Q.  Okay. So that's one of the things
10 that you guys were disagreeing over on that day,
11 right?
12      A.  On that day, I didn't speak to her.
13      Q.  Okay. So when you told Detective
14 Guariano that you were fighting with her about this
15 issue on that day, is it your testimony that Detective
16 Guariano was lying about that?
17      MR. CALLAGY: Objection. The form of the
18 question, "when you told," he just said he didn't say
19 that to Detective Guariano.
20      THE HEARING OFFICER: Would you rephrase
21 your question please?
22      Q.  So if Detective Guariano testified
23 that you told him that on the day of the shooting
24 incident, would you say the detective was lying about

257

GAVINS - CROSS - SHENKMAN

1 that?
2       MR. CALLAGY: Objection. It's
3 argumentative.
4       THE HEARING OFFICER: I'm going to allow.
5 I'm--
6       MR. CALLAGY: [interposing] Obviously, if
7 someone says something different that it's not true.
8       THE HEARING OFFICER: I'm going to allow
9 this.
10      A.  What I am going to say is if I did
11 speak to a detective on the day of the shooting as in
12 regards to her being anywhere near there, I didn't say
13 that me and her argued about the eviction, anything.
14 What I said was I don't feel like she should have been
15 there, because she had already left. We already had
16 the eviction notice and I already had the extension
17 from a judge at civil court. So I didn't feel like
18 she belonged even over there, like, just like that.
19      Q.  Okay. And isn't it true that also
20 there was tension between you and Kim about her
21 hooking up with other men?
22      A.  There were tension when was in a
23 relationship because Kim had a lot of male friends,
24 yes, there was.

258

GAVINS - CROSS - SHENKMAN

1       Q.  And on the actual day of the shooting,
2 that's another thing that you guys argued about,
3 correct?
4       A.  Who argued about?
5       Q.  That you and Kim DePrima argued about
6 on the day of the shooting.
7       A.  I didn't speak to Kim on the day of
8 the shooting. I'm trying to tell you. The most I had
9 with Kim on this day, I spoke to Wise, I spoke to
10 Hicks, I spoke to the police officers, everything.
11 Kim was next door and the only time I really got to
12 say anything is when the door got opened, she stepped
13 out onto the porch and I said "yo, this is how things
14 are going to be?" And she looked at me and she was
15 like, we're dead. What can I tell you we're dead.
16 And then Lakisha started up with her mouth, getting
17 involved in people's business, which she shouldn't be,
18 and Kim went back inside. Outside of that, me and Kim
19 didn't have any discussion whatsoever. She was in the
20 house upstairs. Hicks came outside. Wise came
21 outside. Me and Hicks passed some words between each
22 other. There was already tension. I felt like Kim
23 could have intervened with that at any given time but
24 she didn't. She was upstairs in the house, and I only

259

GAVINS - CROSS - SHENKMAN

1 seen her one time that night, and that's when she came
2 out to the porch, when I was going back in my house.
3 And those words were exchanged. Like I said, yes, I
4 was upset. I don't think she should have came over
5 there, regardless to whose party it was because, you
6 know, we never brought closure really to how our
7 relationship ended, and then to see you with a dude
8 who, you know I knew you had a lot of male friends,
9 but I just didn't like Shawn. I felt like--
10      Q.  Okay, so--
11      A.  --Shawn was backstabbing me during our
12 relationship.
13      Q.  So Shawn Hicks was one of the guys
14 that you suspected that Kim DePrima had hooked up with
15 or had some sort of relationship with, correct?
16      A.  Yes, I did suspect that.
17      Q.  Okay. And you told the detective
18 that, correct?
19      A.  Yeah, I told the detective that I
20 suspected Kim of hooking up with Hicks, probably other
21 people like maybe she wanted her separation from the
22 relationship. I don't know what it was.
23      Q.  So you testified that it was emotional
24 between the two of you on that day.

8-8-11 In the Matter of Ms. DePrima

SHEET 12

260

GAVINS - CROSS - SHENKMAN
1
2     A.  Yes, it was.
3     Q.  And you just testified to me now that
4  there were many issues going on that caused tension
5  between you, correct?
6         MS. SHENKMAN:  Objection, as to many.
7         THE HEARING OFFICER:  There were issues.
8         MR. GAVINS:  There were issues.
9     Q.  But you want us to believe that on
10  that day you didn't talk about any of those things?
11  With all this tension, you and Kim never exchanged
12  words about any of those issues.  That's what you want
13  us to believe?
14        MR. CALLAGY:  Objection. --.
15        THE HEARING OFFICER:  Why don't you ask your
16  next question?
17     Q.  So is it your testimony sitting here
18  today under oath that the only thing that Kim DePrima
19  said to you on the day of the shooting was "our
20  relationship is dead"?  Is that your testimony under
21  oath?
22        A.  My testimony under oath is that the
23  only time me and Kim spoke to each other during that
24  day was when she was standing on the top porch at
25  Lakisha's house and I turned around and I said to her.

261

GAVINS - CROSS - SHENKMAN
1
2  is this how you want things to go?  And she said,
3  we're dead.
4     Q.  She said, we're dead?
5     A.  Yeah.
6     Q.  And you took that to mean our
7  relationship is dead?
8     A.  Not at the moment in time, no, I
9  didn't, because dealing with the people I'm dealing
10  with and me knowing a little something about the
11  people of my neighborhood, I took it at the time as a
12  threat.  It wasn't a threat until somebody else put me
13  onto yo, listen she said we're dead, not you're dead.
14  We're dead.  Like, listen to what she's saying.  But
15  I'm trying to listen to her, they're arguing, these
16  people are loud.  Lakisha got a mouth that can be
17  heard in Manhattan from my block.  You know what I
18  mean?  So there was a lot of things going on, a lot of
19  tension was in the air.
20     Q.  But it's your testimony that the words
21  "we're dead" are the only things that she said to you
22  on the day of the shooting?
23        MR. CALLAGY:  Objection, I don't know why
24  we're yelling "we're dead."
25        THE HEARING OFFICER:  I'm going to allow the

262

GAVINS - CROSS - SHENKMAN
1
2  question.
3     Q.  Is that your testimony?  Is that the
4  only thing she said?
5         MR. CALLAGY:  Objection.  Asked and answered
6  about four times.
7         THE HEARING OFFICER:  I'm going to allow the
8  question.
9         MR. CALLAGY:  That night we're talking.
10       A.  That night?  Pretty much, yeah.  With
11  my recollection that is the only time I spoke to Kim
12  period.  I spoke to a whole array of other people
13  though.
14     Q.  Okay.  I'd like to show the witness
15  what's been marked as D-16.
16       THE HEARING OFFICER:  I'm giving this to
17  him.
18       MR. GAVINS:  This is D-15.
19       [background noise]
20     Q.  Does your signature appear at the
21  bottom of this document?
22       A.  Yes, ma'am, it does.
23     Q.  And what date does it say?
24       A.  This says 8/2/11.  Oh no, wait,
25  1/8/11.

263

GAVINS - CROSS - SHENKMAN
1
2       THE HEARING OFFICER:  Okay, that's mine.
3  That's my notation.
4       MR. GAVINS:  My apologies.
5     Q.  At the top right hand corner I believe
6  there's a date.  What does it say?
7       A.  It's January 8th of 2011.
8     Q.  So that's the day after the shooting
9  incident, correct?
10       MR. CALLAGY:  Objection.
11       THE HEARING OFFICER:  What's the nature of
12  the objection?
13       MR. CALLAGY:  Well, it's 0200 hours.
14       MR. GAVINS:  I believe it was the same day.
15       MR. CALLAGY:  Maybe it's the evening of the
16  incident.  It's the next day after midnight.  But it's
17  not...
18     Q.  Okay, so it's 2 in the morning of
19  technically the same day as the shooting incident.
20       A.  Okay.
21     Q.  Correct?
22       A.  Yes, ma'am.
23     Q.  Okay.  And this is a statement that
24  you wrote, right?
25       A.  Yes, ma'am.

264

GAVINS - CROSS - SHENKMAN

1  Q. This is your handwriting?
2  A. Yes, ma'am, it is.
3  Q. You signed it to be the truth?
4  A. Yes, ma'am, I did.
5  Q. You wrote this inside the detective
6  squad in the police precinct?
7  A. Yes, ma'am, I did.
8  Q. Okay. And you wrote this for
9  Detective Guariano?
10  A. I'm not sure who I wrote this for.
11  Q. Okay. One of the NYPD detectives--
12  A. An officer.
13  Q. --in the case.
14  A. Yes.
15  Q. Correct? All right. And I'd like to
16  bring your attention to about the middle of your
17  statement where it says "Kim comes out of the next
18  door apartment." Do you see that part?
19  A. What say, the middle?
20  Q. Somewhere around the middle.
21  A. Yep, that was the lying part. But I
22  retracted that, so...
23  Q. Okay. So my question is I want you to
24  look at the part that I'm bringing your attention to
25

265

GAVINS - CROSS - SHENKMAN

1  that states: Kim comes out of the next door apartment,
2  leans over the rail and states I told you, you are
3  dead motherfucker. Do you see that part?
4  A. Yes, ma'am, I do.
5  Q. Did you write that?
6  A. I wrote that.
7  Q. Okay. Show me where in this statement
8  you say that the only thing Kim said to you is we are
9  dead. Show me where it says that.
10  A. Well that statement that you just
11  wrote, the exact same statement--
12  Q. I didn't write that statement.
13  A. Well, that you just read, right. That
14  exact same statement is what I was referring to,
15  because if you notice, there's nowhere else in here
16  where I speak to Kim at all.
17  Q. Okay, but my question is--
18  A. Like I told you, I had--
19  Q. My question, Mr. Gavins is show me in
20  this statement that you wrote--
21  A. Okay.
22  Q. --where you said that Kim DePrima said
23  we are dead.
24  A. Kim comes out over there. Kim comes
25

266

GAVINS - CROSS - SHENKMAN

1  out of the next door apartment, leans over the rail
2  and states: I told you we are dead. My mother hears
3  this and comes to the door, so I push my mother away
4  from the door, close it and call 911, as I'm on the
5  phone with them, blah-blah-blah. That would be the
6  same statement; it's just that, I'm sorry, at that
7  time, I was asleep when the whole thing happened. I'm
8  still groggy. I'm going through my emotion. Like,
9  I'm looking for her to help me alleviate the
10  situation. It didn't go that way. Like I said, she
11  did say we were dead, but I took it as you're dead,
12  because your friend is acting all unruly and drunk.
13  You brought them here. So at the time I took it as
14  your intention.
15  Q. Okay. So my question is what you just
16  told us today, that the only thing she ever said to
17  you is "we are dead". You didn't write that in this
18  statement, did you?
19  A. No, I didn't.
20  Q. Okay. I would like to show the
21  witness--I don't believe this is in evidence, but it
22  was in discovery.
23  THE HEARING OFFICER: Okay.
24  MS. SHENKMAN: I would like it to be marked
25

267

GAVINS - CROSS - SHENKMAN

1  for identification.
2  THE HEARING OFFICER: That is--just a
3  second, let me see, I think we're up to--I'll mark it
4  as D-20. Okay, it's a two-page document without a
5  heading. Pass that to the witness. We need to get --
6  [Background noise]
7  A. Okay.
8  Q. Okay, so in addition to talking to the
9  detectives, on the day of the shooting, you also
10  talked to Police Officer Ann Deloney [phonetic],
11  correct?
12  A. Okay.
13  Q. Police Officer Ann Deloney was the
14  officer that actually arrested Kim DePrima. Do you
15  remember that?
16  A. I'm not sure which officer arrested
17  Kim.
18  Q. Okay. But you were actually there
19  when Kim DePrima was arrested on Holland Avenue,
20  right?
21  A. Yes, I was. I was in the--
22  Q. You actually watched them put--
23  A. --back of the police car.
24
25

Ubiqus Reporting, Inc.    8-8-11 In the Matter of Ms. DePrima

SHEET 14

**268**

GAVINS - CROSS - SHENKMAN

1
2   Q. --the cuffs on her and arrest her?
3   A. Yes, ma'am.
4   Q. So you were in the back of a police
5 vehicle at that time?
6   A. Yes, ma'am, I was.
7   Q. You were directing the police to Kim
8 DePrima, correct?
9   A. No, ma'am. They already knew who she
10 was. They was asking me is that definitely her.
11   Q. So you identified Kim DePrima as Kim
12 DePrima--
13   A. Yeah.
14   Q. --for the police?
15   A. I said that's Kim.
16   Q. And you gave them her name from the
17 beginning, correct?
18   A. Yeah.
19   Q. Okay. And then later, when this
20 paperwork was being processed that you see here, you
21 know that Kim DePrima was arrested for acting in
22 concert with Shawn Hicks for the shooting, correct?
23   A. Correct.
24   Q. Okay. And in this document under the
25 investigation section, on the first page.

**269**

GAVINS - CROSS - SHENKMAN

1
2   A. I see it.
3   Q. It states: at TPO complainant states
4 ex-girlfriend acting in concert with un-apprehended
5 named perp. did fire numerous shots with firearm into
6 complainant's residence. That's what Kim DePrima was
7 being arrested for, correct?
8   A. I'm believing so.
9   Q. And you signed the second page of this
10 document, right?
11   A. Did I sign the second? Yeah, I signed
12 the second page of this document.
13   Q. Okay. So you knew what was going on
14 that night, right?
15   A. A whole bunch of things--
16   MR. CALLAGY: Objection--
17   A. --were going on--
18   MR. CALLAGY: --what that means.
19   THE HEARING OFFICER: You want to rephrase
20 that question.
21   Q. You knew what Kim DePrima was being
22 arrested for that night.
23   A. For the incident that just happened at
24 the house.
25   Q. Right. So at the time, you were

**270**

GAVINS - CROSS - SHENKMAN

1
2 cooperating with the police in apprehending her for
3 the crime, right?
4   A. Of course.
5   Q. And now you're not.
6   A. Well, I was helping the police to
7 apprehend her because I knew that if they apprehended
8 her they'd catch everybody else involved. See, I
9 don't know where the other guys go to. I don't know
10 where they hang out at. I just know we all in a small
11 circle. The incident happened. They got in her car.
12 You catch her, you catch the guy who did the shooting.
13   Q. Show me where, on the second page--
14 well, no, let me ask you this. On this night, when
15 you direct the police to Kim DePrima, you identify her
16 and she gets arrested for the crime of acting in
17 concert with Shawn Hicks, you never told the police
18 that night, oh no, she didn't do anything wrong. She
19 wasn't a part of it.
20   A. I still felt like she was responsible.
21 They were with her. She didn't pull a gun. She
22 didn't threaten me. She didn't go harassing nobody,
23 if that's what you're asking. She didn't do none of
24 the above. I don't think she dictated a drunk
25 imbecile to shoot at a house when there are people

**271**

GAVINS - CROSS - SHENKMAN

1
2 standing outside to begin with.
3   Q. Okay. Mr. Gavins, I'm not asking you
4 what you're saying now.
5   A. Okay.
6   Q. I'm asking you on the night of the
7 incident when you were talking to the police.
8   A. Okay.
9   Q. On the night that the shooting
10 occurred and the night that you wrote this statement
11 that you just read--
12   A. Yes, ma'am.
13   Q. --that said: I told you, you are dead
14 motherfucker. That night, you were telling the police
15 that Kim was a part of this and that she was
16 threatening you, right?
17   A. That night I was telling the police
18 with the statement, with the identifying her and
19 everything is that I personally held her responsible.
20   Q. Okay.
21   A. It's not to say that she did anything,
22 it's just to say that I felt like if Kim would have
23 never came there to begin with, none of this would
24 have happened.
25   Q. And you called 911 twice on the night

272

GAVINS - CROSS - SHENKMAN
1
2 of the incident, correct?
3    A. Yes, ma'am, I did.
4    Q. Okay. I can take that piece of paper
5 back.
6    MS. SHENKMAN: Okay, at this time, I would
7 like to move this document into evidence.
8    MR. CALLAGY: No objection.
9    THE HEARING OFFICER: D-20 is received in
10 evidence.
11    [Whereupon Department of Education's Exhibit
12 20 is admitted into evidence]
13    Q. So you called 911 twice that night,
14 the night of the shooting, right?
15    A. Yes, ma'am.
16    Q. And you repeatedly told the 911
17 operator that your ex, Kim DePrima, was harassing you,
18 correct?
19    A. Yes, ma'am.
20    Q. You told the 911 operator that Kim
21 DePrima was threatening you, correct?
22    A. No, ma'am.
23    Q. Okay. You told the 911 operator that
24 you felt you were in danger, correct?
25    A. Yes, ma'am.

273

GAVINS - CROSS - SHENKMAN
2    Q. Okay. And you told the 911 operator
3 that Kim DePrima had brought the guys over, correct?
4    A. Yes, ma'am.
5    Q. Okay. And you told the 911 operator
6 more than once that Kim DePrima was harassing you,
7 correct?
8    MR. CALLAGY: Objection. You just asked him
9 that question.
10    THE HEARING OFFICER: I think this question
11 was slightly different, so I'm going to allow it.
12    A. I do remember telling the 911 operator
13 that my ex-girlfriend was harassing me.
14    Q. And is it fair to say that you were
15 scared at the time that you were calling 911?
16    A. I was doing what I thought was the
17 smarter thing to do to avoid a bad situation.
18    Q. Okay. So you were worried that you
19 might be in danger, correct?
20    A. I was worried that a bad situation
21 might occur.
22    Q. And your mom was there, right?
23    A. Yes, ma'am.
24    Q. And your step-father was there, right?
25    A. Yes, ma'am.

274

GAVINS - CROSS - SHENKMAN
1
2    Q. And there were children in the house?
3    A. Yes, ma'am.
4    Q. So you were concerned about everyone's
5 safety, right?
6    A. Correct.
7    Q. Okay. So this 911 call happened in
8 the heat of the moment. Is that right?
9    A. No, not the first one.
10    Q. The second one?
11    A. The second one was after everything
12 happened.
13    Q. Well, isn't it true that the shooting
14 actually happened while you were on the phone with
15 911?
16    A. Yeah.
17    Q. So that was the heat of the moment,
18 wasn't it?
19    A. I don't know, bullet coming through
20 the door. I already had 911 on the phone from the
21 last call I made. So, you know...
22    Q. So it was a very tense time when you
23 were talking to the 911 operator?
24    A. Yeah, pretty much.
25    Q. You identified Kim DePrima's red

275

GAVINS - CROSS - SHENKMAN
1
2 Toyota Corolla to the 911 operator, correct?
3    A. Yes, ma'am, I did.
4    Q. Okay. And you told the 911 operator
5 that Kim DePrima and Shawn Hicks were leaving in that
6 car, right?
7    A. Yes, ma'am, I did.
8    Q. And you gave the 911 operator Kim
9 DePrima's name, in addition to Shawn Hicks, correct?
10    A. Yes, ma'am, I did.
11    Q. You never told anybody from NYPD that
12 the original statement you made was not true, did you?
13    A. Yes, I did. Two detectives came to my
14 house when I guess they wanted to subpoena me to go
15 somewhere, and I let them know that I'm not pressing
16 charges on Kim because I don't believe that she could
17 control what one gentleman did. I did, indeed, let
18 them know the other gentleman wasn't at all hostile.
19 There was really no argument or nothing with him. But
20 at the time that everything was going on--please
21 excuse me--I just got up, I walked into a situation
22 that had the potential to become very, very bad. And
23 yes, I totally blamed Kim DePrima for it. So
24 regardless to who was doing what, her name was going
25 up.

8-8-11 In the Matter of Ms. DePrima

SHEET 16

276

GAVINS - CROSS - SHENKMAN

1
2    Q. Okay. Isn't it true that the only
3  time you ever made a statement retracting what you had
4  said the first time was to a private investigator, not
5  NYPD? Isn't that true?
6    MR. CALLAGY: Other than today as well?
7    THE HEARING OFFICER: We're talking about a
8  statement. I assume you mean in writing?
9    MS. SHENKMAN: Yes.
10    THE HEARING OFFICER: Okay.
11    A. In writing? I do remember writing a
12  statement for Danny. I did meet Danny. But in verbal
13  conversation, I spoke to the detectives that came to
14  my house, and I spoke to I don't know who it was when
15  I went to this place on Stuyvesant, I believe it was.
16    Q. Okay. The only written statement that
17  you ever made retracting what you said the first time
18  was to a private investigator name Daniel Yargos
19  [phonetic]. correct?
20    A. Okay, I do remember writing a
21  statement out for Danny, yes.
22    Q. Okay. And that's because about a
23  month after the incident. Danny came to your house to
24  take a statement from you, correct?
25    A. Danny didn't come to my house. Danny

277

GAVINS - CROSS - SHENKMAN

2  did come out and meet me though, but it wasn't at my
3  house.
4    Q. Okay. So he came and met you. And he
5  came to meet you to get a statement from you, correct?
6    A. Yes, ma'am.
7    Q. Danny Yargos is not NYPD, right?
8    A. I don't know.
9    Q. Okay. Danny Yargos, you know, is a
10  private investigator hired by Kim DePrima, right?
11    MR. CALLAGY: Objection, the form of the
12  question.
13    THE HEARING OFFICER: Do you want to
14  rephrase your question please.
15    Q. Did you know that Danny Yargos is a
16  private investigator that was hired by Kim DePrima's
17  defense attorney?
18    A. No. I knew Danny Yargos was an
19  investigator. Because when he spoke to me, he did
20  tell me he's coming, he wants to talk to me about the
21  situation that happened. He asked me what I wanted to
22  do as far as concerned with Kim. And I told him, I
23  just want to correct my statement. So he was like I'm
24  going to come through, I'm going to sit down with you.
25  You can write out whatever you need to write out. You

278

GAVINS - CROSS - SHENKMAN

1
2  know what I mean? I'm not going to ask you no
3  questions, which he really didn't. He just sat down
4  and was like, well listen, this is what's going on.
5  There's a criminal case, blah-blah-blah--
6    Q. Okay. My question to you, Mr. Gavins,
7  is did you, Mr. Gavins, is did you know that Danny
8  Yargos, who took this statement from you, was actually
9  hired by Kim DePrima? Did you know that?
10    MR. CALLAGY: Objection. He answered that
11  question.
12    THE HEARING OFFICER: I'm going to allow it
13  one more time.
14    A. What I know is that--
15    Q. Did you know that or did you not know
16  that?
17    A. I didn't know who hired him. I knew
18  that he came from some investigation. He told me he
19  was a private investigator and he was investigating
20  Kim--
21    Q. So you knew he was private and you
22  didn't know who hired him.
23    A. I knew he was investigating Kim,
24  though.
25    Q. Okay.

279

GAVINS - CROSS - SHENKMAN

1
2    A. Like--
3    Q. You, in fact, never gave any
4  statement, any written statement to NYPD retracting
5  your statement, did you?
6    A. Not that I know of, but I know I spoke
7  to them verbally.
8    Q. Okay. And you have two children you
9  said?
10    A. Do I have two children?
11    Q. Yes.
12    A. I'm sorry. I don't understand where
13  that question is going to.
14    Q. Okay. You gave testimony that there
15  were two children living in the house with you when
16  you lived with Kim.
17    A. Yes.
18    Q. Were those your children?
19    A. Kim has two children.
20    Q. Okay. Were those your children?
21    A. No.
22    Q. Those were Kim's children?
23    A. Yeah.
24    Q. You developed a relationship with
25  those children?

**280**

GAVINS - CROSS - SHENKMAN

1
2 A. Yes, I have - - with the boys.
3 Q. Okay. And you still have a
4 relationship with those children?
5 A. Well, yeah, when I see them.
6 Q. Do you still see them to this day?
7 A. Well, yeah. I see one of them.
8 Q. Okay. And you said that Kim DePrima
9 has developed a relationship with members of your
10 family, correct?
11 A. True.
12 Q. So at this point, you don't want to
13 get her in trouble for anything?
14 A. I don't really decide how any of that
15 happens. Like, if you want me to give you my
16 testimony, I can do that. If you want me to say
17 whether I want her to get in trouble or not, she's
18 going to have to eat whatever comes to her. That was
19 the ending of our whole thing.
20 Q. My question to you is, isn't it true
21 that you don't want to get her in trouble for anything
22 because of her relationship with your family members,
23 her children, et cetera.
24 A. That's iffy. I got to be honest. Her
25 relationship, me and Kim are cordial now, which means

**281**

GAVINS - CROSS - SHENKMAN

1
2 we can see each other and say hi and see each other
3 and say bye, without all the back fighting and
4 nitpicking. We're cordial. But I do appreciate what
5 she does with my little brothers and sisters and stuff
6 like that.
7 Q. So isn't it true that you don't want
8 to see her get in trouble?
9 A. I don't want to see her unfairly get
10 in trouble.
11 Q. Okay. And you still talk to her,
12 correct?
13 A. It depends.
14 Q. Well, it was just your testimony her
15 today, you said that you hadn't talked to Kim in a
16 couple of days, right?
17 A. Okay. Yeah, it depends.
18 Q. So you talked to her a couple of days
19 ago.
20 A. Sure.
21 Q. Okay. That's when she wanted you to
22 come testify for her in this hearing, right?
23 A. Not at all. What I spoke to Kim about
24 a couple of days ago was dealing with my little
25 brother. He's, you know, developmentally disabled.

**282**

GAVINS - CROSS - SHENKMAN

1
2 And, I don't know, he has a liking for her. She helps
3 him out. When she called, she couldn't get in contact
4 with my mother. Of course, you call the next of kin,
5 the one watching them, me.
6 Q. Okay. So is it fair to say that
7 you've had continuous communication with Kim over the
8 last couple of years?
9 MR. CALLAGY: Objection as to what
10 continuous may mean.
11 A. Yeah, that was out there.
12 THE HEARING OFFICER: I think you can answer
13 that question.
14 A. Well I'm not sure what level of
15 continuance you mean. From intimate to cordial,
16 there's a big open gap.
17 Q. My question is isn't it true that you
18 have communication with her by phone, or in person.
19 You guys speak to each other and have continued to
20 speak to each other at certain points in time over the
21 last two years. Isn't that true?
22 A. Partially. Kim will only call me if
23 she can't get in contact with my mother or the old
24 man.
25 Q. I'm not asking you what her reasons

**283**

GAVINS - CROSS - SHENKMAN

1
2 are. I'm asking you simply isn't it true that you
3 have communication with her?
4 A. We have an open line, yes.
5 Q. And you still do today?
6 A. Yeah, we can talk to each other if we
7 choose to, yeah.
8 Q. Isn't it true that you suspected that
9 Kim DePrima had sexual involvement with other men?
10 A. Yes, I suspected.
11 Q. And one of those men was Shawn Hicks.
12 A. Yes.
13 Q. And then another one of those men was
14 Austin Wade [phonetic].
15 A. Not so much Wade. I just didn't like
16 Wade.
17 Q. Isn't it true that you told Detective
18 Guariano the night of the shooting that Kim DePrima
19 had performed sexual acts on Shawn Hicks and Austin
20 Wade? Isn't it true that you told the detective that?
21 A. No. No, absolutely not.
22 Q. Isn't it true that you told Detective
23 Guariano that Kim DePrima actually had a reputation of
24 performing sexual acts with a variety of these men
25 that were in your circle?

SHEET 18

284

GAVINS - CROSS - SHENKMAN

1
2        A. No. The truth is, in private talk,
3    which is why none of it is written down, I told the
4    guys a lot of things that I never expected them to
5    come out--
6        [Crosstalk]
7        Q. I'm asking though about what you told
8    Detective Guariano.
9        A. Detective Guariano, was he questioning
10   me about what? Because there was a lot of cops, Miss.
11   It was a late night. I was tired. A lot of--
12       Q. Isn't it true that you told a cop,
13   even if you don't remember--
14       A. A cop.
15       Q. --which one.
16       A. Okay.
17       Q. That Kim DePrima was known for
18   performing sexual acts on many of the men that were in
19   your circle?
20       A. No. What I told the cop that night is
21   that I think Kim messes with a lot of guys and that's
22   why I didn't know--
23       Q. Okay. That's what you believed.
24       A. A lot of things happening. Yes.
25       Q. And one of those guys was Shawn Hicks.

285

GAVINS - CROSS - SHENKMAN

1
2        A. Yeah.
3        Q. Isn't it true that on the day of the
4    shooting, you believed that Kim DePrima was involved
5    in getting these guys to threaten you?
6        A. A belief?
7        Q. Yeah, is that what you believed on the
8    day of the shooting?
9        A. On the day of the shooting, I believed
10   that Kim had no regard to me being there and therefore
11   was responsible for anything her friends did. That's
12   what I believed that night. I don't believe she
13   should have been there. So I believe that anything
14   that happened should have been placed on her.
15       Q. Now, you testified that you do have a
16   criminal history, correct?
17       A. Yes, ma'am, I do.
18       Q. Okay. And you said one of the things
19   you remembered was a burglary and robbery conviction
20   from 1999, correct?
21       A. Yes, ma'am, I do.
22       Q. Okay. But you've had many more
23   convictions besides that, right?
24       A. I remember those because those were
25   the life changing F's on my life's report card.

286

GAVINS - CROSS - SHENKMAN

1
2        Q. Okay. My question is you've had many
3    other convictions besides those in '99, correct?
4        A. Sure.
5        Q. You had a resisting arrest in 2004,
6    right?
7        A. Okay.
8        Q. And an obstructing governmental
9    administration in 2005, correct?
10       A. Okay.
11       Q. A possession of a forged instrument,
12   also in 2005, correct? Does this sound familiar to
13   you?
14       A. To be perfectly honest, you're reading
15   a paper and asking me about times that came and gone.
16   The whole resisting arrest was a misdemeanor. I was
17   out the next day. I didn't pay it mind. You're going
18   to see smoking pot, open container. Like, there's
19   been a whole bunch of things I've done in my life. I
20   just can't keep track of each and every single one of
21   them.
22       Q. Okay. So when I'm talking about prior
23   convictions, I just want to know if you recognize them
24   or remember them.
25       A. I'm pretty sure they're there.

287

GAVINS - CROSS - SHENKMAN

1
2        Q. Okay. And do you remember an arrest
3    for endangering the welfare of a child in 2007?
4        A. Was I in Monticello, New York or was I
5    down here?
6        Q. Well, you've had several arrests in
7    Monticello and in Staten Island, so I'm not sure which
8    one this was from.
9        A. Me neither.
10       Q. Okay. And isn't it true that in 2005
11   you were charged with a violation of your probation
12   for the burglary and robbery in '99, and you were re-
13   sentenced to a one to three-year sentence in jail?
14       A. Yes--
15       Q. Do you remember that? So you served
16   time?
17       A. A little bit.
18       Q. Okay. And in more recent history, in
19   2010, you were arrested for marijuana possession and
20   the possession of a scalpel, correct?
21       A. Yes, ma'am.
22       Q. Okay. And that was recently, in March
23   of 2010, right?
24       A. Yes, ma'am.
25       Q. And that was a big case that you

8-8-11 In the Matter of Ms. DePrima
Case 1:12-cv-03626-MKB-LB    Document 1    Filed 07/20/12    Page 118 of 127 PageID #: 118
Sheet 19

288

GAVINS - CROSS - SHENKMAN
1
2  probably remember where it was written up in the news
3  because there was another individual who pretended
4  they were you in the court and escaped. Do you
5  remember that?
6      A.  I remember that. Yes, I do.
7      Q.  That was in March of 2010, correct?
8      A.  Yes, ma'am. It inconvenienced me
9  tremendously. I remember that--
10     Q.  Okay. So that was during the time
11 when you were in an intimate relationship with Kim
12 DePrima, right?
13     A.  Was I?
14     [Crosstalk]
15     Q.  That was during the time when you were
16 living with her at Newark Avenue, right, in March
17 2010?
18     A.  I'm thinking we were probably on the
19 outs. I'm not too certain, because I was looking at a
20 house over in Stapleton at that time. That's actually
21 how that whole incident came about. I was walking to
22 Stapleton to look at a new house. So I don't think we
23 were too much around each other like that.
24     Q.  Okay. Well, it was your testimony
25 here today that you were together with Kim DePrima for

289

GAVINS - CROSS - SHENKMAN
1
2  about a year before the shooting incident happened.
3      A.  Okay--
4      MR. CALLAGY:  Give or take a month, I think
5  he said.
6      THE HEARING OFFICER:  This is cross
7  examination, Mr. Callagy.
8      Q.  So are you sitting here and testifying
9  today that on March 11th of 2010 you weren't living
10 with Kim DePrima at 59-A Newark Avenue?
11     A.  I probably still did reside at 59-A
12 Newark Avenue. I didn't leave that residence until
13 February. Kim, on the other hand, took off earlier
14 than I did.
15     THE HEARING OFFICER:  Could we repeat the
16 question? Please listen to the question and answer
17 the question.
18     MR. GAVINS:  Okay.
19     Q.  The question is isn't it true that in
20 March 2010, both you and Kim DePrima were on the lease
21 and living together at 59-A Newark Avenue?
22     A.  Just give me a second to run months
23 through my head real quick. All right, yeah, I'd say
24 around then we were both still cohabiting.
25     Q.  Okay. So Kim DePrima must have known

290

GAVINS - CROSS - SHENKMAN
1
2  about this 2010 arrest, right?
3      A.  Yeah, I figured she should have known
4  about it.
5      Q.  Okay. So you did discuss with her
6  your criminal convictions, right?
7      A.  No, I probably discussed with her that
8  case.
9      Q.  So she knew you had criminal
10 convictions then?
11     A.  I would say she knew I got convicted
12 for that.
13     Q.  She came to your court appearances,
14 right?
15     A.  No.
16     Q.  She came to visit you when you were
17 arrested?
18     A.  No.
19     THE HEARING OFFICER:  No, there's no
20 question pending.
21     MS. SHENKMAN:  Just one moment. I'm sorry.
22 If I could just have one moment, I think I'm almost
23 done but--
24     THE HEARING OFFICER:  [interposing] Okay.
25     MS. SHENKMAN:  --I just have confidence in--

291

GAVINS - CROSS - SHENKMAN
1
2      THE HEARING OFFICER:  [interposing] Sure,
3  let's just go off the record please.
4      [Off the record]
5      [On the record]
6      THE HEARING OFFICER:  Back on the record
7  please. Any other questions?
8      MS. SHENKMAN:  We have no further questions.
9      THE HEARING OFFICER:  Okay. Do you have any
10 re-direct?
11     MR. CALLAGY:  I think I'm going to have a
12 little bit. But can I have two minutes more to speak
13 with Ms. DePrima?
14     THE HEARING OFFICER:  Two minutes. Okay,
15 off the record please.
16     [Off the record]
17     [On the record]
18     THE HEARING OFFICER:  Back on the record
19 please. Mr. Callagy, do you have any more questions?
20     MR. CALLAGY:  Thank you, Ms. Crangle.
21     REDIRECT EXAMINATION
22 BY MR. CALLAGY:
23     Q.  Mr. Gavins, did anyone offer you
24 anything to retract the statements you made to the
25 police?

SHEET 20

292

GAVINS - REDIRECT - CALLAGY

1
2   A. No, sir.
3   Q. I'm sorry?
4   A. No. I'm sorry.
5   Q. Why did you retract them?
6   A. Honestly, I spoke to my mother and she
7   said be fair. So I was being fair. I retracted my
8   statement because, you know, it would have went
9   differently had I not been angry enough to like, you
10  know, really just want to see destruction happen at
11  that point in time. But I do have a good upbringing,
12  as bad as my record might make it look. I was just
13  doing the fair thing and giving her, her fair and
14  square shot. I wouldn't want nobody to like drown me
15  just because they could.
16  Q. Mr. Gavins, counsel asked you some
17  questions on cross examination about an arrest in
18  March of 2010 involving marijuana. Do you remember
19  that?
20  A. Yes, sir. I do.
21  Q. Do you know what happened with that
22  case?
23  A. A cop pulled me over--
24  Q. No, I mean what happened in terms of
    the disposition of the case?

293

GAVINS - REDIRECT - CALLAGY

1
2   A. Oh, everything was dismissed.
3   Q. Where were you living. if you can
4   remember, at the time of the arrest involving
5   marijuana?
6   A. At the time of the arrest involving
7   the marijuana? Let me see... It was 59 Newark, because
8   mind me, there was an array of addresses that--there
9   was 59 Newark, which I'm believing that, you know, we
10  was probably having our tension at the time. My mom
11  lived at--where did my mom live at the time? She
12  lived I think on Grove Avenue, 46 Grove. And that is
13  primarily where I was at for most of that time,
14  because whenever we argued, I would go to mommy's
15  house. Which is why I'm saying, on that day I don't
16  think she even knew I was out in Stapleton because I
17  wasn't speaking to her, I was going to look at the new
18  house with my brother. And that's how I wounded up
19  arrested for having that marijuana in my pocket.
20  MR. CALLAGY: Nothing further.
21  THE HEARING OFFICER: Do you have anything
22  further?
23  MS. SHENKMAN: Nothing further.
24  THE HEARING OFFICER: Okay, thank you.
25  You're excused.

294

GAVINS - REDIRECT - CALLAGY

1
2   MR. GAVINS: Thank you.
3   THE HEARING OFFICER: Please don't discuss
4   your testimony with anybody. Okay?
5   MR. GAVINS: Nobody.
6   THE HEARING OFFICER: Okay.
7   MR. GAVINS: Please don't tell anybody I was
8   here.
9   [Laughter]
10  THE HEARING OFFICER: We'll go off the
11  record please.
12  [Off the record]
13  [On the record]
14  THE HEARING OFFICER: We'll go back on the
15  record please. Okay, Mr. Callagy, who is your next
16  witness?
17  MR. CALLAGY: Respondent calls Mr. Willie
18  Foster.
19  THE HEARING OFFICER: Mr. Foster, will you
20  raise your right hand please? Do you swear or affirm
21  that the testimony you're about to give in this matter
22  will be the truth, the whole truth and nothing but the
23  truth?
24  MR. WILLIE FOSTER: Yes, ma'am.
25  THE HEARING OFFICER: Okay. Please be

295

KIM DEPRIMA - 08/08/11

1
2   seated. Would you spell your name please for the
3   record?
4   MR. FOSTER: Willie, W-I-L-L-I-E, Foster, F-
5   O-S-T-E-R.
6   THE HEARING OFFICER: Okay. Mr. Foster, as
7   I'm sure Mr. Callagy has explained to you, this
8   proceeding is being tape recorded. So it's extremely
9   important that you keep your voice up so we can all
10  hear you, and also make sure all your responses are
11  verbal, since obviously a tape recorded can't tell if
12  you're nodding your head.
13  MR. FOSTER: Yes, ma'am.
14  THE HEARING OFFICER: Okay. Thank you.
15  Okay. Mr. Callagy?
16  MR. CALLAGY: Thank you.
17  DIRECT EXAMINATION
18  BY MR. CALLAGY
19  Q. Mr. Foster, where do you live?
20  A. 76 Grove Ave., Staten Island, New
21  York.
22  Q. Where did you live before that?
23  A. 46 Grove Ave.
24  Q. And how about before then, if you
25  remember?

8-8-11 In the Matter of Ms. DePrima

296

298

FOSTER - DIRECT - CALLAGY

1   FOSTER - DIRECT - CALLAGY
2   A. 57 Gordon.
3   Q. Did you ever live at Newark Avenue?
4   A. I stayed there like a month or so.
5   Q. Okay. When was that?
6   A. In December, last year.
7   Q. Why would have occasion last year to
8   be there at all?
9   A. We had a problem with our housing with
10   the landlord, so we had to move at the spur of the
11   moment. So I called my son Angel to talk to Kim. She
12   said we could stay there until we had our apartment
13   get ready in January.
14   Q. Why'd you have Angel speak to Kim?
15   A. Because I didn't have her number at
16   the time.
17   Q. Who was Kim to you at that time?
18   A. She's Jermaine's fiancée. A friend of
19   mine's as well.
20   THE HEARING OFFICER: Pardon me?
21   MR. FOSTER: A friend of mine's as well.
22   Q. And who is Jermaine to you?
23   A. My stepson.
24   Q. I'll draw your attention to the night
25   of January 7th of this year. Were you at 59 Newark

297

1   FOSTER - DIRECT - CALLAGY
2   Avenue that evening?
3   A. Yes.
4   Q. Do you recall occasion for the police
5   to come to the premises?
6   A. Yes, I remember.
7   Q. What happened?
8   A. As far as my knowledge, I came home
9   from work and I was speaking with a few gentlemen that
10   was standing outside. Then I went inside the house,
11   closed the door and a few shots rang out.
12   Q. Okay. What'd you do?
13   A. Well, my son had called 911. Then
14   when the cops came, they looked around the house and I
15   just left with my son.
16   Q. Where'd you go?
17   A. We went by some darkened street where
18   they had wind up locking Ms. DePrima up.
19   Q. Okay. Mr. Foster, did you make any
20   statement to the police?
21   A. I made one because I was made, just to
22   support my son. But it wasn't true.
23   Q. Well, what was your statement? What
24   did it say?
25   A. I really don't remember. I know I

1   FOSTER - DIRECT - CALLAGY
2   made a statement but I don't know what I wrote.
3   Q. Why do you say it wasn't true?
4   A. Because I didn't see anything.
5   Q. When you say you didn't see anything,
6   what are you referring to?
7   A. I didn't see, I didn't even see Kim
8   leave, I didn't see anybody. I just know when I came
9   in from work, I spoke to the guys and that was it.
10   And Jermaine was on the phone, I heard the shots.
11   That's it.
12   Q. Did you continue to know Kim DePrima
13   beyond that night?
14   A. Yes, I have.
15   Q. Okay. How so?
16   A. Actually, me and her older son are
17   like-best friends.
18   THE HEARING OFFICER: Pardon me. I can't
19   hear you. What?
20   MR. FOSTER: I said me and her oldest son
21   Corey [phonetic], we're like best friends.
22   Q. Has Ms. DePrima had any other
23   involvement with your family, other than Jermaine?
24   A. Yes, ma'am. I mean, yes, sir. She
25   takes care of my 6-year-old son. He's--

299

1   FOSTER - DIRECT - CALLAGY
2   Q. How so?
3   A. He's special needy disability. And
4   she helps work with him and he has improved a lot
5   since she's been around. She picks him up, spends
6   nights out with him. She takes him away on trips. So
7   she's doing fine with him.
8   Q. How long has that been going on?
9   A. It's been going on for three years.
10   Q. Tell us again why did you make a
11   statement to the police that night that was not true?
12   A. To support my son.
13   Q. Did anybody ask you to come here today
14   to change your story?
15   A. No, sir.
16   Q. Were you offered any sort of reward?
17   A. No, sir.
18   Q. Why are you here today?
19   A. To help Ms. DePrima tell the truth.
20   MR. CALLAGY: Nothing further.
21   THE HEARING OFFICER: Okay. Ms. Shenkman is
22   going to ask you some questions now. Okay?
23   MR. FOSTER: Yes, ma'am.
24   MS. SHENKMAN: One moment.
25   THE HEARING OFFICER: Sure.

8-8-11 In the Matter of Ms. DePrima

300

```
 1        FOSTER - CROSS - SHENKMAN
 2        CROSS EXAMINATION
 3     BY MS. SHENKMAN:
 4        Q.  Good afternoon, Mr. Foster.
 5        A.  Good afternoon, ma'am.
 6        Q.  I just have a few questions for you on
 7   cross examination.  Okay?
 8        A.  Yes, ma'am.
 9        Q.  Okay.  You said you're here today to
10   help Kim DePrima, correct?
11        A.  Yes.
12        Q.  Okay.  You have a positive
13   relationship with her?
14        A.  Yes, I do.
15        Q.  And your relationship with her
16   continues even to the present day?
17        A.  Yes, it does.
18        Q.  And your relationship with Kim DePrima
19   has continued even though she's not together with your
20   son anymore, correct?
21        A.  Yes, that's right.
22        Q.  Okay.  And your son, Jermaine Gavins,
23   is that--he's your stepson?
24        A.  Yes, ma'am.
25        Q.  Okay.  And you had said that Kim
```

301

```
 1        FOSTER - CROSS - SHENKMAN
 2   DePrima was Jermaine's fiancée?
 3        A.  Yeah, that's what I always call it.
 4   You know, it's like girlfriend/boyfriend, but when
 5   they get older you just say fiancé or stuff like that.
 6        Q.  You just call it fiancée?
 7        A.  Yes.
 8        Q.  Okay.  Were they actually engaged to
 9   be married or--
10        A   Not that I know of, no.
11        Q.  Not that you know of.  Okay.  But they
12   were in a serious relationship?
13        A.  Yes, they was at the time.
14        Q.  Do you remember how long they were
15   together?
16        A.  That I don't know.
17        Q.  But you know that they were living
18   together for a period of time--
19        A.  Yes.
20        Q.  --at 59-A Newark Avenue, correct?
21        A.  Yes, ma'am.
22        Q.  Okay.  So your son Jermaine, he has
23   gotten into trouble with the law in the past, correct?
24        A.  Yes.
25        Q.  Okay.  And would you say now that he's
```

302

```
 1   trying to turn himself around?
 2        A.  He's been turned around.  He's 360.
 3   He hasn't been in trouble or anything like that.
 4        Q.  Okay.  So Kim DePrima, as his
 5   girlfriend, she knew that he had a troubled past,
 6   correct?
 7        A.  Not that I know of, no.
 8        Q.  Okay.  She knew about his arrest in
 9   2010, correct?
10        MR. CALLAGY:  Objection as to what Ms.
11   DePrima knows about from this witness?
12        THE HEARING OFFICER:  Well, she can ask him,
13   if he knows?
14        A.  I don't know.  Me and Jermaine don't
15   speak his relationship and what goes on with them, per
16   se.  When we get together it's like a cookout or she
17   comes to pick up his little brother and they go.  As
18   far DePrima, my wife has more interaction speaking
19   with her about things.  Things like that I don't know.
20        Q.  You don't know what--
21        A.  No.
22        Q.  --what she knows about his criminal
23   past?
24        A.  No, I don't.
```

303

```
 1        FOSTER - CROSS - SHENKMAN
 2        Q.  Okay.  He doesn't keep his criminal
 3   past a secret does he?
 4        A.  Yes, he does.
 5        THE HEARING OFFICER:  Pardon me?
 6        MR. CALLAGY:  How would he know how to
 7   answer that?
 8        THE HEARING OFFICER:  If he knows how to
 9   answer.  I mean I think he can answer the question.  I
10   don't know whether he knows or not because--
11        MR. CALLAGY:  [interposing]  Secret from
12   whom?  I mean the world, is that the question?
13        THE HEARING OFFICER:  Do you understand the
14   question?
15        MR. FOSTER:  If he tells people about his
16   criminal record, no, we don't.  He doesn't say that.
17   We meet people on the street, you know, we don't just
18   say, hey, I got a criminal record.  Is it okay I hang
19   out with you?  We're not going to say that.  So...
20        Q.  Okay, well you as his step-father, you
21   know about his past criminal record--
22        A.  Yes, I do.
23        Q.  Correct?  And his family members know
24   about it, right?
25        A.  Yes, but--
```

8-8-11 In the Matter of Ms. DePrima

304

FOSTER - CROSS - SHENKMAN
1
2  [Crosstalk]
3      Q.  Those close to him know about it?
4      A.  Yes, we do.
5      Q.  Okay. Now you said you also had a
6  relationship with Kim DePrima's older son Corey?
7      A.  Yes.
8      Q.  How old is her older son?
9      A.  Corey's like 24--24, yeah.
10     Q.  And he has a criminal history himself,
11 correct?
12     A.  I don't know.
13     Q.  You don't know about his gun
14 convictions?
15     MR. CALLAGY: Objection.
16     THE HEARING OFFICER: It's cross
17 examination, Mr. Callagy.
18     [Crosstalk]
19     MR. CALLAGY: - -.
20     THE HEARING OFFICER: She asked him if he
21 knew about Respondent's oldest son's gun conviction.
22 Do you know or don't you know?
23     MR. CALLAGY: The relevance of that is what?
24     MR. FOSTER: I don't know.
25     THE HEARING OFFICER: I'm going to allow it.

305

FOSTER - CROSS - SHENKMAN
1
2      MR. FOSTER: No, ma'am.
3      Q.  But you described yourself as being
4  best friends with him?
5      A.  Yes.
6      Q.  The date of the shooting incident, you
7  were inside the house at 59-A Newark Avenue?
8      A.  When the shots were done, yes ma'am, I
9  was.
10     Q.  And your wife was there?
11     A.  Yes, ma'am, she was. She was in the
12 basement.
13     Q.  And were there children in the house?
14     A.  Yes, my three little ones. They was
15 in the basement sleeping.
16     Q.  So that must have been a frightening
17 experience for you when someone was shooting through
18 the door.
19     A.  I didn't pay it no mind. I mean, I'm
20 from Brooklyn, that's what you hear all the time.
21     Q.  Were you scared for the safety of your
22 children and your wife?
23     A.  They was in the basement. I was
24 scared, yeah.
25     Q.  Okay. So you were alarmed when you

306

FOSTER - CROSS - SHENKMAN
1
2  called 911, correct?
3      A.  I never called 911.
4      Q.  You spoke to 911 on that day. Isn't
5  that true?
6      A.  No, I didn't.
7      Q.  Okay. Is it possible that you spoke
8  to 911 and you don't recall? Or are you 100 percent
9  sure you didn't speak to them?
10     A.  The only one that I possibly spoke to
11 was the detective from the precinct when they came or
12 when the cops came to the house. That was it. I
13 never made a phone call to the operator, no.
14     MS. SHENKMAN: Just one moment. I'd like to
15 show the witness at this time what has been marked D-
16 17 in evidence.
17     THE HEARING OFFICER: Pass that please.
18 Pass that down please.
19     Q.  Do you recognize this document?
20     A.  Yes, I do.
21     Q.  Did you sign this document?
22     A.  Yes, ma'am, I did.
23     Q.  Did you write this?
24     A.  Yes, ma'am, I did.
25     Q.  Is this the statement you were

307

FOSTER - CROSS - SHENKMAN
1
2  referring to before, that you gave to the police later
3  that night of the shooting?
4      A.  Yes.
5      Q.  Okay. And this is the statement that
6  you said in your testimony you made up?
7      A.  Yes, ma'am.
8      Q.  Okay. So this is the statement that
9  you said is not true at all?
10     A.  It's not true, no.
11     Q.  And your reason for writing it at the
12 time was to support your son?
13     A.  Yes, ma'am, it was.
14     Q.  And now you've changed your mind about
15 that?
16     A.  Yeah. Might as well tell the truth,
17 I'm not going to let nobody get in trouble for
18 something I didn't see.
19     Q.  So in this statement, the second to
20 last sentence when you say "then I saw Kim make them
21 get in the car and pull off."
22     A.  I never saw Kim.
23     Q.  That's a pretty specific statement,
24 isn't it?
25     A.  Yes, ma'am. I never saw--

SHEET 24

308

FOSTER - CROSS - SHENKMAN

Q. So you're just saying that you made it up completely that you saw Kim make them get in the car and pull off? That never happened?

A. Never happened. I didn't see her pull off.

Q. Okay. Now you have some criminal convictions in your past as well, correct?

A. Yes, ma'am, I do.

Q. You're a convicted felon?

A. Yes, ma'am.

Q. Okay. You have an attempted robbery from 1989, correct?

A. Yes.

Q. And then another attempted robbery in 1992, correct?

MR. CALLAGY: Objection to the relevance of this--

A. Yes.

MR. CALLAGY: --the man has said he's a convicted felon.

THE HEARING OFFICER: I'm going to allow it.

Q. So two attempted robberies, possession of a controlled substance in 2002, is that right?

A. Yes.

309

FOSTER - CROSS - SHENKMAN

Q. You also had weapons charges in Monmouth, New Jersey, is that right?

A. Yes, ma'am.

Q. You were convicted of possession of a weapon and you served three years probation for that.

A. Yes, ma'am.

Q. Okay. I would just like one moment. I'm just checking out the 911 tape and then I'll wrap up shortly.

THE HEARING OFFICER: Okay. Let's go off the record for a minute.

[Off the record]

[On the record]

THE HEARING OFFICER: Back on the record please. Okay. Ms. Shenkman?

MS. SHENKMAN: I'd like to play an excerpt from the 911 tape that has been marked in evidence as D-10.

THE HEARING OFFICER: Okay. All right.

MS. SHENKMAN: Yes.

[911 Tape playing]

MR. FOSTER: I didn't remember calling.

Q. So, Mr. Foster, is it still your testimony that you never called 911 the day of the

310

FOSTER - CROSS - SHENKMAN

shooting?

A. I didn't remember calling.

Q. Well that was your voice that we just heard, correct?

A. I just heard it. I was shocked I heard it.

Q. That was you, right?

A. Yeah, I guess so. Yeah.

Q. Okay. And at the time you said you knew who did the shooting, right? That's what you told the 911 operator?

A. Yes.

Q. You told the 911 operator that they ran back into the house next door, right?

A. Yes.

Q. So you told the 911 operator at the time that you saw who did it, right?

A. Yes.

Q. Okay. And at that time, you hadn't had time to make up a story, had you?

A. No. I saw who shot in the house.

Q. Your testimony today was that you didn't see anything.

A. I didn't see her, I said.

311

FOSTER - CROSS - SHENKMAN

Q. So you saw Shawn Hicks?

A. At the time that's how I found out his name, yeah. I didn't even know his name at the time.

Q. And you saw them, Kim DePrima and Shawn Hicks, pulling away together in the red Toyota, correct?

A. No. I didn't even know the car left.

MS. SHENKMAN: Okay, one moment. Okay, no further. One moment. Thank you, no further questions.

THE HEARING OFFICER: Anything further?

MR. CALLAGY: No.

THE HEARING OFFICER: Okay, thank you Mr. Foster. You're excused.

MR. FOSTER: Thank you. Yes, ma'am.

THE HEARING OFFICER: Please don't discuss your testimony.

MR. FOSTER: Yes, ma'am.

THE HEARING OFFICER: Okay. Off the record.

[Off the record]

[On the record]

THE HEARING OFFICER: Okay. Can we go back on the record please? Mr. Callagy, do you have another witness?

8-8-11 In the Matter of Ms. DePrima

SHEET 25

312                                                                314

1      KIM DEPRIMA - 08/08/11                          Student Index
2          MR. CALLAGY: We had hoped to have Mr. Wade        None.
3      Austin, but he has not appeared.  So we do not have
4      another witness for today.  We do intend to call
5      Lakisha Dennis and Ms. DePrima and perhaps the
6      probation officer and then if we can get Mr. Austin,
7      it's a very short witness, but he hasn't shown today.
8      So I don't know.  That's our plan for the next day.
9          THE HEARING OFFICER:  Okay.  All right, so
10     we're concluded for today.  Our next day of hearing is
11     next Wednesday, August 17th at 10:00.  So we'll see
12     you all there.
13         MR. CALLAGY:  Thank you.
14         THE HEARING OFFICER:  Thank you.
15     (The hearing adjourned at 1:00 p.m.)
16

313

CERTIFICATE

I, Donna Hintze do hereby certify that the foregoing
typewritten transcript of proceedings in the matter of New
York City Department of Education v. Kim DePrima, File No.
17,502/17,698 was prepared using the required
transcription equipment and is a true and accurate record
of the proceedings.
Signature: _____
Date: __August 15, 2011_____

Ubiqus Reporting, Inc.     8-8-11 In the Matter of Ms. DePrima

**THE CITY OF NEW YORK**
**DEPARTMENT OF PROBATION**
340 BAY STREET
STATEN ISLAND, NEW YORK 10301
Tel: (718) 876-7459   Fax: (718) 876-8799

**Vincent Schiraldi**
*Commissioner*



*Lisa D' Ambrosio*
Director
*Staten Island Adult Services*

6/29/11

NYS Dept of Education
49-51 Chambers Street
New York, NY  10007

Re: Deprima, Kim

Probationer Kim Deprima was placed on Five Years probation by Judge J Collini on 4/16/2009 in Richmond Supreme Court. The probationer completed her DNA Testing on 4/16/2009. A Violation of Probation was submitted on 1/18/2011. The Violation Report was submitted based upon her re arrest that occurred on 1/7/2011. She is now aware that she can not be with disreputable people while on probation. The violation of probation is based upon her re arrest and nothing further. The probationer has been compliant with all aspects of her probation obligations.  She has reported regularly to our Automated Kiosk System.  Based opun my experience if the re arrest is terminated on 8/30/2011, the Judge more likely will restored the probationer back to probation. She will no longer be on violation status. This letter should not be an endorsement of the probationer's criminal past behaviour.

Signature of Probation Officer

Tel.# 718 876-8159

*Reminder: On all Supreme Court cases, probation officers should send a Copy of this letter to the sentencing judge.*

1081-96

*Creative solutions for a safer city: protecting lives, changing lives, saving lives.*

**CONIGATTI & RYAN, LLP**
Attorneys at Law
67 New Dorp Plaza
Staten Island, New York 10306

Thomas R. Conigatti*
Michael J. Ryan*

*Also admitted in N.J.

Tel. (718) 351-1111
Fax. (718) 351-8616

January 12, 2011

**Via Fax (718) 442-3584 and Mail**
ADA Jennifer Cilia
District Attorney
Richmond County
130 Stuyvesant Place
Staten Island, New York 10301

Re:   **DEPRIMA, Kim**
      **Dkt. # 2011RI000257**
      **Part AP1**
      **Next Court Date:  01-13-2011**

Dear ADA Cilia,

Re the above matter, this correspondence shall confirm our January 11th telephone conversation.  As we discussed, the complaining witness Jermaine Gavins was present in Court at Ms. DePrima's arraignment on January 9th.  Mr. Gavins has asserted that Ms. DePrima was **not** responsible for the shooting incident; rather it was the sole responsibility of Shawn Hicks.

As I advised you I made a record of the foregoing at the arraignment.  Given the significance of Mr. Gavins' presence at the arraignment, I was dismayed to learn that you were not apprised of same and were learning of it for the first time from me two (2) days later.  Under the circumstances and before your proceed any further with respect to Ms. DePrima, it is imperative that you contact Mr. Gavins at (347) 336-2109 to discuss this matter further.

I need not remind you of your obligation to pursue potentially exculpatory information and your further obligation to advise the defendant of same should you learn of such information.  In any event, I trust that you will take the necessary steps to investigate this matter further.

If you have any questions or require additional information, please do not hesitate to contact me.

Yours very truly,

Michael J. Ryan

MJR:df
C: Kim DePrima



# SOUTH BEACH PSYCHIATRIC CENTER
**777 Seaview Avenue**
**Staten Island, New York 10305-3409**
**Telephone (718) 667-2300   Fax (718) 667-2344**

ROSANNE GAYLOR, M.D.
Executive Director (Acting); Director Clinical Services

ALFREDO GRANADOS, Psy.D
Deputy Director Inpatient Operations

DOREEN PIAZZA,R.N.C.,M.S.
Director of Nursing

TITUS MATHEW, BE
Deputy Director Administration

KARIN WAGNER, Ph.D.
Deputy Director Community Services

NATALIE TOOMEY, LCSW, R.N.
Director Quality Management

INTIKHAB AHMAD, M.D
Director Psychiatry

RE: Kim Deprima
Date of Birth: 1/15/1971
Consecutive Number 214665

July 20, 2012

To Whom It May Concern,
  Ms. Kim Deprima was admitted to South Beach Psychiatric Center's South Richmond Outpatient Clinic on 2/28/12. Ms. Deprima stated on admission that her Chief Complaint and reason for seeking treatment was "To help with depression and anxiety. My guilt (regarding incident with dogs attacking elderly man) and self worth."

Ms. Deprima reports that since termination of her position with the Board Of Education she had become extremely depressed and sought psychiatric treatment for depression.

Ms. Deprima's admission diagnosis are as follows:
Axis I – Depressive Disorder Not otherwise specified
        Bipolar Disorder Not otherwise specified
        Adjustment Disorder with Depressed Mood
Axis II – No Diagnosis
Axis IV – Stressors- Economic Problems, Occupational Problems, Problems related to interaction with the legal system, Problems with primary support group.
Axis V – Global Assessment Functioning – Current 50.

Ms. Deprima is treated with individual psychotherapy sessions with primary therapist, Steven DiDonato Community Mental Health Nurse, sessions scheduled bi-weekly. Ms. Deprima is also treated with medications as prescribed by Dr. Prabhakaran, Rangaswamy, Primary Psychiatrist. Medications prescribed to alleviate feelings of depression, stabilization of mood and assist with sleep.

Present Medications:
Zoloft 50mg 1 tablet daily (anti-depressant)
Trazadone 50mg 1 tablet before sleep (to assist with sleep)
Klonopin 0.5mg as needed 1 tablet before sleep (anti-anxiety)
Lamictal 25mg daily (mood stabilizer)

If there are any further questions please contact me at 718-667-2855.

Sincerely,

Steven DiDonato R.N.
Community Mental Health Nurse